**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                    :
EDWARD RAMIREZ,                          :
                                                    :     CIVIL ACTION NO. 12-5803
                         Petitioner,             :     (habeas corpus)
                                                    :
            v.                                       :
                                                    :
JOHN E. WETZEL, Secretary, Pennsylvania :
Department of Corrections; MICHAEL      :
WENEROWICZ, Superintendent of the State :
Correctional Institution at Graterford,    :
                                                    :
                         Respondents.          :
                                                    :
                                                    :
_____

_____

**AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
**BY A PRISONER IN STATE CUSTODY**
_____

SUSAN M. LIN, ESQ.
Federal Community Defender Office
  for the Eastern District of Pennsylvania
The Curtis Center, Suite 540 West
Independence Square West
Philadelphia, PA 19106
215-928-1100
susan_lin@fd.org

Attorney for Edward Ramirez

Dated: May 31, 2013

# TABLE OF CONTENTS

PROCEDURAL HISTORY............................................................... 1

STATEMENT REGARDING EXHAUSTION........................................... 5

GROUNDS FOR RELIEF............................................................... 6

CLAIMS FOR RELIEF................................................................. 7

Claim I.      PETITIONER'S CONSTITUTIONAL RIGHTS TO CONFRONTATION AND DUE PROCESS WERE VIOLATED DUE TO PROSECUTORIAL MISCONDUCT WHERE THE COMMONWEALTH FAILED TO REVEAL THE EXISTENCE OF FINGERNAIL CLIPPINGS CONTAINING EXCULPATORY DNA EVIDENCE AND PRIOR STATEMENTS WHICH WOULD HAVE IMPEACHED THE COMMONWEALTH PRINCIPAL WITNESS; COUNSEL WAS INEFFECTIVE FOR FAILING TO ENSURE THIS EVIDENCE WAS PUT BEFORE THE JURY.. ....................................................... 7

       A.      Suppressed Fingernail Clippings Exculpatory DNA Evidence............... 7

       B.      Suppressed Inconsistent Statements by William Weihe. ................... 11

Claim II.     THE PROSECUTOR REPEATEDLY COMMENTED ON PETITIONER'S SILENCE AND ATTEMPTED TO SHIFT THE BURDEN OF PROOF TO THE PETITIONER THEREBY VIOLATING PETITIONER'S RIGHT TO REMAIN SILENT AND HIS PRESUMPTION OF INNOCENCE. COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AND PROPERLY PRESERVE THIS MERITORIOUS ISSUE.................................... 13

       A.      Petitioner's Right to Remain Silent Was Violated When the Prosecutor Repeatedly Introduced Evidence Of, and Referred To, Petitioner's Pre-arrest Silence.. ..... 13

       B.      Petitioner's Right to Remain Silent Was Violated When The Prosecutor Argued That His Post-arrest Silense Was Evidence of Guilt............................ 16

       C.      The Prosecution Violated Petitioner's Presumption of Innocence by Arguing That The Defense Should Have Presented Certain Evidence..................... 18

       D.      Individually and Cumulatively, the Prosecutor's Comments Constituted Prosecutorial Misconduct and Violated Mr. Ramirez's Due Process Rights, the Presumption of Innocence, and the Right to Remain Silent.............................. 19

       E.      Counsel Was Ineffective. ......................................... 20

i

Claim III.      THE TRIAL COURT JURY INSTRUCTIONS DIMINISHED THE PROSECUTOR'S BURDEN OF PROOF IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE AND PROPERLY PRESERVE THIS MERITORIOUS ISSUE.. . . . . . . . . . . . . . . . . . . . . . 20

     A.      The Trial Court Gave a Contradictory and Incorrect Jury Instruction that Diminished the Prosecutor's Burden of Proof by Allowing the Jury to Find Petitioner Guilty Without Ever Considering the Defense Evidence... . . . . . . . . . . . . . . . . . . . . . . 21

     B.      The Trial Court's Instructions Diminised The Prosecutor's Burden of Proof by Directly Stating and/or Implying That The State Had Proven Each Charge... . . . 22

     C.      Counsel Was Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Claim IV.      THE PROSECUTOR DELIBERATELY ELICITED TESTIMONY ABOUT UNRELATED OTHER BAD ACTS IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL; COUNSEL WAS INEFFECTIVE IN FAILING TO RAISE AND PROPERLY PRESERVE THIS MERITORIOUS ISSUE... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.      The Commonwealth Deliberately Elicited Inadmissible Evidence Concerning "Threatening" Letters Purportedly Received by a Prosecution Witness, and the Trial Court's Curative Instruction Improperly Vouched for the Credibility of That Witness, Denying Petitioner Due Process of Law... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     B.      The Prosecutor Deliberately Elicited Inadmissible Evidence that Petitioner had Previously Purchased Drugs Thereby Denying the Petitioner His Right to a Fair Trial Before an Impartial Jury... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Claim V.      TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT AN ADEQUATE INVESTIGATION AND TO CHALLENGE THE COMMONWEALTH'S CASE... . . . . . . . . . 29

     A.      Failure to Marshal Proof that Someone Else Committed the Murder. . . . . . . .    29

     B.      Failure to Impeach William Weihe with His Own Admissions that he Fabricated His Account... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     C.      Failure to Impeach Joey Maio with His Own Admissions that he Fabricated His Account... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     D.      Failure to Impeach Melanie Foreman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      E.      Failure to Challenge the Blood Evidence and Hair Evidence. . . . . . . . . . . . . . . . 35

Claim VI.      DUE PROCESS WAS VIOLATED WHEN THE PROSECUTION INTENTIONALLY SOLICITED DETECTIVE VIVARINA'S EXPRESSION OF HIS PERSONAL OPINION THAT HE BELIEVED THAT WILLIAM WEIHE WAS TELLING THE TRUTH.. . . . . . . . . . . . . . . . . . . . . . . 36

Claim VII.     THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED IN THIS PETITION DENIED PETITIONER DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL. 39

REQUEST FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                              :
EDWARD RAMIREZ,                               :
                                              :     CIVIL ACTION No. 12-5803
                        Petitioner,           :     (habeas corpus)
                                              :
             v.                               :
                                              :
JOHN E. WETZEL, Secretary, Pennsylvania       :
Department of Corrections; MICHAEL            :
WENEROWICZ, Superintendent of the State       :
Correctional Institution at Graterford,       :
                                              :
                        Respondents.          :
_____     :
                                              :

_____

**AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**
_____

Petitioner, EDWARD RAMIREZ, through undersigned counsel, files this petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

## PROCEDURAL HISTORY

1.      Edward Ramirez was arrested on July 4, 1996 and charged in Philadelphia, at

Information 9609-0391, O.T.N. M7076694, with capital murder, criminal conspiracy, robbery,

and possession of an instrument of crime.  Mr. Ramirez appeared in the Court of Common Pleas

_____

[1] All emphasis herein is supplied unless otherwise indicated.  Notes of testimony of court
proceedings will be cited as "NT" followed by the date and page number.  All other citations are
either self-explanatory or will be explained.

of Philadelphia County, and was tried before Judge Robert A. Latrone and a jury. On January 2, 1998, despite the absence of any physical evidence establishing that he was involved in this crime in any way, Mr. Ramirez was convicted of murder in the second degree, robbery and conspiracy. On March 11, 1998, he was sentenced to life in prison, without the possibility of parole.[2]

2.  From July 4, 1996 until July 24, 1996, Mr. Ramirez was represented by the Defender Association of Philadelphia. Mr. Ramirez then retained Jack McMahon, Esq. Mr. McMahon represented Mr. Ramirez at his preliminary hearing, at trial, on his direct appeal to the Superior Court, and on his Petition for Allowance of Appeal in the Supreme Court of Pennsylvania. The direct appeal from this conviction and sentence was captioned in the Superior Court of Pennsylvania as *Commonwealth v. Edward Ramirez*, at No. 1030 PHL 1998. The conviction was affirmed on June 5, 2000 at 760 A.2d 431 (Pa. Super. 2000). *See* Exhibit "T." The Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, *Commonwealth v. Edward Ramirez*, at No. 418 E.D. Alloc. Dkt. 2000, was denied on December 7, 2000, at 564 Pa. 707, 764 A.2d 1067 (2000).

3.  On April 16, 2001, Mr. Ramirez filed a *pro se* petition for post conviction collateral relief in the Philadelphia County Court of Common Pleas at CP 9610-0391, pursuant to 42 Pa. C.S. §9541 et seq., challenging the constitutionality of his conviction and sentence. The Defender Association of Philadelphia was appointed as counsel and filed a preliminary amended petition for post conviction collateral relief.

4.  Petitioner's petition pursuant to the Post-Conviction Relief Act (PCRA) was

---

[2]Judge Latrone's opinion is found at Exhibit "R."

originally assigned to Judge Richard Klein. Petitioner fought to have DNA testing performed on trace evidence recovered from decedent's hands; specifically, hair that was adhered to her hands and genetic material scraped from under her fingernails that had been clipped and preserved at the time of the original autopsy. On December 18, 2001, after DNA testing results came back inconclusive, Judge Klein denied counsel's request for further DNA testing.

5. On January 28, 2003, Petitioner filed his Amended PCRA filed a motion for further DNA testing. Subsequent DNA testing excluded Mr. Ramirez from being a contributor to the male genetic material that was scraped from underneath the decedent's fingernails. On June 2, 2004, Judge Peter Rogers announced his intention to dismiss Mr. Ramirez's PCRA. On June 4, 2004, Judge Rogers filed a Notice of Intent to Dismiss. On July 2, 2004, Judge Rogers rescinded the 907 Notice, and granted Petitioner an evidentiary hearing on the issue of ineffective assistance of counsel, but did not rule on whether he would allow an evidentiary hearing on the suppressed evidence claim, as well as the prosecutorial misconduct claim.

6. From January 3, 2005 through January 6, 2005, Judge Rogers heard testimony from Petitioner's trial counsel, Jack McMahon, as well as the testimony from defense witnesses who were available to testify at the time of trial, and were not investigated nor subpoenaed to testify. On March 8, 2005, Judge Rogers denied counsel's request for an evidentiary hearing on the issue of the suppressed evidence, determining that male DNA found under the decedent's fingernails was not exculpatory. He also denied relief on grounds of ineffective assistance of counsel based on what he had heard with regard to the failure to investigate and call witnesses. Judge Rogers continued the hearing so that he could call Dr. McDonald, the original coroner in this case, as a "court" witness he believed necessary to resolve any ineffectiveness claims.

3

7.     On April 22, 2005, Judge Rogers heard testimony from Dr. Gregory McDonald and the original prosecutor in the case, Mark Gilson.  Following their testimony, counsel for Mr. Ramirez made three motions: a) for further DNA testing on the untested hairs found on the back of the decedent's hand; b)  for further discovery, specifically, the Homicide Division's activity logs; and c) to reopen the hearing on after-discovered evidence by way of the testimony of Dr. Richard Saferstein, who PCRA counsel proferred would testify that the genetic material recovered from under the decedent's fingernails would be highly unlikely to have been deposited from incidental contact.  *See also* Exhibit "Q."  All three motions were denied.  At the conclusion of the hearing, Judge Rogers continued the matter to review the record and his notes before making a final decision.

8.     On January 27, 2006, Judge Rogers denied relief on all grounds and dismissed Mr. Ramirez's petition.[3]  A timely appeal followed.

9.     On July 6, 2009, the Superior Court issued its Memorandum Opinion in the case of *Commonwealth v. Ramirez*, No. 592 EDA 2006, attached as Exhibit "A." The Superior Court only ruled on one issue, ruling that Petitioner's assertion that trial counsel was ineffective for failing to object to the Commonwealth's illegal commentary on his post-arrest silence had arguable merit.  The Superior Court then declined to speculate on why trial counsel, Jack McMahon, Esquire, failed to object, and remanded the case for an evidentiary hearing on that issue alone.

10.    On February 25, 2010, pursuant to the Superior Court's remand order the Judge Rogers heard testimony from trial counsel, Mr. McMahon.  The only issue before the trial Court

---

[3]The Court's opinion is found at Appendix "D."

was whether or not Mr. McMahon had a strategy in failing to object to the Commonwealth's "highly inappropriate references to Appellant's post-arrest silence during closing argument." Superior Court Opinion, Exhibit "A" at 8. Mr. McMahon testified that he did not object because he did not feel that the prosecutor's comments were objectionable. On May 21, 2010, Judge Rogers issued an order dismissing Petitioner's PCRA, attached as Exhibit "B." On June 16, 2010, a timely appeal was filed.

11. On July 13, 2010, Judge Rogers, without ordering Petitioner to file a Rule 1925(b) statement of matters complained of, issued an Opinion, attached as Exhibit "C," in which he concluded that he had committed legal error in dismissing Petitioner's PCRA, and ruled that trial counsel had no legally recognizable strategy for failing to object to the prosecutor's illegal commentary, that the curative instruction given was insufficient, and that the PCRA petition should be granted, and a new trial ordered.

12. On July 26, 2010, Petitioner filed a Petition to Remand to the Lower Court to Enter an Order Consistent With the Opinion of the Lower Court. This petition was denied.

13. On August 30, 2011, a three-judge panel affirmed the dismissal of the PCRA but only addressed the issue of the prosecution's comments with respect to Mr. Ramirez's post-arrest silence. A petition for Panel Reconsideration or Argument *En Banc* was filed. On February 6, 2012, the Superior Court issued the Opinion denying relief. Petitioner sought allowance of appeal which was denied on August 22, 2012. Attached as Exhibit "U."

## STATEMENT REGARDING EXHAUSTION

14. Rule 5 of the Rules Governing § 2254 Cases places on the Commonwealth the burden of raising exhaustion-related issues in its answer to a habeas petition. <u>See</u> Rule 5 ("The

answer shall respond to the allegations of the petition.  In addition it shall state whether the petitioner has exhausted his state remedies"); *Cranberry v. Greer*, 481 U.S.  129, 134 (1987) (discussing Rule 5; "When the State answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available state remedies").

15.     While this burden is on the Commonwealth, Petitioner here notes that all of the claims raised in this Petition have been exhausted in the state court, either on direct appeal, in PCRA proceedings, or by the doctrine of futility.

16.     Finally, should this Court determine that, contrary to Petitioner's arguments, any of Petitioner's claims have not been exhausted, and that any further state court proceedings would be futile, Petitioner submits that any state bars that might preclude him from litigating them at this time in the state courts are not "adequate and independent" and, therefore, do not bar this Court from reviewing the merits of those claims.  Alternatively, Petitioner submits that he can satisfy the requirements of cause and prejudice, or demonstrate a miscarriage of justice, as to any such claim.  Thus, federal habeas review is appropriate.  However, because exhaustion and default are defenses that must be asserted by Respondents and can be waived, Petitioner reserves his right to respond to any such default and procedural bar arguments that Respondents may choose to assert.

**GROUNDS FOR RELIEF**

17.     By this Petition for a Writ of Habeas Corpus, Petitioner asserts that his convictions and sentences violate the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, for each of the reasons set forth herein.  To the extent the state court rendered decisions on the merits of any claims, those decisions are contrary to, and/or involve an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or are based on unreasonable determinations of facts in light of the evidence presented in the state court proceedings.

18.     This Petition sets forth the claims requiring habeas corpus relief and provides the factual basis supporting these claims.  As permitted by local Civil Rule 9.4, Petitioner herein files a fact petition.  Pursuant to that Rule, Petitioner will file a *Memorandum of Law* describing the standard of review to be applied to these claims, making legal argument supporting the claims for relief, and addressing the opinion of the state courts as to each claim raised.

## CLAIMS FOR RELIEF

**CLAIM I.**     **PETITIONER'S CONSTITUTIONAL RIGHTS TO CONFRONTATION AND DUE PROCESS WERE VIOLATED DUE TO  PROSECUTORIAL MISCONDUCT WHERE THE COMMONWEALTH FAILED TO REVEAL THE EXISTENCE OF FINGERNAIL CLIPPINGS CONTAINING EXCULPATORY DNA EVIDENCE AND PRIOR STATEMENTS WHICH WOULD HAVE IMPEACHED THE COMMONWEALTH PRINCIPAL WITNESS;  COUNSEL WAS INEFFECTIVE FOR FAILING TO ENSURE THIS EVIDENCE WAS PUT BEFORE THE JURY.**

19.     All allegations and facts set forth in the pending Petition are incorporated herein and should be deemed as if fully in the claims below.

20.     The prosecution engaged in deliberate misconduct and violated its duties under *Brady v. Maryland*, 373 U.S.  83 (1963) and *Napue v. Illinois*, 360 U.S.  264 (1959) by failing to disclose exculpatory DNA evidence and statements which would have impeached its chief witness.

**A.     Suppressed Fingernail Clippings Containing Exculpatory DNA Evidence**.

21.     When he conducted his post-mortem examination on February 20, 1995, Dr. Gregory McDonald of the Philadelphia Medical Examiner's Office clipped the decedent's

7

fingernails.  The nails were placed in a manila envelope and, to the best of Dr. McDonald's knowledge, were refrigerated.  He made no notation of this in his autopsy report.  Dr. McDonald also preserved hair that had been adhered to the back of the decedent's hands.  After the filing of the original PCRA, and the attempt to DNA test the hair, the existence of the fingernail scrapings came to light.

22.　　　Dr. McDonald met with the prosecutor assigned to this case twice.  At the evidentiary hearing on January 6, 2007, when Dr. McDonald was called to testify as a witness of the court, he did not remember the first meeting, and had a vague recollection of his trial preparation in the minutes before he testified.  Importantly, he did recall that he told the prosecutor that there was trace evidence still outstanding.  During his testimony, Mark Gilson recalled that conversation, however, he was more concerned with the questions that were arising during the course of the trial, rather than what still remained in the coroner's office.

23.　　　Mr. Gilson testified that he had no knowledge of any preserved fingernails.  During the course of the PCRA proceedings, the Report of Death, a form kept in the ordinary course of business at the Medical Examiner's Office came to light.  The form, attached as Exhibit "P", clearly states "Homicide sending MCDU for fingernail scrapings." The report was generated from the assigned homicide detective, Detective Hoffner.  Mr. Gilson may not have known about the fingernail clippings; Mr. McMahon clearly did not know about the clippings; however, there can be no question that homicide detectives knew.

24.　　　In 2001, Judge Klein ordered DNA testing on the trace evidence scraped from underneath the decedent's fingernails as well as the hair samples.  On October 30, 2002, Petitioner's counsel was notified by Cellmark that the laboratory had isolated male DNA from

the decedent's fingernail clippings, at one of four possible loci, through YSTR DNA testing. Comparison testing commenced, and eventually, Mr. Ramirez was excluded as the source for this male DNA.

25.     In 1995, Homicide Detective Hoffner made a Report of Death to the Medical Examiner's Office.  In that report, he specifically provided information to the coroner's office to preserve the fingernails for future scrapings for trace evidence.  The Report of Death is not part of discovery, rather it is an internal document created by the coroner's office for their own internal files.  However, Homicide Detective Hoffner was not only aware of the form, since he provided the information required for its completion, he was the one who actually ordered the preservation of the potential trace evidence.

26.     The Assistant District Attorney met with the medical examiner Dr. McDonald on two occasions, once at his office, and once minutes before he testified.  At the PCRA hearing, he testified he never had possession of the Report of Death, nor was he made aware of the preservation of this potentially exculpatory evidence.  Dr. McDonald specifically recalled a conversation in 1994, as he arrived in court, when he notified Mr. Gilson that "trace" evidence remained preserved at the office.  Petitioner did not become aware, nor could he have become aware, that these scrapings existed, until 2001, when he filed his first pro se PCRA, and subsequent counsel reopened the investigation into Mr. Ramirez's actual innocence.  Cellmark's results excluded Mr. Ramirez as the source of the male DNA found under the decedent's fingernails.

27.     A different verdict would be likely if the suppressed evidence was disclosed.  The PCRA court erred where it found that the DNA.  evidence was not exculpatory.  None of the

standards applicable to suppression of exculpatory evidence require Petitioner to demonstrate that previously unpresented evidence would have ruled out the possibility of guilt. Rather, the standard speaks to the reasonable likelihood that a different result would have obtained had the evidence been presented. Mr. Ramirez's proof is not a matter of speculation, but unchallenged science. The remarkable results of those tests – combined with the complete lack of physical evidence linking Petitioner to this crime – yield the inescapable conclusion that Mr. Ramirez was wrongfully convicted of this crime. This powerful physical evidence demonstrates that the decedent scratched an unknown male, the true perpetrator of this crime, not Mr. Ramirez. Had the jury heard this evidence, they would have trusted it rather than put their faith in an admitted liar who would say or do whatever he needed to do in order to save himself.

28. The PCRA court suggested that the DNA evidence was not compelling because it could have been the result of incidental casual contact. This is an assumption, with no basis in science. A host of independent forensic studies have demonstrated the probative value of fingernail-scrapings containing DNA in cases of violent crime. Most importantly, these studies reveal that when such material is detected, the DNA is not likely to be the result of casual contact with another individual during the course of normal daily activities. *See* A.R. Henderson et al., INST. OF ENVTL. SCI. & RESEARCH LTD., *Prevalence of Foreign DNA under Fingernails* (finding that the most likely source of foreign DNA under fingernails is "an individual with whom the donor has had intimate contact"). Henderson reported that out of 48 fingernail debris samples collected from laboratory and administration staff, only four samples contained foreign DNA. *Id.* The foreign DNA in all four of these samples came from the donors' consensual sexual partners. *Id.* None of the 48 subjects' fingernails contained DNA from casual contact

with another individual during the entire sampling period.  *Id.*

29.     By contrast, researchers have found DNA profiles from perpetrators of crime under the fingernails of victims in cases where - as here - a violent struggle occurred.  *See* S.A. Harbison *et al.*, *The Persistence of DNA Under Fingernails Following Submersion in Water*, INTL. CONGRESS SERIES 1230 (2003), at 813 (noting detection of perpetrator DNA under nails of one victim even after victim's submergence in water; and urging testing of fingernails in all cases of violent crime due to probative value); A. Piccinini et al., *A 5-Year Study on DNA Recovered from Fingernail Clippings in Homicide Cases in Milan*, INTL. CONGRESS SERIES 1239 (2003), at 931 ("[T]he routine collection of such kind of evidence should always be performed in violent crimes because of its great value both in exclusionary cases and in the reconstruction of the circumstances of a crime"); Kitty Lai *et al.*, INST. OF ENVTL. SCI. & RESEARCH LTD., *An Evaluation of the Routine DNA Analysis of Fingernail Debris in Forensic Casework* (finding DNA in 15% of 227 forensic cases studied, and concluding that "fingernail samples can be a significant source of forensic evidence"); *Genetic Analysis of Fingernail Debris: Application to Forensic Casework*, INTL. CONGRESS SERIES 1239 (2003), at 924 (same conclusion, upon study of fingernail DNA in 106 cases).

### B.     Suppressed Inconsistent Statements by William Weihe.

30.     The Commonwealth suppressed two inconsistent statements made by its chief witness, William Weihe  –  statements disclosed at trial but too late to effectively utilize –  which would have undermined Weihe's credibility.

31.     Mr. Weihe made a statement in the presence of his parents that was inconsistent with his trial testimony and from the statement to Detectives Vivarina and Snell.  A second

11

undisclosed statement was made in conjunction with a polygraph examination. Detective Vivarina turned this information over to the Commonwealth at the time of the preliminary hearing, over two years before the trial.

32.     The statements would have severely impeached Weihe's testimony, had they been disclosed in a timely manner. Weihe's credibility was already suspect. The evidence presented against Mr. Ramirez consisted of the word of his co-conspirator, William Weihe, who received an extremely lenient deal, avoiding death sentence and pleading instead to third degree murder, a charge that carried a sentence that would some day result in his freedom. His multiple accounts to police were already marred by inconsistencies and outright lies, including admissions that he fabricated evidence against another suspect.

33.     Ten days after the incident, Weihe gave a statement to the police denying his own involvement but implicating Mr. Ramirez and another friend, Mary Emmanuel, in this crime. Weihe said that after the statement was recorded, he told a homicide detective that it was a lie. He said that he talked to Mr. Ramirez and told him that he recanted his statement. A month later, Weihe gave a second statement to police, again implicating Mr. Ramirez, still not exonerating Mary Emmanuel, and still denying his own involvement. Several months later, he made a third statement to the police, now saying that he was involved in the crime as a lookout, but that Mr. Ramirez had killed the decedent. He testified that he pled guilty to third degree murder, had not been sentenced, but knew that he would not be subject to the death penalty or life imprisonment (NT 12/16/97, 126-150, 237-238). He admitted that he simply fabricated Mary Emmanuel's involvement in the crime, merely because he thought that implicating Mary somehow would shield himself (NT 12/16/97, 156-158).

34.     Had counsel been able to effectively utilize these statements, the jury would likely would have rejected Weihe's testimony altogether.

**CLAIM II.     THE PROSECUTOR REPEATEDLY COMMENTED ON PETITIONER'S SILENCE AND ATTEMPTED TO SHIFT THE BURDEN OF PROOF TO THE PETITIONER THEREBY VIOLATING PETITIONER'S RIGHT TO REMAIN SILENT AND HIS PRESUMPTION OF INNOCENCE. COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AND PROPERLY PRESERVE THIS MERITORIOUS ISSUE.**

35.     The claims and factual allegations set forth in all other sections of this petition are realleged as if set forth entirely herein.

36.     From the very opening of trial, and during his trial, and throughout his closing, the prosecutor repeatedly and relentlessly used Mr. Ramirez's constitutional right to remain silent as a weapon against him before the jury, shifting the burden to the defense. The references violated Petitioner's rights to pre- and post-arrest silence under state and federal law, and thus counsel was ineffective for failing to object.

**A.     Petitioner's Right to Remain Silent Was Violated When the Prosecutor Repeatedly Introduced Evidence Of, and Referred To, Petitioner's Pre-arrest Silence.**

37.     Throughout the trial, the prosecutor repeatedly commented on Mr. Ramirez's choice to remain silent and not speak with the police during their investigation. In the opening statement, the prosecutor said, "The police went to the Ramirez house three separate times. No one was home and they left messages *and no one called*." NT 12/11/97 at 53. Immediately after the prosecutor finished his opening statement and prior to the defense starting its opening statement, defense counsel objected to this statement at sidebar arguing that it was "an unfair comment about his right to remain silent." *Id*. at 58. Defense moved for a mistrial which the Court denied.

38.    Later, during direct testimony from a police detective, the prosecutor elicited

testimony that Mr. Ramirez did not respond to police efforts to speak with him:

> THE PROSECUTOR: During the initial investigation into this homicide, did you and other homicide detectives make efforts to contact and *speak with* an individual by the name of Edward Ramirez?
>
> THE DETECTIVE: Yes, sir.
>
> THE PROSECUTOR: *When were those efforts-when were those efforts made to contact Mr. Ramirez-and what exactly was done to try and speak with him?*
>
> THE DETECTIVE: February 24 of that year, 1995.
>
> THE PROSECUTOR: This is four days after the homicide?
>
> THE DETECTIVE: Yes, sir.  Detectives went to Mr. Ramirez's house.  There was no answer at the door.  *We left a card to contact the homicide division.  We were never contacted on that occasion.*
>
> THE PROSECUTOR: Do you recall what the address was of the house that Mr. Ramirez was living in?
>
> THE DETECTIVE: 4816 North Ninth.
>
> THE PROSECUTOR: *Did you receive any response to the card that was left?*
>
> THE DETECTIVE: *No, sir.*
>
> THE COURT: You said you left.  What do you mean by "left"?  What did you specifically do to leave it at the house?
>
> THE DETECTIVE: We left it in the mailbox, your honor.
>
> THE PROSECUTOR: Did you ever return to the house?
>
> THE DETECTIVE: Yes, sir.
>
> THE PROSECUTOR: When was that?

THE DETECTIVE: February 27, 1995.

THE PROSECUTOR: Was anyone home?

THE DETECTIVE: Again, no one was home.  Again a card was left to contact the homicide division as soon as possible.  *Again no one contacted our division.*

THE PROSECUTOR: Did you ever go any other times?

THE DETECTIVE: The following day detectives again went to the residence, left a card again.  Again there was no answer at the door.  Again a card was left.  And again, there was no response.

NT 12/16/97 at 61-63.  During this entire impermissible exchange regarding Mr. Ramirez's

silence, there was no defense objection.

39.     During closing argument, the prosecutor impermissibly argued that Edward

Ramirez's refusal to speak with the police during their investigation was evidence of guilt:

THE PROSECUTOR:  Immediately after this happened, when the police first got word that Ramirez and Weihe may have been involved, Ramirez had been over to the laundromat, what was it that they did, they tried to find him, they tried to find Edward Ramirez.  You remember, they stopped by his house on the 24th and the 27th of February and again on the 28th.  No one was ever home.  They left cards for them to call back.  Mr. Ramirez [petitioner's father], who is a retired police officer and investigator for a large defense firm and who has a lot of experience in this area and knows a lot of criminal justice system, never returned their phone calls.  He could not be found.  *Edward Ramirez, where was he, he was still living at his house.  If you're an innocent man and the police wanted to talk to you about something that you have no knowledge of-*

DEFENSE COUNSEL: Objection.

THE COURT:  Disregard this line of thought.  You don't know if anybody ever received notice as a fact.  There were cards left in the mailbox.  You don't know if anyone was home or whether they were actually received.

> THE PROSECUTOR: Well we do know that Ramirez's father
> called homicide. Now, what did he do, just call homicide out of
> the clear blue sky because there was a up in Frankford. He called -
> homicide, but he doesn't recall when that was. He eventually got
> around to calling homicide to see what it was they wanted and then
> when he received this information that they wanted to talk to his
> son about a homicide and robbery that occurred in Frankford. So,
> keep that in mind. *Where was Edward Ramirez when the police
> went to that house to try to find him, why wasn't there any
> cooperation.*

NT 12/29/97 at 143-145. When the defense at last made an objection, the trial court noted that

the line of thought was to be disregarded only because there was no proof that anyone *had*

received the police notices. This "curative" left the jury with the impression that, if the

detectives cards were received, the jury could indeed weigh against the Petitioner his pre-arrest

silence to the homicide detectives.

40.   The prosecutor went on to argue to the jury, with no defense objection, that

Petitioner's father would not have called homicide "out of the clear blue sky." Thus, the district

attorney capitalized on the court's faulty curative by providing the jury with "facts" that

purported to prove that the police communication *had* been received by Petitioner's father. He

then went on to argue that this very lack of communication was inconsistent with the actions of

an innocent man. NT 12/29/97 at 145. Defense counsel failed to object to this as well, and the

court did absolutely nothing to ensure that the jury did not use Petitioner's silence as evidence of

guilt.

### B.   Petitioner's Right to Remain Silent Was Violated When the Prosecutor Argued That His Post-arrest Silence Was Evidence of Guilt.

41.   The prosecutor further violated Petitioner's right to remain silent and the

presumption of innocence when he argued in closing that Petitioner's silence after he was

arrested was a "tacit admission" of his guilt:

> THE PROSECUTOR: They arrested Ramirez and they brought him down to the police station. He and Weihe are up in the same room together. What is Ramirez's reaction, according to Weihe? You have now been arrested and charged with robbery, and murder you have nothing to do with and you're a completely innocent man and the person who you think has caused you to be arrested is in the same room with you. What did Ramirez do? Did he confront Weihe and saying something to him? Did he speak-when you think a person would normally speak? No. He turns around in the cell and says to the guard, "You have to put me somewhere else." *When people accuse you of doing something you know you didn't do, do you turn around and walk away from them? Do you say nothing to them, even if it something minor in your life, you know, you ate the last piece of cake? No I didn't. You defend yourself. You confront your accuser. Ramirez said nothing.*

> In the law, there is something called tacit admission. An admission is what Weihe did on himself, she (sic) he spoke, he put it on himself and he said he wanted to tell. Sometimes not speaking when you should speak is as much of an admission when someone accuses you of doing something that you didn't do. You don't even defend yourself. Like when my wife came in and said, did you eat the last piece of cake, and I know I did, I don't bother to deny it because my tacit admission, my silence definitely says everything.

> Ramirez was in the same cell room with Billy Weihe he was getting arrested and charged with murder and he had that chance to [–]

> THE COURT: The concept of tacit admission in criminal law is not an acceptable one nor any reference to tacit admission in criminal law. It is not admissible evidence. Ignore the whole context in which he was going to make the statement he was about to make. It is not the law.

> THE PROSECUTOR: On the defense evidence in this case, the defense has no burden of proof. They don't have to put on any case at all. They don't have to call any witnesses. They can sit back and say nothing and do nothing because if you do. It's going to backfire and blow up, because when that happens, you may lie.

17

NT 12/29/97 at 148-150. The trial court attempted to cure only the Commonwealth's outrageous invention of a supposed legal principle of "tacit admission;" it never corrected the prosecutor or cautioned the jury that the defendant's silence was to play no part in their decision.

### C. The Prosecution Violated Petitioner's Presumption of Innocence by Arguing That the Defense Should Have Presented Certain Evidence.

42.     During his closing, the prosecutor argued that the defense should have presented certain evidence from Petitioner's father if Petitioner was actually innocent:

> THE PROSECUTOR: Mr. Ramirez [Petitioner's father], was 18 years of a police officer and is a private investigator for the largest criminal defense firm in Philadelphia supposedly has the clothes and boots and there is no evidence of any blood on those things. This is your son and you have a personal experience knowledge of the criminal justice system and investigation. *You have physical evidence that your son is not involved in any murder, or at least evidence which would indicate that he was not involved. What do you do with it? You would have to expect that Mr. Ramirez would come into this court room with the clothes, he says he checked them, where are they. They have no burden to prove anything to you, but if this was your child and you had that kind of experience wouldn't you be running with those clothes down to homicide and telling them, "here's the clothes-"*
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: You are given the impression that they have a burden of proof in this case. Disregard the context. They have a burden to prove nothing. You have to prove his guilt. They don't have to disprove his guilt.
>
> THE PROSECUTOR: I'm not saying that.
>
> THE COURT: You're holding them to a burden of proof or drawing an adverse inference by evidence that they are otherwise under a duty to present evidence. They have no burden to present evidence, so why should they infer any adverse inference from their failure to present it. Just get off it, let's move on.

THE PROSECUTOR: I am not suggesting - there is a certain expectation of cooperation as one would expect from the defendant's father during the investigation, not to prove anything during the investigation, but just to cooperate with the police in terms of turning over this evidence -

DEFENSE COUNSEL: Objection.

THE PROSECUTOR: This is not at trial.

THE COURT: But when you originally explain the context - Just disregard the argument.

THE PROSECUTOR: I am talking about during the investigation.

THE COURT: All right.

NT 12/29/97 at 162-164.

> **D.** **Individually and Cumulatively, the Prosecutor's Comments Constituted Prosecutorial Misconduct and Violated Mr. Ramirez's Due Process Rights, the Presumption of Innocence, and the Right to Remain Silent.**

43. In the instant case, the state sought a verdict based upon passion, prejudice, and speculation. The prosecutor made repeated, impermissible reference; in opening, in argument, and in the direct examination of the detective, to Mr. Ramirez's failure "cooperate" with the police investigation and at every turn throughout the trial the prosecutor intentionally and impermissibly commented on Mr. Ramirez's silence.

44. Individually, any of this prosecutorial commentary, if properly brought to the attention of the reviewing court, would be deemed to have violated Mr. Ramirez's constitutional rights to the point that a new trial would be the appropriate remedy. Cumulatively, their prejudicial effect is unmistakable and cannot be overstated. The Constitution requires that the prosecution prove a defendant's guilt beyond a reasonable doubt. Here, the state sought to place

a burden on the defense.  This compromised Mr. Ramirez's presumption of innocence, and

denied him fundamental due process, and the right to a fair trial before an impartial jury.

**E.     Counsel Was Ineffective**.

45.     Trial counsel failed to object to the prosecutor's argument regarding Mr.

Ramirez's post-arrest silence.  He also failed to object to the deficient curative instruction given

*sua sponte* by the trial court.  There was no reasonable basis for trial counsel's failure to object

and this failure constituted ineffective assistance of counsel.

46.     At an evidentiary hearing, trial counsel was asked why he failed to object to the

prosecutor's closing argument regarding Petitioner's post-arrest silence.  Trial counsel testified as

follows:

> Q:  So is it fair to say that you didn't object because you didn't
> find it objectionable?
>
> A.  Exactly.
>
> Q.  If you were to hear this testimony again, you would still find it
> not objectionable?
>
> A.  I would not object again.  I do not believe that's objectionable
> testimony.  In my opinion at the time - and I still stand by it in my
> opinion at the time, that was not objectionable testimony.  So that
> was my reason at the time.

NT 2/25/10 at 8.

47.     The prosecutor's improper reference to Petitioner's silence cost Petitioner any

semblance of a fair trial.  Where as here counsel failed to even pecieve the error, it cannot be said

any "strategy" was reasonable.

**CLAIM III.     THE TRIAL COURT JURY INSTRUCTIONS DIMINISHED THE PROSECUTOR'S
BURDEN OF PROOF IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS**

**OF LAW AND A FAIR TRIAL. TRIAL AND APPELLATE COUNSEL WERE
INEFFECTIVE IN FAILING TO RAISE AND PROPERLY PRESERVE THIS
MERITORIOUS ISSUE.**

48.     The claims and factual allegations set forth in all other sections of this petition are

realleged as if set forth entirely herein.

49.     The instructions permitted the jury to convict without even considering the

defense case and usurped the jury's fact-finding function in violation of Petitioner's right to due

process and trial by jury.

**A.      The Trial Court Gave a Contradictory and Incorrect Jury Instruction that
Diminished the Prosecutor's Burden of Proof by Allowing the Jury to Find
Petitioner Guilty Without Ever Considering the Defense Evidence.**

50.     After the prosecution rested, the defense presented five witnesses on behalf of

Mr. Ramirez.  The prosecution presented no rebuttal testimony.  During its charge, the trial court

erroneously instructed the jury as follows:

> In your deliberations, you can find a reasonable doubt of the
> defendant's guilt by appraising the defense evidence alone, the
> Commonwealth's evidence alone or the admixture or combination
> of the evidence presented on behalf of the prosecution and the
> defense.  *On the other hand, after evaluating the Commonwealth's
> evidence, and the Commonwealth's evidence alone, you can find
> that the evidence was sufficient to establish the defendant's guilt
> beyond a reasonable doubt* with respect to each and every element
> or each and every part of every charge for which the defendant
> stands accused here at trial.

NT 12/30/97 at 12.  The trial court erred in giving this contradictory and incorrect charge.  It

diminished the prosecutor's burden of proof by leaving the jury free to find Petitioner guilty

without ever considering the evidence that the defense presented.

51.     According to the instruction here, the jury never even had to reach the

defendant's evidence.  As long as a juror found the state's evidence initially persuasive, he or she could totally discount whatever the defense presented.  This unconstitutionally diminished the state's burden, and abridged Mr. Ramirez's right to present a defense to the charges against him.

**B.    The Trial Court's Instructions Diminished the Prosecutor's Burden of Proof by Directly Stating and/or Implying that the State had Proven Each Charge.**

52.    The trial court's instructions to the jury either directly stated or implied that the prosecution had proven the charges of conspiracy, felony murder, and robbery.  To Petitioner's prejudice, these instructions unconstitutionally diminished the prosecutor's burden of proof.  As a result, confidence in the outcome of this trial is undermined.

53.    The trial court's instruction regarding the testimony of William Weihe as an "undisputed accomplice" improperly vouched for Weihe's version of events and implied that a conspiracy had been established.

54.    The Commonwealth charged two people, Petitioner and Weihe, with this crime.  At trial, Weihe testified that he was involved as a "lookout" for a robbery and that the Petitioner alone killed the decedent.  The trial court instructed the jury that, when it weighed Weihe's credibility, it should consider the possibility of bias, due either to the fact of, or Weihe's hope for, special treatment by the prosecutor.  But the lower court directly followed that instruction with this:

> Now, the testimony of William Weihe presents the treatment of principles relevant to evaluating the testimony of an accomplice.
>
> What is an accomplice?  Well, an accomplice is one who knowingly and voluntarily cooperates or aids another in committing a crime....  You can match that legal definition to the relevant evidence in this case concerning what was testimony as to whether or not he participated in what took place at the

laundromat. I will not go into all of that. You recollect his participation.

In any event, William Weihe claims that he and the defendant committed the relevant crimes in this case together. Weihe has admitted his guilt. He's entered guilty pleas to certain charges, third degree murder, conspiracy and robbery. *Thus, at the present time, there is no dispute or conflict that Weihe, as a matter of law, is a witness who has the status of being a Commonwealth witness, who is an undisputed accomplice, and I have just given you that test.*

Thus, if the facts with respect to the participation of this witness and the crimes for which this defendant is on trial are clear and undisputed, a, the court, as a matter of law, instructs and charges you that that witness is an undisputed accomplice and that the following principles are to be applied by you as guidance in specifically weighing and evaluating such testimony of an undisputed accomplice.

Experience shows that after being caught in the commission of a crime, a person may falsely blame others because of some wicked or corrupt motive. On the other hand, such a person may well tell the truth about how he and other persons committed the crime together.

NT 12/30/97 at 29-31.

55.     Weihe was an "undisputed accomplice" only if the state's version of events was true. Moreover, the trial court went so far as to instruct the jury that "you recollect his participation." NT 12/30/97 at 29. This instruction's harm went beyond its interference with the jury's function as the sole fact finder. If, as the judge said, Weihe "participated" as an "undisputed accomplice," then by definition a conspiracy existed. Since the Petitioner was the only person other than Weihe who was charged with this crime -- which, unless you accepted Weihe's version, might have been committed by one person alone -- this "undisputed accomplice" instruction directly implicated Mr. Ramirez.

56.     The trial court further violated the jury's role as the sole fact finder by baldly telling the jury that the court believed the jury could "probably find" that the prosecution had proven the conspiracy charge.  The court instructed:

> Here, there was more than an attempt under the evidence, so we are
> not considering an attempted robbery or homicide under the facts
> of this case.  They are consummated crimes.
>
> The object of this conspiracy that's relevant to the evidence, and
> you can probably find it, I'm not finding it for you, you can apply
> the evidence and reach your own conclusions on the facts.  All that
> is required is that but one overt act done in pursuance of the
> conspiracy.

NT 12/30/97 at 46-47.

57.     After referring to "this conspiracy" and telling the jury that the panel "probably" could find "it," the court qualified its commentary.  But the court's expressed personal opinion already had usurped the jury's function, and no attempt was ever made to correct this harm.  Here again, too, since only Weihe and the Petitioner were charged with this crime, the trial court's commentary again implicated Mr. Ramirez.  And it again vouched for Weihe's disputed credibility, as there was "proof" of a conspiracy only if the jury believed what Weihe said.

58.     Beyond conspiracy, the court again usurped the jury's function when, concerning felony murder, the court instructed the jury that a robbery, a felony, had indeed occurred.  The court instructed:

> In fact, to make out a case of felony murder, it is not even
> necessary that the underlying felony be fully completed.  It is
> sufficient that the Commonwealth has proved beyond a reasonable
> doubt that there was an attempt to commit a robbery.  So, when I
> refer to the underlying felony of robbery throughout these

> instructions, you understand that they also could have included an
> attempted robbery. Evidently, under the facts, it would appear --
> well, you determine what it was. There was a robbery.

NT 12/30/97 at 73. With the Petitioner standing by himself before the court charged with

robbery, this instruction but certainly directed the jury to reach the same conclusion that the court

had.

59.     The court went on to say this:

> Second degree murder requires the presence of malice like all other
> degrees of murder, but in the context of felony murder in this
> instance you, as fact finders, can infer malice from the very fact
> that the defendant engaged along with an accomplice in the
> commission or attempted commission of the underlying felony
> dangerous to human life, such as robbery, which is one of the
> statutorily enumerated crimes.

NT 12/30/97 at 74. Alone, as well as in conjunction with the court's other cited instructions, this

affirmative, never-qualified and never-corrected statement of "fact" from the trial court

concerning Mr. Ramirez's supposed involvement constituted an instruction to the jury that the

prosecution had proven Mr. Ramirez's guilt.

60.     These cited jury instructions served to diminish the prosecution's burden of proof

in violation of Mr. Ramirez's due process rights.

**C.     Counsel Was Ineffective.**

61.     Trial counsel did not object to any portion of these jury instructions, NT

12/30/97, 86, nor seek curative or clarifying instructions. Counsel had no strategic basis for

failing to raise this meritorious claim.

62.     Counsel's prejudicially deficient performance in failing to raise these

meritorious issues under all available legal theories violated Petitioner's right to

25

effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments.

**CLAIM IV.** **THE PROSECUTOR DELIBERATELY ELICITED TESTIMONY ABOUT UNRELATED OTHER BAD ACTS IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL; COUNSEL WAS INEFFECTIVE IN FAILING TO RAISE AND PROPERLY PRESERVE THIS MERITORIOUS ISSUE.**

63. The claims and factual allegations set forth in all other sections of this petition are realleged as if set forth entirely herein.

64. The prosecutor deliberately elicited testimony about unrelated other bad acts. The highly prejudicial impact of such evidence requires an immediate, clear limiting instruction to ensure that the jury considers only relevant, competent evidence in reaching its verdict. Here, the failure to give the required instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (same).

**A.** **The Commonwealth Deliberately Elicited Inadmissible Evidence Concerning "Threatening" Letters Purportedly Received by a Prosecution Witness, and the Trial Court's Curative Instruction Improperly Vouched for the Credibility of That Witness, Denying Petitioner Due Process of Law.**

65. At trial, the prosecution presented William Weihe as the sole eyewitness to the crime. Weihe claimed that he acted as a "lookout" while Mr. Ramirez committed these crimes. During Weihe's testimony, the prosecutor directly solicited Weihe's claim that he had received "threatening" letters while Mr. Ramirez's case was pending, clearly seeking an inference that Petitioner was responsible. NT 12/16/97 at 242. Notwithstanding that he had knowingly and intentionally elicited this testimony, the prosecutor admitted during a sidebar conference that he knew of no connection between Mr. Ramirez and these supposed letters. NT 12/16/97 at 243, 245.

66. The "other crimes" evidence is patently inadmissible. The prosecutor knowingly implied to the jury that Mr. Ramirez was responsible for these threatening letters. The sole purpose of this questioning could have only been to unfairly and unlawfully prejudice the jury against Petitioner. By deliberately eliciting testimony that it knew was unproven and inadmissible, the Commonwealth wantonly violated Mr. Ramirez's due process rights.

67. Upon defense objection, the trial court acknowledged that this testimony was inadmissible, yet the "curative" instruction given only served to magnify the error. NT 12/16/97 at 254-257. The trial court deemed the letters as "threats to snuff out the inculpatory or to eliminate the inculpatory evidence that is coming from the mouth of the informant or the snitch" and declared that the threats to Weihe were "admittedly" made. NT 12/16/97 at 256. The effect was that the court's curative instruction vouched for the disputed credibility of this critical witness. All this was said to the jury by the trial court without there being a scintilla of evidence which supported Weihe's claim that he had been threatened.

68. There is at least a reasonable probability that the trial court's naked acceptance of Weihe's testimony, both here and elsewhere, played a role without which Mr. Ramirez would not have been convicted.

69. Defense counsel at trial made no objection to this "curative" instruction, nor when the trial court elsewhere vouched for this critical witness's testimony.

**B.      The Prosecutor Deliberately Elicited Inadmissible Evidence that Petitioner had Previously Purchased Drugs Thereby Denying the Petitioner His Right to a Fair Trial Before an Impartial Jury.**

70. At trial, the prosecution presented the testimony of Melanie Forman, a federally convicted drug dealer. Forman testified that she heard Mr. Ramirez admit to the charged crimes

the day after the crimes occurred.  During Forman's testimony, the prosecutor deliberately

elicited irrelevant, inflammatory, and highly prejudicial testimony that Mr. Ramirez, on

occasions remote in time from the date of this crime, had purchased drugs from her.  Once again,

this undermines confidence in the outcome of this trial.  The prosecutor elicited this irrelevant

but highly prejudicial testimony as follows:

> THE PROSECUTOR: Okay.  You can't tell us what Sara told you.
> But let me ask you this: do you know the defendant in this case
> Edward Ramirez?
>
> THE WITNESS: Pretty well.
>
> THE PROSECUTOR: Do you know him to go by a nickname?
>
> THE WITNESS: No.
>
> THE PROSECUTOR: Where do you know him from?
>
> THE WITNESS: Frankford.
>
> THE PROSECUTOR: And where did you meet him? How was it
> that you knew him?
>
> THE WITNESS: Buying drugs.
>
> THE PROSECUTOR: Had he bought drugs from you?
>
> THE WITNESS: Yes.
>
> THE PROSECUTOR: On that night that Sara Hurd was coming to
> your house to buy drugs, did Edward Ramirez ever come to your
> house to buy drugs?
>
> THE WITNESS: Yes.
>
> THE PROSECUTOR: When was that?
>
> DEFENSE COUNSEL: Objection.

NT 12/16/97 at 9-10. At sidebar, defense counsel argued that Forman "has testified that my client has on a regular basis purchased drugs from her. There's no probative value to that. It is merely to portray my client as a regular and frequent user of drugs. And that's not permissible. There's no possible reason to introduce that evidence." NT 12/16/97 at 11. The trial court overruled his objection. NT 12/16/97 at 19.

71.     Purported drug usage by the Petitioner at times other than the date of this crime, even if true, was obviously wholly irrelevant, and transparently had no probative value whatsoever. Eliciting this testimony served one purpose only, to make Mr. Ramirez appear to be a "bad guy" in the eyes of the jury deciding his fate. Introduction of this evidence surely subverted the truth-determining process here, and denied Mr. Ramirez his constitutional rights to due process, an impartial jury, and a fair trial.

**CLAIM V.     TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT AN ADEQUATE INVESTIGATION AND TO CHALLENGE THE COMMONWEALTH'S CASE.**

72.     Mr. Ramirez received ineffective assistance of counsel at all prior stages of this case. Counsel failed to investigate, develop and present evidence available to establish Mr. Ramirez's innocence, and failed to properly preserve and/or argue vital issues at trial and on appeal. Prior counsel's lack of stewardship was prejudicial to Mr. Ramirez because, individually and collectively, counsel's errors undermined confidence in this verdict – a verdict that placed Mr. Ramirez in prison for life at the age of nineteen.

**A.     Failure to Marshal Proof that Someone Else Committed the Murder.**

73.     On June 5, 1995, less than four months after this crime was committed, Detectives Snell and Vivarina showed Ms. Ann Thompson a photospread of possible suspects in this killing

(see Exhibit "K"). Ms. Thompson was a laundromat customer on the night of this murder. The police showed her this photospread so that she might identify a man who repeatedly entered and left the laundromat that night. His actions were so unusual, and the male seemed so threatening, that Ms. Thompson went to her car to get a knife for self-protection (Exhibit "L," statement of Ann Thompson, dated May 26, 1995).

74.    This photospread contained Mr. Ramirez's photograph. Ms. Thompson viewed the photospread and identified another person whom the police suspected of this crime, but not Mr. Ramirez, as looking "familiar." Ms. Thompson identified Patrick Oberholzer, a person who was known to the decedent. Significantly, Patrick Oberholzer was the brother of an early suspect in the crime, Kenneth Oberholzer. Kenneth was stopped and questioned by patrol officers, and admitted to them that he had been in the area of the laundromat on the night of the crime, "dusted out," and that he knew the decedent (Exhibit "M").

75.    Both Oberholtzer brother's have lengthy records. Kenneth Oberholzer was scratched on the night of the murder, consistent with a struggle with the decedent. As Patrick Oberholtzer was known to the decedent, she would have opened the door to the laundromat for him, also consistent with the known facts. The discovery revealed another connection; at least one of the Oberholtzers was selling drugs for Melanie Forman, one of the prosecution's main witnesses.

76.    Jack McMahon did not offer a *reasonable* strategy for failing to elicit this evidence or conduct further investigation. He failed to recognize that a defendant has a right to present exculpatory evidence, even in the face of state rules that otherwise impose limits. NT 1/5/05 at 101-02. Mr. McMahon expressed a fanciful fear that Ms. Thompson would identify

Mr. Ramirez if she saw him in person, one completely belied by the facts; the photospread contained Mr. Ramirez's photograph and Thompson made no identification at that time, instead picking out Oberholtzer. At the PCRA hearing, Ms. Thompson could not have been more clear. She did not know Eddie Ramirez, had never seen him before, and he was not the man she saw.

**B.     Failure to Impeach William Weihe with His Own Admissions that he Fabricated His Account.**

77.     William Weihe admitted to Mary Emanuel (the same women he admittedly falsely accused, NT 12/16/97 at 156-158) that he fabricated his account implicating Petitioner.

> MARY EMANUEL:     [Weihe] said, look, I just confessed because I was scared. But then he did tell them, look, Eddie didn't do this. I just wanted to get out of here. I was scared. You know.
>
> THE COURT:     That's what he told you?
>
> THE WITNESS:     Yes. And I am under oath. I swear to that. Yes.

NT 1/5/2005 at 67. Jack McMahon acknowledged he was aware of this highly relevant impeachment evidence yet failed to confront Weihe with this inconsistency or call Emanual to impeach Weihe's crucial account. NT 1/3/2005 at 136-40.

78.     There was no conceivable reason not to call Mary Emanuel at least for the purpose of impeaching the credibility of William Weihe. As Ms. Emanuel testified at the PCRA hearing, Mr. Weihe told her in no uncertain terms that he had fabricated his account of the incident. Ms. Emanuel also painted a clear picture of the tactics employed by the homicide detectives in this case. Indeed, she testified that they employed such pressure on her, that she herself nearly accused Mr. Ramirez of the crime.

**C.     Failure to Impeach Joey Maio with His Own Admissions that he Fabricated His Account.**

79.     Three witnesses were known and available to defense counsel to impeach Mr.

Maio.  He admitted to Billie Jo Blood, Sabrina Suarez, and Sabrina's mother, Maureen Suarez,

that his statement implicating Petitioner was false, and that he knew that Mr. Ramirez did not

commit this crime.  Each of these witnesses was available to testify not only to Maio's statement,

but also to his evident distress at having falsely implicated Mr. Ramirez.  Sabrina Suarez also

was available to testify that Maio told her that he was being pressured to implicate Mr. Ramirez.

More specifically, Billie Jo Blood was available to testify that Maio told her that the police said

that they would charge Maio with a prior stabbing, of a Timmy King, unless he implicated Mr.

Ramirez in the murder of Joyce Dennis.

80.     Maio was a crucial Commonwealth witness.  He said that on February 19, 1995 he

went to a party at a Sara Hurd's house. At some point, Petitioner arrived with Weihe.  Maio

claimed that Ramirez admitted that he had "hit" a lady at the laundromat. NT 12/12/97, 79-89.

Although there was no evidence that the laundromat's change machines had been broken into,

nor that there otherwise was some other repository of change that could have been stolen there,

Maio said that he remembered that both of Mr. Ramirez's pants pockets were "loaded with

change" NT  12/12/97, 136.

81.     Mr. McMahon also acknowledged that Joey Maio was a very compelling witness

for the prosecution, and yet he did nothing to investigate Mr. Maio's allegations that Mr.

Ramirez confessed to him, nor any motive Mr. Maio would have had to lie.  Mr. McMahon did

admit that he had talked to Billy Jo Blood about Mr. Maio, citing concerns about her credibility.

The after-the-fact rationalization cannot be deemed reasonable in the context of this case, as

multiple other witnesses corroborated her account, and the Commownealth's entire case was

likewise saddled with credibility concerns.

82.     This evidence would have exposed to the jury a powerful motive –  always a relevant and important consideration for the factfinder – for Maio's admittedly false testimony against Mr. Ramirez.  Though it would have cast strong doubt upon both the state's version of events and the quality of its witnesses, none of this available evidence was presented.

**D.     Failure to Impeach Melanie Foreman**.

83.     Melanie Forman was an admitted drug dealer with ongoing contacts with state and federal authorities.  She had clearly received some type of favorable treatment in the form of leniency in some cases and dismissal of charges in others.  See Exhibit "O." She also had a drug association with the Oberholzer brothers, one of whom was an early suspect, which would have given her a motive to lie by diverting suspicion from her drug organization.

84.     The murder of Ms. Dennis occurred sometime between 11:30 p.m.  and 2:30 a.m. on February 19-20, 1995.  It was not until May 1, 1996 that Melanie Forman gave a statement to homicide detectives implicating Petitioner, NT 12/16/97 at 27-28, 44, and gave that statement only after she had been arrested for a federal gun charge.  *See* Exhibit "N", Government's Sentencing Memorandum.

85.     Two weeks after she gave that statement, her open state drug trafficking charges were withdrawn and adopted by the federal government resulting in Ms. Forman facing two federal drug trafficking charges and one federal gun charge.  NT 12/16/97 at 46; Gov't Sent Memo.  For all of her federal charges she was facing a mandatory minimum of five years and a maximum sentence of 50 years in prison.  *Id.*

86.     After she gave that statement to homicide detectives, she was able to plead guilty

on June 17, 1996, to all of her pending criminal charges pursuant to a cooperation plea agreement. *See* Exhibit "N." The only way to earn such a cooperation plea agreement is to assist in the investigation and prosecution of others. Such a cooperation plea agreement was also the only manner in which Forman would be able to receive a sentence below the five-year mandatory minimum that she was facing. According to the standard cooperation plea agreement offered by the United States Attorney's Office, a cooperating defendant is obligated to continue cooperating with authorities, including testifying at hearings if requested, even after she has been sentenced.

87. As a result of her statement to homicide detectives, which helped her earn a cooperation plea agreement as well as her cooperation in other matters, Forman ultimately received a sentence of 18 months imprisonment followed by three years supervised release. This was far less than the mandatory minimum sentence of five years imprisonment that she was originally facing.

88. At the time of the trial, Forman was still on federal supervised release. Under the terms of her plea agreement, she was obligated to testify upon request and she knew she had to testify consistently with her statement of May 1996 that she had given to homicide detectives.

89. The impeachment evidence against Ms. Forman again would have cast strong doubt upon the state's version of events and the quality of its witnesses. The jury certainly should have been afforded the opportunity to gauge all of this information in determining whether Forman had a pro-prosecution bias and a motive to testify falsely in this case. It is "reasonably probable" that jurors would have determined that Forman's testimony was completely untrustworthy, knowing her cooperation with federal authorities was designed save herself from a lengthy jail sentence. Here again, McMahon was ineffective in failing to apprise

34

the jury of this vital and available defense evidence.

90.    As a cooperating defendant in her own prosecutions, she would have had a motive to curry favor with the authorities by "assisting" in other prosecutions as well.  And, had Mr. McMahon done any investigation into the connection between the Oberholzer brothers and Melanie Forman, it would also be reasonable that she would accuse Eddie Ramirez of this crime to shield one of her "employees" in her drug business.

### E.    Failure to Challenge the Blood Evidence and Hair Evidence.

91.    Not only was Mr. McMahon's performance deficient in failing to investigate other suspects and failing to present impeachment in the form of readily available witnesses, his reading of the provided discovery was wanting as it related to potential physical evidence. Clearly, the police thought there was a struggle.  Putting that together with all of the blood found at the scene, Mr. McMahon should not have blindly stipulated to the blood evidence as being a generic "A" positive - that of the victim.  There was potentially a mix of blood samples, and Mr. McMahon completely ignored that evidence.

92.    Mr. McMahon was a former homicide assistant district attorney.  There is no chance that he did not know of the existence of Report of Death for Ms. Dennis.  They are routinely created in the medical examiner's office, and as a prosecutor, he routinely met with the coroner.  He did not obtain the Report of Death here, not because he was unaware of his existence, but because he was unprepared.  The same holds true for the hair found at the scene, adhered to the victim's hands.  This information was not "buried" in discovery, but plain as day in the autopsy report.  All Mr. McMahon had to do was read the report with some level of scrutiny.  While the one hair that was tested came back as a match to the decedent, that does not

foreclose a finding of ineffectiveness on his failure to request, obtain and test those samples. Other hairs remain untested. This was a struggle. She had a mixture of DNA under her fingernails. It is reasonable to think that there may be a mixture of hair samples on her hand.

93.　　Individually as well as in combination with defense counsel's other failings, this ineffectiveness entitles Mr. Ramirez to a new trial under federal and state constitutional law, and under state PCRA law. Counsel's ineffectiveness, here as elsewhere, so undermined the truth-determining process that no reliable adjudication of guilt could have taken place.

**CLAIM VI.　　DUE PROCESS WAS VIOLATED WHEN THE PROSECUTION INTENTIONALLY SOLICITED DETECTIVE VIVARINA'S EXPRESSION OF HIS PERSONAL OPINION THAT HE BELIEVED THAT WILLIAM WEIHE WAS TELLING THE TRUTH.**

94.　　William Weihe was the Commonwealth's principal witness. Due process was violated when the prosecution intentionally solicited the investigating detective's expression of his personal opinion that he believed that William Weihe was telling the truth. Any curative instruction was insufficient to cure the taint.

95.　　The defense recalled one of the Commonwealth's witnesses, Detective Vivarina to the witness stand. During the Commonwealth's cross-examination, the following testimony was elicited:

Q. [By the prosecutor]: You brought Weihe down on April 11th, 1995:

A. Yes. I had more information and I wanted to talk to him again.

Q. But you did not interview him; correct?

A. Out of an abundance of caution, we had two other detectives interview Mr. Weihe.

Q. You took the first statement from him and established sort of rapport with him at that time; correct?

A.  Yes, sir.

Q.  When you brought him down on April 11th, 1995, you were there and Detective Snell was there, your partner; correct?

A.  Yes, sir.

Q.  But you turned over that interview to some other detectives.  Why did you do that?

A.  As I said, as an abundance of caution, we asked two other detectives, Detectives Gross and Worrell to interview Mr. Weihe to get their feeling as to whether he was actually lying or not.  On the first statement we did, as I said earlier, I had the gut feeling that he was lying and we wanted two other detectives to talk to him and maybe get the same feel or whatever.  They took the interview and talked to Mr. Weihe and took the interview.  [sic]

Q.  Now, after April 11th, 1995 and that statement, Weihe was interviewed for the last time in July of 1996; correct?

A.  Yes, sir.

Q.  And it was at that interview in which he implicated himself; correct?

A.  Yes, sir.

Q.  After that interview was completed, do you remember having Weihe's mother and other members of his family brought to the homicide division?

A.  Yes, sir.

Q.  What was the purpose of that?

A.  They were in homicide and during the end of the interview, they showed up.  I informed Mr. Weihe that his parents were there and that they were concerned about him.  I informed his parents that he was being arrested for the murder of Joyce Dennis and he asked if he could talk to his parents.  I said sure.  I was somewhat concerned.  I had a feeling that if I brought the parents in, I would get the truth and --

Q.  Did you want a confrontation between Mr. Weihe and his parents?

A.  Yes, sir.  I brought the parents into the room.  I asked Billy Weihe to explain

to his parents what happened. He sort of broke down and got a little emotional and told his parents the whole truth of how he· was involved in the murder of Joyce Dennis, exactly the way the statement read, and he explained in detail what happened. They broke down, the parents broke down. They hugged and they kissed. *I was thoroughly convinced that he had told the truth*.
[By defense counsel]: Objection and move to strike. May we see you at side bar or in the back?

NT Trial, 12/18/97, at 46-49.

96.     The court agreed that Detective Vivarina's opinion about the truth of William

Weihe's statement should have not been elicited by the Commonwealth. Rather than grant the

requested mistrial, the court issued a curative instruction,[4] but the damage was irreparable. The

jury already heard Detective Vivarina's comments and was tainted by them.

97.     Detective Vivarina's vouching for the truthfulness of William Weihe profoundly

impacted the jury's decision to find Mr. Ramirez guilty. Detective Ramirez was the Philadelphia

police detective who was the lead detective assigned to the investigation. The jury should have

been permitted to draw its own opinion regarding the credibility of William Weihe's final

statement. Instead, Detective Vivarina was permitted to reach a such a conclusion.

---

[4]The court instructed:

You determine what's the truth in this case. Don't be in any way affected by his opinion as to whether he was telling the truth or not.

***

Ladies and Gentlemen, just obliterate from your minds whathe believes or does not believe. You strike it out of your minds. You determine whether you believe all, part or none of that testimony from this witness at trial. That's the way it works. You determine believability and credibility and nobody's opinion. What they think, what they believe and what they feel about it and whether or not they believe him ain't important in any degree at all. Ignore it.

NT Trial, 12/18/97, 49, 57-58

**VII.  THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED IN THIS PETITION DENIED PETITIONER DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL.**

98.     All allegations and facts set forth in the pending Petition are incorporated herein and should be deemed as if fully set forth in the claims set forth below.

99.     Each of the claims contained herein provides Petitioner with a basis for relief from his conviction and sentence.  Should this Court find that Petitioner is not entitled to relief based on any single claim because he has failed to show the prejudicial effect of a single error, he is entitled to relief because of the cumulative prejudicial effect of all of the errors set forth in this Petition.  As described herein, Petitioner has identified a pervasive pattern of errors by trial and appellate counsel, the prosecutor, and the trial court.  Collectively, these claims of error denied Petitioner his state and federal constitutional rights to due process and the effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments.

## REQUEST FOR RELIEF

For all of the above reasons, and based upon the full record of this matter, Petitioner requests that, once Petitioner's Memorandum of Law is filed, that the Court provide the following relief:

A)    That Petitioner be granted such discovery that is necessary for full and fair resolution of the claims contained in this Petition;

B)    That leave to amend this Petition, if necessary, be granted;

C)    That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D)    That Respondents be Ordered to respond to this Petition;

E)    That Petitioner be Permitted to file a Reply Memorandum; and

F)      That Petitioner's convictions and sentences be vacated, and a new trial and
        sentencing be ordered.

                                        Respectfully Submitted,


                                        _/s/ Susan M. Lin_____
                                        Susan M. Lin
                                        Federal Community Defender Office
                                          for the Eastern District of Pennsylvania
                                        The Curtis Center, Suite 540 West
                                        Independence Square West
                                        Philadelphia, PA 19106
                                        215-928-1100

                                        Attorneys for Edward Ramirez

Dated: May 31, 2013

**CERTIFICATE OF SERVICE**


I, Susan M. Lin, hereby certify that on this date, I caused the foregoing to be served on the

following people at the location and in the manner indicated below:

**VIA ELECTRONIC FILING NOTICE AND FIRST CLASS MAIL**


Jennifer Andress, Esquire
Office of the Philadelphia District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499


*/s/Susan M. Lin*
Susan M. Lin

Dated: May 31, 2013