IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD RAMIREZ              :        CIVIL ACTION
                          :
     v.                  :
                          :
DAVID DiGUGLIELMO, et al.     :        NO. 12-5803

## REPORT AND RECOMMENDATION

M. FAITH ANGELL                          May 12, 2014
UNITED STATES MAGISTRATE JUDGE

Presently before this Court is a counseled Petition for Writ of Habeas Corpus filed, pursuant to 28 U.S.C. §2254, by a state prisoner. Petitioner Edward Ramirez is currently incarcerated at SCI-Graterford in Graterford, Pennsylvania, where he is serving a term of imprisonment for second degree murder, robbery and criminal conspiracy. For the reasons which follow, it is recommended that Mr. Ramirez's habeas claims be denied and dismissed without an evidentiary hearing.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

The background of this matter was set forth by the Court of Common Pleas of Philadelphia County as follows:

On the evening of February 19, 1995, the [petitioner] and several friends were engaged in a bout of drinking and drugs that culminated with some of them going to a "wild party" in the Frankford section of Philadelphia while the [petitioner] and his co-defendant (Billy Weihe) stopped by another friend's house in Frankford. While at the house, the [petitioner] walked across the street to the Fabric Care Center Laundromat to buy a soda. When he returned to the house, he informed his friends that he had met two girls at the Laundromat who had given him their telephone numbers. They then all went into the basement of the house where they smoked more marijuana cigarettes and watched a movie.

---

[1] In preparing this Report and Recommendation, I have reviewed the following documents: Mr. Ramirez's *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody; the Commonwealth's Response; Petitioner's counseled amended petition for a writ of habeas corpus, inclusive of all exhibits and appendices thereto; Mr. Ramirez's memorandum of law in support of his petition and his supplemental appendix to his amended petition; the Commonwealth's Response, with exhibits; Petitioner's reply to the Commonwealth's response, and the state court record.

At some point, the co-defendant decided to leave, and one of the people in the basement offered to give him a ride home. The [petitioner] accompanied him back to his house, and the two of them stayed there a short while. They then decided to go back to the house where they had watched the movie, and they both walked back to that house. As they approached the house, the [petitioner] told his co-defendant that he needed money and that he was going to rob the laundromat across the street from his friend's house. The co-defendant tried to talk him out of it, but was not successful. In fact, the [petitioner] was able to get the co-defendant to agree to be his "lookout" while he robbed the laundromat.

The [petitioner] walked into the laundromat, and the co-defendant followed him inside and sat on a table. The only other person inside of the place at that time was the decedent, Joyce Dennis, who was the attendant there. The [petitioner] approached Ms. Dennis from behind, grabbed her arm, and screamed at her to give him money. When she panicked and froze, the [petitioner] again demanded the money she had collected for the business. When she did not reply again, he picked up what later was identified as a three-foot section of metal pipe and struck her on the head. She fell to her knees begging for mercy, but the [petitioner] followed her as she tried to get to the rear of the premises. At that point, the co-defendant turned and walked out of the laundromat. He testified that the last time he saw the decedent, the [petitioner] was standing over her.

Shortly thereafter, the co-defendant returned to the laundromat and was walking back into it as the [petitioner] was coming out. The [petitioner] came outside and told him that they needed to go, and the two of them began to run down a nearby street. Along the way, they met up with one of the friends that they were with earlier in the day. That friend, Thomas "T.A." Dennis, suggested that they return to the "wild party" that he had attended that afternoon, and the two of them agreed to accompany him.

On the way to the party, the [petitioner] offered his co-defendant some of the proceeds from the robbery, but he declined. He also asked Mr. Dennis if he had money to buy some "angel dust" or PCP, but Mr. Dennis said that he did not have any money. Once they arrived at the party, the [petitioner] told everyone there that "we just got paid" as he patted his bulging pants pockets. He then directed his friends to contact a person, Melanie Forman, who could supply them with the PCP. The [petitioner] left the house, and met with her later that night and purchased a large amount of drugs from her.

The [petitioner] and his friend returned to the house where the party was going on, and they all began to smoke PCP inside the kitchen. Thomas Dennis then asked the [petitioner] where he had gotten all the money that he had to buy drugs. The [petitioner] proceeded to tell everyone in attendance that he had robbed the attendant at the laundromat, and that he had hit her after she refused to comply with his initial demands for money.

The decedent was discovered in the laundromat by her husband later on that morning. Upon his seeing fresh blood inside of the laundromat, he alerted a police officer who entered the premises and kicked in the locked door of the laundromat office. The police officer discovered the body of Ms. Dennis lying face down on the floor with her head surrounded by a large pool of

blood. He also noticed a bloodstained, three-foot section of metal pipe near her body. The owner of the laundromat arrived at the premises later that day and determined that at least eight hundred dollars was missing from the business.

A post-mortem examination was conducted on the body of the decedent on that same day. The assistant medical examiner concluded that she had died as a result of multiple blunt force injuries to her head. He counted nine distinct impact sites on her skull that resulted in numerous fractures that caused lacerations and bleeding directly to her brain. He also testified that she sustained a large number of injuries to her hands and fingers that were "defensive wounds" that probably occurred while she was lying face-down on the floor with her hands covering the back of her head.

The day after the murder, Melanie Forman heard a media account of the homicide that had occurred inside of the laundromat. She went to the house where the [petitioner] and his friends were still together and ingesting PCP, and asked him directly if he was the person who had robbed the decedent. He admitted to her, Thomas Dennis, and the owner of the house, Sara Hurd, that he had done it, and that he was forced to hit her when she refused to cooperate.

Later that same week, the [petitioner] admitted his role in the murder to another man, Luis Rivera, who was visiting the house where the "wild party" had taken place earlier that week. In that instance, the [petitioner] actually approached Mr. Rivera and asked him if he had heard about the "laundromat murder". When the man told him that he had not heard about it, the [petitioner] said, "Well, me and Billy Weihe did a stickup and we hurt the lady and she died." Thereafter, Mr. Rivera confronted the [petitioner] about the fact that the police had contacted him about the murder, and the [petitioner] assured him that he did not need to "worry about it".

In June of 1996, more than a year after the murder, Billy Maio gave one of many statements he made to the homicide detectives who were investigating this case. At that time, he told them that the [petitioner] had admitted to killing the decedent shortly after the murder took place while they were all talking at the house where the original "wild party" had taken place.

Sometime during the following month, Billy Weihe was arrested on an unrelated charge, and during his questioning he finally recounted his role as a lookout during the fatal robbery. He also detailed how the [petitioner] had entered the laundromat, and robbed and murdered Joyce Dennis. As a result of this information, the [petitioner] was finally arrested on July 4, 1996. Mr. Weihe eventually pleaded guilty to third-degree murder, robbery, and conspiracy, and testified against Mr. Ramirez at his trial. Joey Maio also testified against the [petitioner] and told the jury how the [petitioner] had admitted his role in the fatal crime after he and Mr. Weihe arrived at the house "flush with cash" immediately after the murder of Ms. Dennis. The [petitioner] elected not to testify at his trial, though he did offer witness testimony on his behalf.

*Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 3-9 (C.C.P.

Philadelphia County, May 3, 2007); Amended Petition for a Writ of Habeas Corpus by a

Prisoner in State Custody,[2] Appendix, Exhibit D, Document 14-1 at 47-53. Following a jury trial before the Honorable Robert A. Latrone, Mr. Ramirez was found guilty of second-degree murder, robbery and criminal conspiracy. "On the murder conviction, he was sentenced to the mandatory term of life imprisonment on March 11, 1998. There was no further penalty on the robbery conviction, but he was sentenced to a concurrent term of four to eight years' imprisonment on the conviction for conspiracy." *Commonwealth v. Ramirez,* September Term, 1996, No. 0391 2/2, slip op. at 1 (C.C.P. Philadelphia County, May 3, 2007); Amended Petition, Appendix, Exhibit D, Document 14-1 at 45.

Mr. Ramirez filed no post-sentencing motions, but he did lodge a timely notice of appeal. He raised the following issues for the court's consideration:

1. Whether the trial court committed reversible error when it admitted evidence of [Petitioner] taking drugs eight hours prior to the incident.

2. Whether the trial court committed reversible error when it admitted other crimes evidence of [Petitioner's] prior drug purchases.

3. Whether the trial court committed reversible error when it allowed the witness, William Weihe to testify regarding a threatening letter that he received.

4. Whether the trial court committed reversible error when it allowed Detective Vivarina to express his personal opinion that he believed that William Weihe was telling the truth.

5. Whether the Commonwealth was in violation of the rules of discovery when it turned over statements of William Weihe to defense counsel which contained a recantation of his prior statement against [Petitioner] after William Weihe had been cross-examined by defense counsel.

6. Whether the Commonwealth's statement that "there was no cooperation from the [petitioner] after he was contacted by homicide["] in his closing argument contained improper and inflammatory statements and constituted an impermissible comment on the [Petitioner's] burden of proof and his fifth Amendment Right to Remain Silent.

---

[2] Hereinafter "Amended Petition".

*Commonwealth v. Ramirez*, No. 1030 Philadelphia 1998, slip op. at 3 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 66; [Amended] Response to Petition for Writ of Habeas Corpus,[3] Document No. 27-2 at 3. Judgment of sentence was affirmed on June 5, 2000. *See Commonwealth v. Ramirez*, 760 A.2d 431 (Pa.Super. 2000) (Table). The Supreme Court of Pennsylvania denied *allocator* on December 7, 2000. *See Commonwealth v. Ramirez*, 764 A.2d 1067 (Pa. 2000) (Table).

On April 16, 2001, Mr. Ramirez filed a timely *pro se* petition for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa.C.S. §9541, *et seq.* As explained by the PCRA court,

The [petitioner] then exercised his rights to a collateral attack on his conviction and the ensuing judgment of sentence by way of a *pro se* petition through the Post Conviction Relief Act ("PCRA"). In that petition, he raised a multitude of issues that he alleged entitled him to appellate relief. The amended petition that was filed by his PCRA counsel on May 11, 2001, listed no less than ten grounds upon which he sought relief, and some of them were essentially repeated as both substantive and "ineffective assistance of counsel" claims.

After the [petitioner's] trial, it was discovered that the medical examiner's office had in their possession fingernail clippings from the decedent as well as hair that had been found on her hands. During the course of the PCRA proceedings, the [petitioner] petitioned the court to do DNA testing on these items. This petition was heard by the Honorable Richard B. Klein, and he ordered that testing on the fingernails and hair be done in 2001. The tests revealed that there was some tissue on the fingernails that did not belong to the [petitioner], and that the hair was actually from the decedent's head. At a hearing before Judge Klein on December 18, 2001, the PCRA court summarized the results of the DNA testing, and specifically denied the [petitioner's] request to do any further DNA testing on any of the evidentiary items in question. Judge Klein held that any further testing would be of no value inasmuch as the results could not conceivably exonerate the [petitioner].

On September 23, 2003, [petitioner's] appointed counsel filed yet another "addendum" to the original amended PCRA petition. It repeated and re-argued the same points, but it also contended that the DNA findings were "exculpatory" and that the trial prosecutor's conduct was so egregious that the Commonwealth should be barred from ever trying the [petitioner] again. The Commonwealth filed a motion to dismiss on January 12, 2004, in which they argued that the PCRA petition was meritless, previously litigated, or otherwise waived.

---

[3] Hereinafter "Commonwealth's Response".

After a series of evidentiary hearings on the issues surrounding the DNA evidence and the claims of ineffective assistance of counsel, this court formally dismissed the [petitioner's] PCRA petition on January 27, 2006.

*Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 2-3 C.C.P. Philadelphia County, May 3, 2007); Amended Petition, Appendix, Document 14-1 at 46-47.

Mr. Ramirez appealed to the Superior Court of Pennsylvania contending that he was "entitled to a new trial based on erroneous jury instructions, after-discovered evidence, and various instances of prosecutorial misconduct and ineffective assistance of counsel". *Commonwealth v. Ramrez*, No. 592 EDA 2006, slip op. at 8 (Superior Court, July 6, 2009); Amended Petition, Appendix, Exhibit A; Document 14-1 at 11. The Superior Court found that Petitioner was "entitled to an evidentiary hearing to explore his claim that trial counsel was ineffective for failing to object and request a mistrial and/or a comprehensive curative instruction after the prosecutor made highly inappropriate references to [Petitioner's] post-arrest silence during closing argument". *Id.* The court did not address Petitioner's remaining allegations of confusing jury instructions, prosecutorial misconduct, after–discovered evidence or ineffective assistance of counsel. On May 21, 2010, after hearing testimony from trial counsel, the PCRA court denied Petitioner's claim of trial counsel ineffectiveness. *See Commonwealth v. Ramirez*, CP-51-CR-0903912-1996, Order (C.C.P. Philadelphia County, May 21, 2010); Amended Petition, Appendix, Exhibit B, Document 14-1 at 21.

Once again, Mr. Ramirez filed a timely notice of appeal. On August 30, 2011, a panel of the Pennsylvania Superior Court affirmed the order denying PCRA relief, addressing only the issue related to the reasons for remand. Petitioner then filed an application for reconsideration, asking that the court address all of his issues. On October 18, 2011, the court granted panel

reconsideration to address all of Mr. Ramirez's issues. The following claims were raised for review:

1. Should not this court grant [Petitioner] a new trial where the Superior Court, in its opinion agreed and ruled [Petitioner's] claim of ineffective assistance of counsel regarding trial counsel's failure to object to the Commonwealth's illegal and inflammatory argument concerning [Petitioner's] post-arrest silence has arguable merit, as the evidentiary hearing trial counsel testified that he had no trial strategy whatsoever in failing to object to the Commonwealth's references to [Petitioner's] post-arrest silence and the illegal inferences the prosecutor asked to jury to draw [from] that silence, and where the [PCRA] court, in its opinion, agreed with the Superior Court and concluded that a new trial was warranted?

2. Should not this court grant [Petitioner] a new trial because [Petitioner's] conviction and judgment of sentence were the result of fatally flawed jury instructions that completely undermined the jury deliberation process so that no reliable adjudication of guilt or innocence could have taken place?

3. Should not this court grant [Petitioner] a new trial because prosecutorial misconduct denied [Petitioner] due process of law and a fair trial before an impartial jury?

4. Should not this court grant [Petitioner] a new trial based upon after-discovered evidence where the after-discovered evidence meets the criteria for a new trial established in *Commonweatlh v. Mosteller*, 446 Pa. 83, 284 A.2d 786 (1971), and the after-discovered evidence constitutes undisclosed *Brady* material and a denial of a new trial would deprive [Petitioner] of his fundamental due process rights?

5. Should not this court grant [Petitioner] a new trial because he received ineffective assistance of counsel pretrial, at trial, and on appeal, which in the circumstances of this case so undermined the truth-determining process that no reliable adjudication of guilt could have taken place, and counsel's failures to litigate this mater fully and properly could not have been the result of any rational, strategic, or tactical decision.

*Commonwealth v. Ramirez*, No. 1684 EDA 2010, slip op. at 7-9 (Superior Court, February 6, 2012) (footnote omitted); Amended Petition, Appendix, Exhibit U, Document 14-2 at 97-99; Commonwealth's Response, Document 27-3 at 7-9. The Order denying PCRA relief was affirmed. *See Commonwealth v. Ramirez*, 46 A.3d 806 (Pa.Sup. 2012) (Table). Mr. Ramirez's subsequent petition for allowance of appeal filed in the Supreme Court of Pennsylvania was denied on August 22, 2012. *See Commonwealth v. Ramirez*, 51 A.3d 838 (Pa. 2012) (Table).

On October 5, 2012, Petitioner signed and dated his *pro se* petition for federal habeas corpus relief, and it was filed in this Court on October 11, 2012.[4] Counsel was appointed and an amended petition was filed on May 31, 2013. Mr. Ramirez raises the following issues in his amended petition:

Claim I: Petitioner's constitutional rights to confrontation and due process were violated due to prosecutorial misconduct where the Commonwealth failed to reveal the existence of fingernail clippings containing exculpatory DNA evidence and prior statements which would have impeached the Commonwealth principal witness; counsel was ineffective for failing to ensure this evidence was put before the jury.

Claim II: The prosecutor repeatedly commented on Petitioner's silence and attempted to shift the burden of proof to the Petitioner thereby violating Petitioner's right to remain silent and his presumption of innocence. Counsel was ineffective for failing to raise and properly preserve this meritorious issue.

Claim III: The trial court jury instructions diminished the prosecutor's burden of proof in violation of Petitioner's right to due process of law and a fair trial. Trial and appellate counsel were ineffective in failing to raise and properly preserve this meritorious issue.

Claim IV: The prosecutor deliberately elicited testimony about unrelated other bad acts in violation of Petitioner's right to due process of law and a fair trial; counsel was ineffective in failing to raise and properly preserve this meritorious issue.

Claim V: Trial counsel was ineffective for failing to conduct an adequate investigation and to challenge the Commonwealth's case.

Claim VI: Due process was violated when the prosecution intentionally solicited Detective Vivarina's expression of his personal opinion that he believed that William Weihe was telling the truth.

Claim VII: The cumulative prejudicial effect of the errors described in this Petition denied Petitioner due process and the effective assistance of counsel.

Amended Petition at i-ii, Document 14 at 2-4. The Commonwealth denies that Mr. Ramirez is entitled to federal habeas corpus relief as some of his claims are procedurally defaulted and none are meritorious. *See* Commonwealth's Response to Petition at 8, Document 27 at 8.

## II. DISCUSSION

---

[4] For purposes of this Report and Recommendation, under the prison mailbox rule, I will accept the earlier date, October 5, 2012, as the date of filing. *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

## A. Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA or the Act),[5] signed into law on April 24, 1996, significantly amended the laws governing habeas corpus petitions. One of the amended provisions, 28 U.S.C. §2244(d), imposes a one-year statute of limitations on state prisoners who seek federal habeas relief. A habeas petition must be filed within one year from the date on which the petitioner's judgment of conviction becomes final. See 28 U.S.C. §2244(d)(1).[6]

In the instant case, the Supreme Court of Pennsylvania denied Mr. Ramirez's petition for allowance of appeal on December 7, 2000. Consequently, his state conviction became final on March 7, 2001, which is the last date on which he could have filed a timely direct appeal to the United States Supreme Court.[7] *See* Rule 13 of the Rules of the Supreme Court of the United States, which provides a ninety-day appeal period after a judgment by the state court of last resort. *See also Kapral v. United States*, 166 F.3d 565, 575 (3d Cir. 1999) ("Therefore, a state court criminal judgment is 'final' (for purposes of collateral attack) at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires.") Because Petitioner's conviction became final after the effective date of AEDPA, he was required

---

[5] Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996), effective date April 24, 1996.

[6] While the date on which the petitioner's conviction becomes final is typically the start date for the limitations period, the statute permits the limitations period to run from four other points in time, depending on which occurs latest. In addition to the date on which the petitioner's conviction becomes final, the start date can also run from: (1) "the date on which the impediment to filing an application created by state action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action"; (2) "the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review"; (3) "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence". 28 U.S.C. §2244(d)(1).

[7] There is nothing in the record that would call for the use of one of the other start dates provided in 28 U.S.C. §2244(d)(1). There was no impediment to filing an application created by State action in violation of the Constitution or laws of the United States which prevented Mr. Ramirez from filing a habeas petition. No new constitutional right has been asserted, and at no later date was the factual predicate of the claims presented discovered.

to file his federal habeas corpus petition by March 7, 2002, unless his petition was subject to statutory or equitable tolling.

The amended habeas statute includes a tolling provision for "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending". 28 U.S.C. §2244(d)(2). Mr. Ramirez filed a PCRA petition on April 16, 2001, after forty days had passed of his one-year period. The statute of limitations period was tolled during the entire time that Petitioner's PCRA petition was pending, through August 22, 2012, when the Pennsylvania Supreme Court denied *allocator*. As Mr. Ramirez filed his petition for writ of habeas corpus on October 5, 2012, timeliness is not an issue.

B. **Exhaustion and Procedural Default**

The exhaustion rule, codified in 28 U.S.C. §2254,[8] provides that the habeas petitioner must have "exhausted the remedies available in the courts of the State" for all constitutional claims before a federal court shall have habeas corpus jurisdiction. *See Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citations omitted). There are rare circumstances that circumvent this

---

[8] The exhaustion requirements of 28 U.S.C. §2254 provide:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that:
> > (A) the applicant has exhausted the remedies available in the courts of the State: or
> > (B)(i) there is an absence of available State corrective process, or
> > > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

requirement, none of which apply to the case at hand. To exhaust all remedies for a claim under 28 U.S.C. §2254, the habeas petitioner must give the state courts a full and fair opportunity to resolve all federal constitutional claims. See *Stevens v. Delaware Corr. Ctr.,* 295 F.3d 361, 369 (3d Cir. 2002); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Picard v. Connor*, 404 U.S. 270, 275 (1971). In order for Mr. Ramirez to give each habeas claim a full and fair opportunity for resolution, he must have presented both the factual and legal substance in the state courts through the highest tribunal, the Pennsylvania Superior Court.[9] The exhaustion requirement is rooted in considerations of comity; the statute is designed to protect the role of the state court in enforcement of federal law and to prevent disruption of the state judicial proceedings. See *Rose v. Lundy*, 102 S.Ct. 1198, 1203 (1982); *Castille*, 109 S.Ct. at 1059 (1989). The burden is on the habeas petitioner to establish that he has fairly presented his federal constitutional claims (both facts and legal theory) to all levels of the state judicial system. See *Gattis v. Snyder*, 278 F.3d 222, 231 (3d Cir. 2002) (*quoting Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992), *cert. petition dismissed*, 506 U.S. 1089 (1993)) ("[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts . . . and the same method of legal analysis must be available in the state court as will be employed in the federal court").

Section 2254 also provides that the court may deny a habeas petition on the merits, notwithstanding the petitioner's failure to exhaust state remedies. *See* 28 U.S.C. §2254(b)(2). *See also e.g., Clark v. Ricci*, 285 Fed.Appx. 933, 935 (3d Cir. 2008) ("The court may deny unexhausted claims if they are without merit.")

---

[9] Seeking *allocator* by the Pennsylvania Supreme Court is not part of the standard appeals process. See Pennsylvania Supreme Court *Order No. 218* (May, 2000); see also *Mattis v. Vaughn*, 128 F.Supp.2d 249, 261 (E.D.Pa. 2001); *Lambert v. Blackwell*, 387 F.3d 210, 233-234 (3d Cir. 2004).

An unexhausted habeas claim becomes procedurally defaulted when the petitioner has no additional state remedies to pursue the issue. *See Wenger v. Frank*, 266 F.3d 218, 223-224 (3d Cir. 2001), *cert. denied,* 122 S.Ct. 1364 (2002) (When a claim has not been fairly presented to the state courts, but further state court review is clearly foreclosed under the state law, the claim is procedurally defaulted and may be entertained in a federal habeas petition only if there is a basis for excusing the procedural default.).

Procedural default also occurs when an issue is properly asserted in the state system, but it is not addressed on the merits because of an independent and adequate state procedural rule. *See Sistrunk v. Vaughn*, 96 F.3d 666, 673 (3d Cir. 1996) and *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) ("If the final state court presented with a federal claim refuses to decide its merits based on an established state rule of law, independent of the federal claim and adequate to support the refusal, federal habeas review is foreclosed unless there is cause and prejudice or a showing of innocence.")

Procedural default may be excused if the habeas petitioner can show "cause" for the default and "prejudice attributable thereto", or the petitioner can demonstrate that the failure to consider his or her habeas claim will result in a "fundamental miscarriage of justice". *Wenger*, 266 F.3d at 224 (3d Cir. 2001) and *McCandless*, 172 F.3d at 260 (3d Cir. 1999). "Cause" for procedural default exists if the petitioner "can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule". *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Slutzker v. Johnson*, 393 F.3d 373, 381-382 (3d Cir. 2004). A petitioner can only prove prejudice, in turn, by demonstrating that the errors at trial "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions". *Murray*, 477 U.S. at 494 (1986) (*citing United States v. Frady*, 456 U.S. 152, 170

(1982)) (emphasis in original). To establish a "miscarriage of justice", a petitioner must present new evidence of "actual innocence". *Schlup v. Delo,* 513 U.S. 298, 321 (1995); *Goldblum v. Klem*, 510 F.3d 204, 216 (3d Cir. 2007). Evidence of actual innocence, not presented at trial, sufficient to excuse procedural default must be "reliable evidence" that shows that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence". *Calderon v. Thompson*, 523 U.S. 538,l 559 (1998). *See also Schlup*, 513 U.S. at 324, 329 (1995) (defining "reliable evidence" as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence").

### C. Standard of Review

Because Mr. Ramirez's habeas petition was filed after the effective date of the AEDPA, the amended habeas standards apply to his claims. The federal habeas statute "is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions". *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011). The AEDPA precludes habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

The United States Supreme Court set forth the scope of habeas review after AEDPA. *See Williams v. Taylor*, 529 U.S. 362 (2000). According to the *Williams* majority:

We [the Supreme Court Justices] all  agree that state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated.
. . . . .

In sum, the [AEDPA] statute directs federal courts to attend every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state-court's judgment, a federal court is convinced that a prisoner's custody – or as in this case, his sentence of death – violated the constitution, that independent judgment should prevail.

*Id.* at 389.

In addition, in interpreting the AEDPA language, the Third Circuit has discussed the appropriate degree of deference which the statute requires a federal habeas court to accord a state court's construction of federal constitutional issues and interpretation of Supreme Court precedent. *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir.), *cert. denied*, 528 U.S. 824 (1999). The Third Circuit has held that under 28 U.S.C. §2254(d)(1), a two-step inquiry is warranted. The majority agreed:

First, the federal habeas court must determine whether the state court decision was contrary to Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an unreasonable application of Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

*Matteo*, 171F.3d at 891 (3d Cir. 1999) (internal quotations and citations omitted).

Under AEDPA, a federal reviewing court must presume that factual findings of state trial and appellate courts are correct. The presumption of correctness may only be overcome on the basis of clear and convincing evidence to the contrary. *See Stevens v. Delaware Correctional Center, et al.,* 295 F.3d 361, 368 (3d Cir. 2002).

**D. Analysis**

1. Prosecutorial Misconduct/Ineffective Assistance of Counsel

Initially, Mr. Ramirez claims that his constitutional rights to confrontation and due process were violated due to prosecutorial misconduct when the Commonwealth failed to reveal

14

the existence of fingernail clippings allegedly containing exculpatory DNA evidence and prior statements which would have impeached the Commonwealth's principal witness. He also includes in this claim an assertion of ineffective assistance of counsel for failing to ensure that this evidence was put before the jury. He feels that the prosecution should have known, or that it did know, the decedent's fingernail clippings were exculpatory in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution". *Id.* at 87. Therefore to demonstrate a *Brady* violation, a defendant must show that evidence was suppressed, that it was favorable to him and that it was material to guilt or punishment. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See United States v. Bagley*, 473 U.S. 667, 676-677 (1985); *see also united States v. Pflaumer* 774 F.2d 1224 (3d Cir. 1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1975). The United States Supreme Court further elaborated:

> . . . [T]his Court recently noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706.
>
> . . . . .
>
> Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he had actually overlooked it. Conversely, if evidence actually has no probative significance at all, no purpose would be served

by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*Id.* (footnotes and internal citations omitted). *See also Banks v. Dretke,* 540 U.S. 668, 691 (2004)

(*quoting Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)).

As the PCRA court opined concerning the above-mentioned fingernail clipping evidence:

The [petitioner's] final prosecutorial misconduct claim is raised in the context of a violation of the discovery precepts announced in the landmark case of BRADY- v- MARYLAND, 373 U.S. 83 (1963). He argues that the trial prosecutor violated *Brady* because he failed "to disclose the existence of exculpatory evidence to the defense, concealing the fact that the prosecution had physical evidence in the form of clipped fingernails from the decedent that were available for scientific testing".

When an autopsy was performed on the decedent in this case, Dr. Gregory McDonald, a forensic pathologist employed by the Philadelphia Medical Examiner's Office clipped and preserved her fingernails. However, Dr. McDonald did not notate this action anywhere in the paperwork that accompanied his autopsy report. As a result, the trial prosecutor had no information about the decedent's fingernail clippings, and did not become aware of their existence until after the [petitioner's] trial and during this PCRA process.

It is axiomatic that a prosecutor is not violative of *Brady* or discovery rules by failing to turn over evidence that it does not possess or is aware of. COMMONWEALTH-v-FLOOD, 627 A.2d 1193, 1200 (Pa.Super. 1993). This is true even in a situation where the items of evidence are in the custody of another governmental agency. For example, the Supreme Court of Pennsylvania affirmed a conviction where the prosecutor failed to turn over items of evidence that were actually in the custody of the police department. COMMWEALTH-v-BONACURSO, 455 A.2d 1175, 1177 (Pa. 1983).

. . . . .

The remaining arguments for appellate relief that are offered by the [petitioner] relate to his claim that the DNA evidence that was recovered from the decedent qualify as "after discovered evidence" that entitle him to a new trial. The DNA evidence that he is referring to are the trace material found underneath two of the victim's fingernail clippings, and several strands of hair that were stuck to the back of the decedent's hands at the time that her body was found. It was established by additional tests that the [petitioner's] DNA did not match the DNA results from the fingernail scrapings or the stands of hair.

Under the PCRA, after-discovered evidence can entitle a defendant to relief where he can prove "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have affected the outcome of the trial if it had been introduced". 472 C.P.S.A. §9543(a)(2)(vi). However, before such evidence can be construed as "after discovered", it must satisfy all of the following four criteria: (1) the evidence must have been

discovered after the trial, and not capable of being discovered earlier through the exercise of reasonable diligence; (2) the evidence must be actually exculpatory and not merely cumulative or corroborative; (3) the evidence must not be for the sole purpose of impeaching the credibility of a witness; and (4) the evidence must be of such nature and character that it would compel a different result on the part of the factfinder. COMMONWEALTH-v-TIZER, 580 A.2d 305 (Pa. 1993); COMMONWEALTH-v-COLSON, 490 A.2d 811, 826 (Pa. 1985), *cert. denid*, 476 U.S. 1140 (1986); COMMONWEALTH-v-VALDERRAMA, 388 A.2d 1042, 1045 (Pa. 1978).

The overwhelming problem with the [petitioner's] claim in this regard is the fact that no reasonable argument can be made that the DNA evidence and the test results on them are in any sense exculpatory. It is undisputed that the decedent was killed in her workplace, a laundromat that was open to the public. The record in this case establishes that her duties not only included personally washing the clothing of customers who dropped off their laundry, but it also included cleaning the entire laundromat at the end of each shift. In fact, she was actually involved in cleaning the laundromat when she was killed.

Under these circumstances, the fact that there was genetic material on the decedent's body that did not match the [petitioner] is not only not exculpatory, it is precisely what one would expect from someone who handled other people's clothing on a daily basis. It would be virtually impossible for someone in her position not to come into contact with hair, skin, fluids, and even blood from any number of sources. Thus, it is simply preposterous to assume that the [petitioner] is exonerated in any way because someone else's DNA was deposited on the decedent.

Moreover, given the fact that the decedent was approached from behind and clubbed with the pipe, there was probably no opportunity for her to come into actual contact with the [petitioner's] body or to have any bodily material from him end up under her fingernails. As stated in COMMONWEALTH-v-JONES, 637 A.2d 1001, 1004 (Pa.Super. 1994), "[E]xculpatory evidence is that which 'intrinsically tends to establish [the] defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is merely collateral or impeaching'".

It has been held that newly discovered evidence that was not likely to have affected the jury's verdict if it had been available at trial does not entitle a defendant to post-conviction relief. COMMONWEALTH-v-ABU-JAMAL, 720 A.2d 79, 106 (Pa. 1998); *cert. denied*, 120 S.Ct. 41 (1999). It is also well established that evidence that is neither exculpatory nor material cannot give rise to a *Brady* violation. COMMONWEALTH-v-BUEHL, 658 A.2d 771, 776 (Pa. 1995).

*Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 20-21, 29-32

(C.C.P. Philadelphia County, May 3, 2007); Amended Petition, Appendix, Exhibit D, Document

14-1 at 64-65, 73-76.

Upon remand by the Pennsylvania Superior Court, the PCRA court further opined:

After the [petitioner's] trial, it was discovered that the medical examiner's office had in their possession fingernail clippings from the decedent as well as hair that had been found on her hands. During the course of the PCRA proceedings, the [petitioner] petitioned the court to do DNA testing on these items. This petition was heard by the Honorable Richard B. Klein, and he ordered that testing on the fingernails and hair be done in 2001. The tests revealed that there was some tissue on the fingernails that did not belong to the [petitioner], and that the hair was actually from the decedent's head.

At the hearing before Judge Klein on December 18, 2001, the PCRA court summarized the results of the DNA testing, and specifically denied the [petitioner's] request to do any further DNA testing on any of the evidentiary items in question. Judge Klein held that any further testing would be of no value inasmuch as the results could not conceivably exonerate the [petitioner].

On September 23, 2003, [petitioner's] appointed counsel filed yet another "addendum" to the original amended PCRA petition. It repeated and re-argued the same points, but it also contended that the DNA findings were "exculpatory" and that the trial prosecutor's conduct was so egregious that the Commonwealth should be barred from ever trying the [petitioner] again. The Commonwealth filed a motion to dismiss on January 12, 2004, in which they argued that the PCRA petition was meritless, previously litigated or waived.

After a series of additional evidentiary hearings on the issue surrounding the DNA evidence and the claims of ineffective assistance of counsel, this Court formally dismissed the [petitioner's] PCRA petition on January 27, 2006.

*Commonwealth v. Ramirez,* September Term, 1996, No. 0391 2/2, slip op. at 2-3 (C.C.P.

Philadelphia County, July 13, 2010); Amended Petition, Appendix, Exhibit C, Document14-1 at

29-30.

Mr. Ramirez appealed to the Superior Court, which found:

In his fourth issue, [Petitioner] contends a detective provided a "report of death" to the coroner's office after the homicide. [Petitioner] asserts the report directed the coroner to preserve the victim's fingernails for future analysis. [Petitioner] claims Dr. Gregory McDonald, the medical examiner, notified the prosecutor of the preservation of the fingernail clippings during the trial. [Petitioner] complains he did not learn about the fingernail clippings until 2001, when he filed his first *pro se* PCRA petition. [Petitioner] insists subsequent testing excluded [Petitioner] as the source of the male DNA found under the victim's fingernails. [Petitioner] maintains this after-discovered evidence entitles him to a new trial, because the evidence could not have been obtained prior to trial, it is not cumulative nor corroborative, it is not solely for the impeachment of a witness, and the admission of the evidence would likely result in a different verdict.

[Petitioner] further argues the prosecutor had a duty to disclose the fingernail clippings under *Brady*. [Petitioner] insists the prosecutor had a continuing obligation to disclose any potentially exculpatory material, and the fact that the prosecutor learned about the evidence in the middle of trial did not excuse him from this obligation. [Petitioner] concludes he is entitled to a new trial on these bases. In the alternative, [Petitioner] concludes this Court must remand the matter for a full evidentiary hearing regarding the exculpatory nature of the after-discovered evidence. We disagree.

"After-discovered evidence is the basis for a new trial when it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching the credibility of a witness; and 4) is of such nature and character that a new verdict will likely result if a new trial is granted." *Chamberlain, supra* at _____, 30 A.3d at 414.

"In *Brady*, the United States Supreme Court held: '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Commonwealth v. Harris*, 884 A.2d 920, 931-32 (Pa.Super. 2005), *appeal denied,* 593 Pa. 726, 928 A.2d 1289 (2007) (*quoting Brady, supra* at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218).

> The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and the obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

*Commonwealth v. Puksar*, 597 Pa. 240, 264, 951 A.2d 267, 281 (2008).

> [T]here are three necessary components to demonstrate a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensured.

>> [E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted.

*Harris, supra* at 932 (*quoting Commonwealth v. Causey*, 833 A.2d 165, 170 (Pa.Super. 2003), *appeal denied,* 577 Pa. 732, 848 A.2d 927 (2004)) (internal citations and quotation marks omitted).

If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. Rather, "material evidence" must be favorable to the accused so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.

*Id.* (internal citations and most quotation marks omitted).

Instantly, sometime after trial, [Petitioner] discovered the medical examiner had saved the victim's fingernail clippings. Subsequent testing revealed that [Petitioner's] DNA did not match the genetic material found under the fingernails. Nevertheless, the PCRA court observed:

The overwhelming problem with [Petitioner's] claims in this regard is the fact that no reasonable argument can be made that the DNA evidence and the test results on them are in any sense exculpatory. It is undisputed that the decedent was killed in her workplace, a laundromat that was open to the public. The record in this case establishes that her duties not only included personally washing the clothing of customers who dropped off their laundry, but it also included cleaning the entire laundromat at the end of each shift. In fact, she was actually involved in cleaning the laundromat when she was killed.

Under these circumstances, the fact that there was genetic material on the decedent's body that did not match [Petitioner's] is not only not exculpatory, it is precisely what one would expect from someone who handled other people's clothing on a daily basis. It would be virtually impossible for someone in her position not to come into contact with hair, skin, fluids, and even blood from any number of sources. Thus, it is simply preposterous to assume that [Petitioner] is exonerated in any way because someone else's DNA was deposited on the decedent.

Moreover, given the fact that the decedent was approached from behind and clubbed with the pipe, there was probably no opportunity for her to come into actual contact with [Petitioner's] body or to have any bodily material from him end up under her fingernails.

(*See* PORA Court Opinion, filed May 3, 2007, at 30-31.) We accept this analysis and conclude the DNA found under the victim's fingernails is not evidence warranting a new trial. *See Chamberlain, supra; Harris, supra.*

To the extent [Petitioner] asserts that Dr. McDonald notified the Commonwealth of the fingernail clippings during trial, Dr. McDonald admitted he had a conversation with the prosecutor prior to testifying. Dr. McDonald, however, did not remember informing the prosecutor about the existence of the fingernail clippings:

[THE COURT]: Do you have any recollection of any discourse that occurred between yourself and 'the prosecutor] concerning the fingernail clippings?

> [WITNESS]: No, I do not.
>
> [THE COURT]: So, as you sit here today, you are not able to testify that you had made [the prosecutor] aware of any fingernail clippings?
>
> [WITNESS]: I can't specifically say that, Your Honor, no.

(*See* N.T. PCRA Hearing, 4/22/05, at 7.) In light of this testimony, the PCRA court found the prosecutor did not violate *Brady*, as he was unaware of the fingernail clippings. (*See* PCRA Court Opinion, filed May 3, 2007, at 20.) The record supports the court's determination; we defer to its findings and conclude [Petitioner] is not entitled to relief on this ground. *See Boyd, supra.*

*Commonwealth v. Ramirez,* No. 1684 EDA 2010, slip op. at 33-38 (Superior Court, February 6, 2012); Amended Petition, Appendix, Exhibit U, Document 14-2 at 123-128.

The record reveals four "Reports of Laboratory Examination". On December 4, 2001, Cellmark Diagnostics reported that it received the following items of evidence for analysis: a purple-top tube of blood labeled Edward Ramirez; an envelope containing fingernails from a right hand, an envelope containing fingernails from a left hand, one of several hairs in an envelope and one blood swatch, all labeled Joyce Dennis. Upon analysis, DNA types detected at the genetic marker designated D8S1179 from Mrs. Dennis' right hand fingernails were 12, 13, (14). The report notes that the result in parentheses may be due to the presence of DNA from more than one individual or technical artifact, so they were not interpreted. No DNA determined to be foreign to Joyce Dennis was detected. An analysis of Petitioner's blood reveals 12, 14 at the same genetic marker. Mr. Ramirez was excluded as the source of the DNA obtained from the hair sample. *See* Supplemental Appendix to Amended Petition for a Writ of Habeas Corpus by a Prisoner in State Custody[10] at 110-112; Commonwealth's Response, Exhibit C, Document 27-4 at 1-3. On March 27, 2002, Cellmark Diagnostics tested Ms. Dennis' fingernail clippings again. No DNA determined to be foreign to decedent was detected. *See* Supplemental Appendix at 113-

---

[10] Hereinafter "Supplemental Appendix".

115; Commonwealth's Response, Exhibit C, Document 27-4 at 4-6. A third report was submitted, dated January 31, 2003, from Orchid Cellmark. The items it received for analysis were: a purple-top tube of blood labeled Edward Ramirez and fingernails in envelopes labeled right and left hand. No conclusion could be made regarding the fingernails due to an insufficient amount of amplified product and lack of consistent results. *See* Supplemental Appendix at 116-118; Commonwealth's Response, Exhibit C, Document 27-4 at 7-9.  The final analysis report of record also was conducted at Orchid Cellmark and is dated July 29, 2003. Mr. Ramirez was excluded as a contributor of the male biological material from one fingernail; however, no conclusion could be reached in regard to the other fingernail due to an insufficient amount of male DNA. The genetic marker designated DYS439 was 19 for both Petitioner and the victim. *See* Supplemental Appendix at 119-120; Commonwealth's Response, Exhibit C, Document 27-4 at 10-11. There is nothing to indicate that these tests would have exonerated Petitioner at trial. There is no reasonable probability that had this evidence been disclosed to the defense, the result of the proceeding would have been different. The mere possibility that the analysis of Mrs. Dennis' fingernail clippings might have helped the defense does not establish materiality in the constitutional sense. Furthermore, if the suppression of evidence results in constitutional error, it is because of the character of the evidence, and not the character of the prosecutor.

Also included in Petitioner's first habeas claim is an allegation that the prosecutor failed to reveal prior statements which would have impeached the Commonwealth's principal witness, William Weihe. Specifically, Mr. Ramirez asserts that the Commonwealth suppressed two inconsistent statements made by Mr. Weihe which would have undermined his credibility.

As explained by the Court of Common Pleas on direct appeal,

. . . [T]he [petitioner] here further claims that the Commonwealth violated the rules of discovery by its failure to turn over to the defense recorded statements of oral statements made

by Weihe in the presence of his parents and Detective Vivarina following completion of his written inculpatory statement to Detective Vivarina on July 3, 1996. This issue is completely meritless. The specific claim made by defense counsel is that the defense was not informed that William Weihe had made oral statements to his parents in the presence of Homicide Detective Vivarina immediately following his police statement of July 3, 1996, Exhibit C-31. The pertinent portions of this conversation between William Weihe and his parents was as related in Detective Vivarina's answers to the prosecutor's questioning:

QUESTION: Did you want a confrontation between Mr .Weihe and his parents?

ANSWER: Yes, sir. I brought the parents into the room. I asked Billy Weihe to explain to his parents what happened. He sort of broke down and got a little emotional and told his parents the whole truth of how he was involved in the murder of Joyce Dennis, exactly the way the statement read, and he explained in detail what happened. They broke down, the parents broke down. They hugged and they kissed. I was thoroughly convinced that he had told the truth.
[N.T. dated 12/18/97 at pp. 47-49].

In truth, Exhibits C-29, C-30, and C-31 represent the totality of the recorded statements that were provided by William Weihe to the homicide detectives in this case, by the homicide detectives to the Commonwealth, and by the Commonwealth to defense counsel. Apparently, [petitioner's] counsel claims that the defense should have been provided a verbatim copy of the aforementioned tear-filled session between Weihe and his parents while they were together at the Homicide Division, immediately after Weihe had provided his inculpatory statement to the homicide detectives on July 3, 1996. This is simply not required under the pertinent rules of discovery. Pa.R.Crim.P. 305 governs the discovery procedure in criminal cases and provides in pertinent part that:

(B) Disclosure by the Commonwealth.

(1) Mandatory. In all cases, on request by the defendant . . . the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case . . . .

    (a) Any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth.

    (b) Any written confession or inculpatory statement or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made, which is in the possession or control of the attorney for the Commonwealth. . . .
    Pa.R.Crim.P. 305.

Generally, the prosecution should exercise the utmost good faith to disclose to a defendant all material evidence in its possession when faced with a mandatory discovery request. *Commonwealth v. Schwartz*, 419 Pa.Super. 251, 615 A.2d 350 (1992). However, the defendant

bears the burden of proving that evidence requested in discovery is material, reasonable and in the interest of justice, before a court will exercise its discretion to permit disclosure. *Commonwealth v. Jones*, 432 Pa.Super. 97, 637 A.2d 1001 (1994). The Rules themselves contemplate situations where the Commonwealth does not discover evidence pre-trial. Thus, according to Pa.R.Crim.P. 305D, "[i]f prior to or during trial, either party discovers additional evidence . . . which is subject to discovery under this rule . . . such party shall promptly notify the opposing party or the court of the additional evidence . . ." Moreover, our Supreme Court in *Commonwealth v. Bonacurso*, 500 Pa. 247, 455 A.2d 1175 (1983) noted that the prevailing view in this Commonwealth is that "the prosecution does not violate discovery rules when it fails to provide the defense with evidence that it does not possess and of which it is unaware during pre-trial discovery . . ." *Commonwealth v. Rakes*, 398 Pa.Super. 440, 581 A.2d 212, 214 (1990). Here, the Commonwealth was unaware of the existence of Weihe's inculpatory statements made to Detective Vivarina until trial. Therefore, it is apparent that the Commonwealth complied with the discovery rules. Indeed, since Weihe was an accomplice or coconspirator, any written records of his statements, if available, were as was the case here, were matters of discretionary discovery. Pa.R.Crim.P. 305(B)(2)(c). [Petitioner], nevertheless, alleges that the admission of Detective Vivarina's testimony was unduly prejudicial because counsel did not have the opportunity to adequately contradict his testimony. However, the record clearly reflects that Detective Vivarina was listed as a Commonwealth witness prior to trial, and, consequently, defense counsel had ample opportunity to interview him. Accordingly, we find that [petitioner] was not unduly prejudiced by Detective Vivarina's testimony. Thus, because this late discovery did not prejudice [petitioner], this Court properly permitted Detective Vivarina to testify concerning statements made in his presence by William Weihe and his parents at the completion of Weihe's recorded police statement.

Second, the [petitioner's] argument is without merit because pretrial discovery is not permitted as to witness' statements not reduced to writing. *Commonwealth v. Davis*, 470 Pa. 193, 368 A.2d 260 (1977). Additionally, police notes are not statements, and are not discoverable where the notes are not a verbatim account of the witness's declarations, or that the witness approved them as accurately reflecting what they had said. *Commonwealth v. Hill*, 267 Pa.Super. 264, 406 A.2d 796 (1979). Here, there is no record evidence to establish that any efforts were taken to memorialize these statements.

In the present case, all of the recorded and adopted statements of William Weihe were delivered by the Commonwealth to defense counsel. As testified to by Detective Vivarina, Weihe's tearful encounters on July 3, 1996 with his parents inside the Homicide Division did not occur until after Weihe had signed and adopted his police statement. In fact, this encounter was not recorded verbatim by the homicide detectives, but was testified to by Detective Vivarina from memory while he was on the witness stand. Because pretrial discovery is not allowed as to witness' statements not reduced to writing, *Commonwealth v. Davis, supra*, the [petitioner] was not prejudiced by Detective Vivarina's aforementioned testimony. Since the defense had been accorded discovery of William Weihe's written and ratified statement which inculpated him and this [petitioner] in the instant crimes (Exhibit C-31), it is difficult to understand how prejudice occurred in this case by the absence of discovery of his second acts of contrition in the presence of his parents. Here, Detective Vivarina stated that the oral statements made by Weihe to his parents were "exactly the way the statement read." [N.T. dated 12/18/97 at pp. 47-49]. Thus,

these additional oral statements were cumulative in nature. The Commonwealth does not violate discovery rules by failure to disclose evidence which was only cumulative in nature. *Commonwealth v. Wade*, 480 Pa. 160, 389 A.2d 560 (1978), appeal after remand 501 Pa. 331, 461 A.2d 613. Further, the Commonwealth owes a duty to grant discovery as to material evidence or evidence concerning which had it been disclosed to the defense, its presence would have affected the outcome of a case. *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed. 40 (1987); *Commonwealth v. Jones*, 432 Pa.Super. 97, 637 A.2d 1001 (1994). In truth, prior to the beginning of this trial, the defense knew that Weihe had been a holdout in terms of police cooperation for a long period of time, and after a period of indecision, he made a third and last statement inculpating himself and this [petitioner] in the instant crimes. Consequently, the oral statements in his final acts of informal contrition before his parents and Detective Vivarina related to information about which they had been informed in Exhibit C-31, his formal written statement. Lastly, the defense had equal access to the discovery information presently the basis of complaint since it could have interviewed and called Weihe's parents to present the same information. The discovery rules are not tools to be used by the defense to compel the Commonwealth to furnish evidence to which the defense has equal access. *Commonwealth v. Gelormo*, 327 Pa.Super. 219, 475 A.2d 765 (1984). Indeed, the failure to call these parents as witnesses raises further reasons for rejection of this discovery claim. The duty to grant discovery does not apply to the entire contents of the prosecutor's file, but only to disclosure of evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). To a point of absolute certainty, since this oral act of contrition to his parents inculpated himself and this [petitioner], it is highly unlikely that the defense desired to introduce Weihe's parents to repeat such incriminating evidence. Since this type of evidence was not favorable to the accused in this case, it is highly unlikely that it was the proper subject matter of discovery. In conclusion, this discovery claim was properly rejected for the reasons stated.

*Commonwealth v. Ramirez*, September Tem, 1996, Nos. 0391 1/6, 2/6, 6/6, slip op. at 40-46

(C.C.P. Philadelphia County, May 13, 1999); Amended Petition, Appendix, Exhibit R,

Document 14-2 at 50-56; Commonwealth's Response, Document 27-1 at 40-46. Mr. Ramirez

appealed this issue to Pennsylvania's Superior Court, which opined:

> [Petitioner] next contends that he is entitled to a new trial on the grounds that the Commonwealth failed to provide proper discovery concerning the circumstances surrounding the verbal statements of William Weihe made in the presence of his parents after his written statement was given to the police in July of 1996. We explicitly note that [Petitioner] does not allege he was denied access to Weihe's written statements, or that the Commonwealth failed to provide copies of the written statements on a timely basis. We have carefully considered [Petitioner's] argument in conjunction with our scrutiny of the certified record. We find no merit to [Petitioner's] claim. Because we agree with the analysis and disposition provided by the learned Trial Judge on this point, we affirm on the basis of the Trial Court Opinion with regard to this issue. *See* Trial Court Opinion at 40-46.

*Commonwealth v. Ramirez*, No. 1030 Philadelphia 1998, slip op. at 19-20 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 82-83; Commonwealth's Response, Document 27-2 at 19-20.

Mr. Ramirez also alleges that Mr. Weihe made an undisclosed statement in conjunction with a polygraph examination, information which was given to the Commonwealth at the time of Petitioner's preliminary hearing, two years before his trial. This issue was addressed by the Superior Court of Pennsylvania in a footnote:

> [Petitioner] also complains: "In addition, there was a second statement that was referred to on a police activity sheet where the [petitioner], while taking a lie detector test." [sic] [Petitioner's] Brief at 29. We agree with the Commonwealth's assertion that this virtually indecipherable complaint does not properly identify a cognizable claim. *See Commonwealth v. Ragan*, 538 Pa. 2, 37-38, 645 A.2d 811, 828-829 (1994) (prosecutorial misconduct argument is waived if appellant fails to explain in detail the Commonwealth's allegedly improper action and fails to provide specific citations to the relevant portions of the certified record).

*Commonwealth v. Ramirez*, No. 1030 Philadelphia 1998, slip op. at 20 n. 6 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 83; Commonwealth's Response, Document 27-2 at 20.

The state courts' resolution of this claim is clearly not violative of federal law, and Mr. Ramirez's *Brady* claim presents no valid basis for habeas corpus relief.

Also included in Mr. Petitioner's first habeas claim is an allegation of ineffective assistance of trial counsel for failing to ensure that the above-mentioned evidence was put before the jury. Ineffective assistance of counsel claims are evaluated under the two-prong test that the United States Supreme Court established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, counsel is presumed to have acted reasonably and effectively unless the petitioner can demonstrate that "counsel's representation fell below an objective standard of reasonableness" and there was "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different". *Id.* at 686-688, 693-694. Under the *Stickland* standard, counsel cannot be held ineffective for failing to raise a claim that is without merit or is futile. *See Premo v. Moore*, 131 S.Ct. 733, 741 (2011); *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999). Having found Petitioner's *Brady* claim not violative of federal law, and thus without basis for habeas relief, counsel cannot be found ineffective in regard to it. Mr. Ramirez's first claim does not warrant federal habeas corpus relief in its entirety.

### 2. Prosecutorial Misconduct/Ineffective Assistance of Counsel

Mr. Ramirez's second claim alleges that the prosecutor repeatedly used Petitioner's right to remain silent against him at trial and that defense counsel was ineffective for failing to raise and properly preserve this issue. Specifically, Mr. Ramirez asserts that his right to remain silent was violated when the prosecutor repeatedly introduced evidence of, and referred to, Petitioner's pre-arrest silence and when the prosecutor argued that Petitioner's post-arrest silence was evidence of guilt. He also claims that the prosecution violated his presumption of innocence by arguing that the defense should have presented certain evidence. Petitioner sums up this claim by stating that individually and cumulatively, the prosecutor's comments constituted prosecutorial misconduct and violated Petitioner's due process rights, his presumption of innocence, and the right to remain silent. Petitioner finally alleges that trial counsel failed to object to the prosecutor's argument regarding his post-arrest silence or to the curative instruction given by the trial court, making his representation ineffective.

Issues concerning Mr. Ramirez's silence, both pre-arrest and post-arrest, were initially addressed on direct appeal, and they continued through the PCRA process. In regard to Petitioner's pre-arrest silence, the Court of Common Pleas opined on direct appeal:

Finally, the [petitioner] claims that the prosecutor's statements in closing argument that "there was no cooperation from the [petitioner] after he was contacted by homicide" constituted improper and inflammatory comments and amounted to impermissible remarks on the [petitioner's] burden of proof and his Fifth Amendment right to remain silent. <u>1925(b) Statement of Matters on Appeal</u>, at ¶(6). Defense counsel then cited to the record in support of this claim, "(N.T. 12/18/98, p. 55)". *Id.* As a point of fact, this cited portion of the record does not support the claim that the [petitioner] attempts to advance. Indeed, the cited portion does, however, reflect an issue which had absolutely nothing to do with Ramirez's silence or to any comment by the Assistant District Attorney appertaining thereto.

However, in an effort to fairly address this claim raised by Ramirez, this Court has located a portion of the record in which defense counsel objected to a reference to Ramirez's pre-arrest silence by the prosecutor during his closing summation. That passage reads as follows:

> MR. GILSON: Immediately after this happened, when the police first got word that Ramirez and Weihe may be involved, Ramirez had been over the laundromat, what was it that they did, they tried to find him, they went to find Edward Ramirez. You remember, they stopped by his house on the 24th and 27th of February and again on the 28th. No one was ever home. They left cards for them to call back. Mr. Ramirez, who is a retired Police Officer and an investigator for a large defense firm and who has a lot of experience in this area and knows a lot of criminal justice system, never returned their phone calls. He could not be found. Edward Ramirez, where was he, he was still living at his house. If you're an innocent man and the police wanted to talk to you about something that you have knowledge of –
>
> MR. McMAHON: Objection.

[N.T. dated 12/29/97 at pp. 143-144]. The [petitioner's] claim is meritless. First, in his objection, defense counsel did not state the specific reasons for his objection. However, in response to defense counsel's general objection, this Court cautioned the jury to disregard the Commonwealth's assuming facts not in evidence as a foundation for its legal argument as follows:

> THE COURT: disregard this line of thought. You don't know if anybody ever received notice as a fact. There were cards left in the mailbox. You don't know if anyone was home or whether they were actually received.

[N.T. dated 12/29/97 at pg. 144]. At no time did defense counsel object to this Court's curative instruction or attempt to redefine specific constitutional grounds for his original objection. To preserve an issue for appeal, a party must make a timely, **specific** objection at trial [emphasis supplied]. *Hubbard, supra; Clair, supra; Sampson, supra; Rosenfelt, supra; Montalvo, supra; (citing, Commonwealth v. Smith*, 414 Pa.Super. 208, 606 A.2d 939 (1992). General objections do not preserve issues on appeal. *Commonwealth v. Dillon*, 386 Pa.Super. 236, 562 A.2d 885 (1989); *Commonwealth v. Speelman*, 235 Pa.Super. 109, 341 A.2d 138 (1975). Because defense counsel did not specifically object to the unconstitutionality of the Commonwealth's comment on Ramirez's alleged pre-arrest silence during closing summation, this issue is waived.

Moreover, this issue is substantively without merit. A defendant does not have a right to silence before he is placed into police custody, and it is not error for the Commonwealth to comment on the failure of the defendant to deny accusations made while the accused is not in custody. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981); *Commonwealth v. Schmidt*, 452 Pa. 185, 299 A.2d 254 (1973); *Commonwealth v. Hubble*, 314 Pa.Super. 99, 460 A.2d 784 (1983). In the present case, the Commonwealth did not state that the [petitioner] offered no comment in response to an accusation of a crime. It merely stated that no one responded to Homicide detectives' leaving of business cards at the elder Ramirez's residence. Because the aforementioned lack of response to the leaving of business cards by Homicide detectives did not amount to an impermissible comment on silence by this [petitioner], this issue is meritless.

In a later portion of the Commonwealth's closing summation, this Court, *sua sponte*, interrupted a line of argument by the Commonwealth concerning tacit admissions of guilt by a defendant and issued a curative instruction to the jury that tacit admissions of guilt have no place in the criminal law. [N.T. dated 12/29/97 at pp. 148-150]. Defense counsel did not object to this line of argument by the Commonwealth and, therefore, this issue is waived. *Commonwealth v. Butts*, 495 Pa. 528, 434 A.2d 1216 (1981) (lack of a specific objection at trial to prejudicial remarks waived the issue on appeal). In conclusion, for the reasons stated, this [petitioner's] final claim is meritless.

*Commonwealth v. Ramirez,* September Term, 1996, Nos. 0391 1/6, 2/6, 6/6, slip op. at 46-49

(C.C.P. Philadelphia County, May 13, 1999); Amended Petition, Appendix, Exhibit R,

Document 14-2 at 56-59; Commonwealth's Response, Document 27-1 at 46-49. Mr. Ramirez

appealed, and the Pennsylvania Superior Court determined:

[Petitioner's] final contention is that, during both opening and closing, the prosecutor made impermissible references to [Petitioner's] failure to cooperate with the police investigation. According to [Petitioner's] theory, this constitutes an impermissible comment on his exercise of his Fifth Amendment right to remain silent. We note initially that [Petitioner] has waived his challenge to the prosecutor's opening remarks by failing to raise this question in his Concise Statement filed pursuant to Rule 1925. Because [Petitioner] did not identify this claim for the Trial Court, Judge Latrone did not address it in his Rule 1925 Opinion. We therefore find this aspect of [Petitioner's] argument to be waived under *Lord, supra.*[11]

The specific issue concerning the prosecutor's closing remarks which [Petitioner] has chosen to argue on appeal was not identified by [Petitioner's] Concise Statement.[12] The Trial

---

[11] We note, however, that the specific remarks challenged on appeal pertain to the decision of William Weihe, [Petitioner's] co-conspirator and former co-defendant, to plead guilty and to testify against [Petitioner]. These remarks do not in any way concern [Petitioner's] custodial or post-arrest silence. *See* N.T. Trial, 12/11/97, at 56-57.

[12] In his Concise Statement of Issues Raised on Appeal, [Petitioner] avers that the prosecutor committed misconduct in connection with comments made on December 18, 1996:

The Assistant District Attorney's statement that "there was no cooperation from the [petitioner] after he was contacted by homicide" in his closing argument contained improper an[d] inflammatory statements and

Court *sua sponte* elected to address what Judge Latrone considered to be a rational claim for [Petitioner] to make on appeal. In fact, Judge Latrone correctly predicted the precise issue [Petitioner] has raised concerning the prosecutor's closing statement. However, a recent Superior Court decision squarely addresses the procedural problem raised by Judge Latrone's approach. In *Commonwealth v. Steadley*, 2000 PA Super 62, we held that an issue which has not been raised in a Rule 1925 statement is waived pursuant to *Lord*, even if the trial judge manages to accurately guess the precise question presented to this Court in the ensuing appellate brief. *Id.*, slip opinion at 5. Nevertheless, purely for [Petitioner's] benefit, we shall explain *arguendo* why his argument concerning the prosecutor's closing remarks would have to be deemed meritless if it had been preserved. *See Commonwealth v. Widmer*, 547 Pa. 137, 689 A.2d 211 (1997) (wherein the Supreme Court found error when the Superior Court declined to consider otherwise waived claim addressed by trial court in its Rule 1925 Opinion).[13]

Our law is clear that any reference to a defendant's silence while in police custody violates the accused's constitutional right against self-incrimination. *Commonwealth v. Shotwell*, 717 A.2d 1039, 1043 (Pa.Super. 1998). However, not every such reference requires a new trial. *Id.* The trial court may rectify the error by issuing prompt and adequate curative instructions to the jury. *Id.* A new trial is required only if the reference to the accused's silence was of a nature that would seriously compromise the jury's objectivity and is likely to have deprived the accused of a fair trial. *Id.* "Given an improper reference to the accused's silence, a determination must be made as to whether the error was harmless." *Commonwealth v. Costa*, _____ Pa. _____, _____, 742 A.2d 1076, 1077 (1999). If it is clear from the record that the reference could not have contributed to the verdict, the error may be deemed harmless. *Id.*

In full context, the first statement which [Petitioner] contends requires a new trial on the grounds that it was unduly prejudicial, is as follows:

[By the prosecutor]: Remember this, Billy Weihe, at one time point, sat at the same table with Edward Ramirez. They had a preliminary hearing. Joey Maio testified. **Weihe was presumed innocent, the same as Eddie Ramirez. He had no burden of proof. He had a lawyer. He had every constitutional procedural right guaranteed to every single person in the United States, just like Edward Ramirez. He had every right to have a trial and pick a jury. You folks would have heard it. He had a right to present evidence and a right to cross-examination. He had a right to remain silent and he had a right to testify, if he wanted to.** [Weihe] had every constitutional right that Edward Ramirez has enjoyed throughout this trial. [Weihe] had the right to have a lawyer make opening and closing argument. [Weihe] had a right to plead not guilty and let a jury decide his fate. [Weihe] could have presented any defense. [Weihe] could have said, the detectives coerced that statement out of me, they beat it out of me, I had no reason, everyone else is lying against me, the same argument that you heard today. [Weihe] had

constituted an impermissible comment on the [petitioner's] burden of proof and his 5th Amendment [sic] Right to Remain Silent. (N.T. 12/18/96, p. 55).

1925(b) Statement of Matters on Appeal, filed 1/13/99, at 2 ¶6. The argument actually presented on appeal, however, concerns prosecutorial remarks which occurred on December 29, 1997 at pages 134-135 and 143-144 of the transcripts for that date.

[13] We note/ that *Widmer* was decided before *Lord*-.

everyone of those rights and he gave them up. [Weihe] pled guilty. No one can force you to do that. He pled guilty to robbery, to conspiracy to commit robbery and on top of that, he pled guilty to murder.

> The evidence in this case is that it was Edward Ramirez that beat and killed Joyce Dennis, but Billy Weihe pled guilty to murder because he was there, he was involved. He aided and abetted and he assisted. He made it possible. He doesn't get away with it because he's not the one who did it. If Weihe never agreed to do it, perhaps it never would have happened, but he agreed. He pled guilty and the plea was in front of a complete[ly] different judge, not Judge Latrone.

> What happens in this courtroom with this jury when you go into the back to decide the fate of Edward Ramirez, that absolutely, in no way, affects the fate of William Weihe. If for some reason – and I'm not suggesting that you do this – but if for some reason, you go back there and you come back and say, Edward Ramirez is not guilty, Billy Weihe doesn't get that right to say, oh, I want my case tried in front of these twelve people. I want to let them to decide if I did this, I want to take it all back, you can't do it, it's etched in stone. No matter what this jury does, I can tell you one thing, and one thing for certain, that Billy Weihe is going to jail.  That's for sure. Remember one other thing. Billy Weihe is no friend of mine, no friend of these detectives of the Dennis family. He's not a friend to anybody. He's Eddie Ramirez's friend, his best friend. They were like this.

N.T. Trial, 12/29/97, at 134-137 (emphasis added to the specific portion of the prosecutor's closing to which [Petitioner] objects on appeal). We find this aspect of [Petitioner's] claim to be waived for failure to make a timely and specific objection at trial to the Commonwealth's argument. *See Brown*, 701 A.2d at 254 (issue is waived on appeal if no timely and specific objection was lodged during trial). This Court will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected. *Id.*[14]

[Petitioner's] second challenge to the prosecutor's closing statement concerns on the following remarks:

> [By the prosecutor]: Sometimes in a trial, you have to look for the little things that tell you what the case is all about. Ramirez and Weihe were best of friends. They're together all night from beginning to end. Nobody disputes that. Weihe pled guilty and admitted his role. Some people admit their rolls [sic] and accept responsibility. Others do not and have to have responsibility thrust upon them. That's Ramirez.

---

[14] The Trial Court's Opinion does not address this specific aspect of [Petitioner's] claim. Purely for informational purposes, we note that the argument [Petitioner] has presented to this Court constitutes a misrepresentation of the nature of the prosecutor's remarks with regard to William Weihe and to [Petitioner's] alleged custodial silence. In actuality, the prosecutor accurately commented on the panoply of relevant constitutional safeguards possessed by both Weihe and [Petitioner] for the purpose of highlighting the fact that Weihe, [Petitioner's] co-conspirator and former co-defendant, nevertheless elected to plead guilty to the crimes at issue in [Petitioner's] case. The prosecutor did not comment on [Petitioner's] custodial or post-arrest silence. Rather, the prosecutor commented on the Weihe's election to plead guilty despite his right to a jury trial.

**Immediately after this happened, when the police first got word that Ramirez and Weihe may be involved, Ramirez had been over [to] the laundromat, what was it that they did, they tried to find him, they went to find Edward Ramirez. You remember, they stopped by his house on the 24th and 27th of February and again, on the 28th. No one was ever home. They left cards for them to call back. Mr. Ramirez, who is a retired police officer and an investigator for a large defense firm and who has a lot of experience in this area and knows a lot [about the] criminal justice system, never returned their phone calls. He could not be found. Edward Ramirez, where was he, he was still living at his house. If you're an innocent man and the police wanted to talk to you about something that you have no knowledge of –**

[By defense counsel]: Objection.

THE COURT: Disregard this line of thought. You don't know if anybody ever received notice as a fact. There were cards left in the mailbox. You don't know if anyone was home or whether they were actually received.

N.T. Trial, 12/29/97, at 143-144 (emphasis added to the specific portion of the prosecutor's closing to which [Petitioner] objects on appeal).

Judge Latrone has provided a meticulous analysis of his reasons for concluding that [Petitioner] is not entitled to a new trial predicated on these grounds. *See* Trial Court Opinion at 46-49. We have carefully considered [Petitioner's] claims in conjunction with our scrutiny of the entirety of the prosecutor's closing argument. We find that Judge Latrone has accurately and aptly interpreted the case law governing this question, and we agree with the rationale expressed in his opinion. We would affirm on the basis of the Trial Court Opinion if this issue had been properly preserved for our review. *See id.*

*Commonwealth v. Ramirez,* No. 1030 Philadelphia 1998, slip op. at 20-26 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 83-89; Commonwealth's Response, Document 27-2 at 20-26.

Upon beginning Mr. Ramirez's PCRA proceedings, he presented "a litany of claims" to the PCRA court, including allegations of prosecutorial misconduct. One argument he presented was that "the prosecutor committed prosecutorial misconduct 'by eliciting inadmissible testimony regarding [petitioner's] silence, and repeatedly commenting on [petitioner's] absolute constitutional right to silence'". The PCRA court noted that "all of these allegations of prosecutorial misconduct were previously litigated in the [petitioner's] direct appeal to the

Superior Court, and all of them were rejected as grounds for a new trial". *Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 9, 17-18 (C.C.P. Philadelphia County, May 3, 2007): Amended Petition, Appendix, Exhibit D, Document 14-1 at 53, 61-62. The PCRA court opined:

> As for the prosecutor's alleged misconduct in commenting on the [petitioner's] constitutional right to remain silent during his closing argument, the Superior Court previously addressed that contention in a footnote to their opinion.

> > The Trial Court's Opinion does not address this specific aspect of [Petitioner's] claim. Purely for informational purposes, we note that the argument [Petitioner] has presented to this Court constitutes a misrepresentation of the nature of the prosecutor's remarks with regard to William Weihe and to [Petitioner's] alleged custodial silence. In actuality, the prosecutor accurately commented on the panoply of relevant constitutional safeguards possessed by both Weihe and [Petitioner] for the purpose of highlighting the fact that Weihe, [Petitioner's] co-conspirator and former co-defendant, nevertheless elected to plead guilty to the crimes at issue in [Petitioner's] case. The prosecutor did not comment on [Petitioner's] custodial or post-arrest silence. Rather, the prosecutor commented on Weihe's election to plead guilty despite his right to a jury trial.

Mr. Ramirez also claimed ineffective assistance of counsel due to "trial counsel's failure to object when the 'prosecutor repeatedly called the jury's attention to [petitioner's] silence and repeatedly sought to shift the burden to him". *Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 18-19, 28 (C.C.P. Philadelphia County, May 3, 2007); Amended Petition, Appendix, Exhibit D, Document 14-1 at 62-63, 72. The PCRA court ordered Mr. Ramirez's petition dismissed. Petitioner appealed, and the Pennsylvania Superior Court opined:

> In the instant case, [Petitioner] contends that trial counsel was ineffective for failing to object to comments made by the prosecutor during his closing argument, wherein the prosecutor argued at length that [Petitioner's] pre-arrest and post-arrest action were indicative of guilt. In articulating his position, the prosecutor emphasized that [Petitioner] never confronted his principal accuser, Billy Weihe, while the two men were in police custody, stating in relevant part:

> > They arrested Ramirez and they brought him down to the police station. He and Weihe are up in the same room together. What is Ramirez's reaction, according to Weihe? You have now been arrested and charged with [a] robbery and murder you have nothing to do with and you're a completely innocent man and the person who you think has caused you

to be arrested is in the same room with you. What did Ramirez do? Did he confront Weihe and saying [sic] something to him? Did he speak when you would think a person would normally speak? No. he turns around in the cell and says to the guard, "You have to put me somewhere else." When people accuse you of doing something that you know you didn't do, do you turn around and walk away from them? Do you say nothing to them, even if it's something minor in your life, you know, you ate the last piece of cake? No, I didn't. You defend yourself. You confront your accuser. Ramirez said nothing.

In the law, there is something called tacit admission. An admission is what Weihe did on [sic] himself, she he spoke, he put in on himself and he said he wanted to tell. Sometimes not speaking when you should speak is as much of an admission [as] when someone accuses you of doing something that you know you didn't do. You don't even defend yourself. Like when my wife came in and said, did you eat that last piece of cake, and I know I did, I don't bother to deny it because my tacit admission, my silence says everything.

Ramirez was in the same cell room with Billy Weihe. He was getting arrested and charged with murder and he had that chance to-

THE COURT: The concept of tacit admission in criminal law is not an acceptable one nor any reference to tacit admission in criminal law. It is not admissible evidence. Ignore the whole context in which [the prosecutor] was going to make the statement he was about to make. It is not the law.

N.T.Trial, 12/29/97, at 148-150.

The PCRA court declined to address this claim, finding that all issues relating to the prosecutor's comments about [Petitioner's] silence were previously litigated on direct appeal. *See* Trial Court Opinion, 5/3/07, at 17-18; *see also* N.T. PCRA Hearing, 1/3/05, at 160-164. This ruling is wholly unsupported by the record. The issue on direct appeal, where [Petitioner] was represented by the same attorney who defended him at trial, pertained to the prosecutor's comments at pages 134, 135, 143, and 144 of the December 29, 1997 notes of testimony. *See Commonwealth v. Ramirez,*760 A.2d 431 (Pa.Super. 2000) (unpublished memorandum at 21 n.8). The issue herein pertains to the prosecutor's comments at pages 148 through 150 of that transcript and is materially different from the arguments presented on direct appeal.[15] Moreover, [Petitioner's] present ineffectiveness claim is properly before this Court because it was raised in his *pro se* and amended PCRA petitions. *See, e.g.,* Amended Petition, 5/11/01, at 13.

As [Petitioner] accurately points out in his brief, Pennsylvania courts have consistently held that references to a defendant's post-arrest silence are strictly forbidden. Our Supreme Court has stated:

---

[15]The scenario in this case is strikingly similar to *Commonwealth v. Duffey*, 855 A.2d 764 (Pa. 2004), wherein a PCRA court erroneously concluded that a post-arrest silence issue had been litigated previously on direct appeal. Our Supreme Court disagreed with that assessment, noting that the issue raised on collateral review in that case was "materially different" from the issue addressed on direct appeal. *Id.* at 773 n.12.

The law is clear. It is reversible error to admit evidence of a defendant's silence at the time of his arrest. *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972). The prohibition of any reference to an accused's silence reflects the court's desire that an accused not be penalized for exercising his constitutional rights. *Commonwealth v. Stafford, supra; Commonwealth v. Haideman, supra; Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is a recognition that most lay persons would view an assertion of the constitutional privilege as an admission of guilt. *Commonwealth v. Haideman*, 499 Pa. at 371, 296 A.2d at 767, citing *Walker v. United States*, 404 F.2d 900, 903 (5th Cir. 1968).

*Commonwealth v. Grego*, 350 A.2d 826, 828 (Pa. 1976). *See also Commonwealth v. Singletary*, 387 A.2d 656 (Pa. 1978) ("It is a violation of the accused's constitutional privilege against self-incrimination to make reference to his silence while in police custody."); *Commonwealth v. Duffey*, 855 A.2d 764 (Pa. 2004) (no references to post-arrest silence are permitted; it is irrelevant whether the defendant elects to remain silent from the outset or makes a voluntary statement and then asserts the right).

In the case at bar, the prosecutor made numerous references to [Petitioner's] post-arrest silence and asked the jury to draw damaging inferences from that silence, characterizing [Petitioner's] failure to protest his innocence as an admission of guilt. Therefore, [Petitioner's] underlying claim of ineffectiveness has arguable merit. *See Duffey, supra* (petitioner's ineffectiveness claim had arguable merit where record confirmed that expert witness commented on defendant's post-arrest silence during penalty phase of murder prosecution); *Commonwealth v. Spotz*, 870 A.2d 822 (Pa. 2005) (cross-examination as to whether defendant ever told police that he shot victim in self-defense constituted impermissible reference to defendant's post-arrest silence, and thus, ineffectiveness claim premised on trial counsel's failure to object to various question had arguable merit).

The fact that the trial court informed the jury that the prosecutor's "tacit admission" argument was inappropriate does not dispense with the need for an evidentiary hearing on this issue, as the prejudicial effect of an improper reference to post-arrest silence must be examined on a case-by-case basis. In *Commonwealth v. Turner*, 454 A.2d 537 (Pa. 1982), the prosecutor cross-examined the defendant who had never given a statement to investigators, as to whether he had previously told the police that he shot the victim in self-defense. Defense counsel immediately objected and requested a mistrial at sidebar, but the trial judge denied the motion and instructed the jury as follows:

Ladies and gentlemen of the jury, I told you at the beginning of this trial, when I gave preliminary instructions, the only evidence you are to consider when you deliberate as to your verdict is what you hear from this witness stand. I told you specifically, as I recall, and I reiterate it now, that questions asked by either of the lawyers or even the court are not evidence. A question was just asked before we went to sidebar by the Assistant District Attorney for this witness, the defendant. It has not been answered. It was objected to, I sustained the objection, and that means you are to disregard that question,

or I say to you now you are to disregard that question entirely, as though it had never been asked.

*Turner, supra* at 538 n.2. Notwithstanding this directive, the Supreme Court ordered a new trial, observing that "[t]he jury may have decided that the Commonwealth's case was significantly bolstered by the reference to [the defendant's] post-arrest silence. . . ." *Id.* at 540.

Similarly, the prosecutor in *Singletary, supra*, asked a question indicating that the defendant, following the advice of his attorney, "made no statement" after surrendering to police. *Id.* at 656. Defense counsel objected and requested a mistrial. The judge replied:

I will deny your motion [for a mistrial] and sustain the objection [to the improper question], and I'll ask the jury to disregard that question. The defendant has no duty at all to make any statements, and whatever he did on advice of counsel, he did on advice of counsel, period. So, you draw no inference or implication from that [question] whatsoever. Disregard from your mind it was asked.

*Id.* at 657 n.1. The defendant was subsequently convicted of murder and appealed to our Supreme Court, which granted a new trial because it was "not persuaded that the cautionary instructions eradicated [the] prejudicial inference [that the defendant's silence ws indicative of guilt]." *Id.*

Lastly, in *Commonwealth v. Maloney*, 365 A.2d 1237 (Pa. 1976), the defendant appealed his murder conviction on several bases, arguing, *inter alia*, that a new trial was required because the prosecutor elicited testimony from a police officer concerning the defendant's post-arrest silence and expressed a personal opinion as to the defendant's guilt during his closing argument to the jury. In a plurality decision that ultimately granted a new trial based on the prosecutor's summation, the Supreme Court concluded that the references to the defendant's silence did not constitute reversible error because: (1) the prosecutor did not ask the jury to draw improper inferences from the silence; and (2) the trial court gave the following curative instruction:

Ladies and gentlemen of the jury, in response to one of the questions asked, I believe the response of the witness was that Mr. Maloney made no statement [to police]. Please understand, ladies and gentlemen, that a person who is arrested, who is charged with anything, has no duty to make a statement. He is under no obligation to make a statement at all, in any way, shape or form. That answer, therefore, is not evidence. It may not be considered by you as being any evidence whatsoever against Mr. Maloney with respect to the case we have before us. It's a constitutional right you have, not to say anything. The fact that you exercise that right cannot be held against you. I instruct you specifically at this time concerning that in order that you might understand it and not allow it to in any way interfere with your thinking about the case.

*Maloney, supra* at 1240. The Court held that this timely instruction, coupled wit a subsequent charge reminding the jury that a defendant's post-arrest silence cannot be considered evidence of guilt, was sufficient to cur the prejudicial effect of the challenged remarks. *Id.* at 1241.

These cases demonstrate that a curative instruction is not always sufficient to cure the prejudice of an improper reference to post-arrest silence. Thus, the PCRA court must address the second and third prongs of the ineffective-assistance-of-counsel test on remand. Our Supreme Court has stated that as a general rule, appellate courts should not assess the reasonableness of trial counsel's actions when there has not been an evidentiary hearing to determine the exact reasons for counsel's failure [to] object to remarks about post-arrest silence. *See Duffey, supra* at 775; *accord Commonwealth v. Spotz*, 870 A.2d 822, 832-33 (Pa. 2005). Herein, the PCRA court precluded PCRA counsel from questioning trial counsel about this issue based on its erroneous belief that the matter was litigated previously on direct appeal. We decline to speculate as to why trial counsel did not object to the statements at issue or request a mistrial or a more thorough curative instruction; therefore, the case must be remanded for an evidentiary hearing and the preparation of a PCRA court opinion addressing this issue on the merits.

*Commonwealth v. Ramirez*, No. 592 EDA 2006, slip op. at 9-16 (Superior Court, July 6, 2009);

Amended Petition, Appendix, Exhibit A, Document 14-1 a t 12-19.

Pursuant to the remand order, an evidentiary hearing was conducted before the PCRA court, and, after hearing testimony, the court denied Mr .Ramirez's claim of trial counsel ineffectiveness. The matter proceeded once again to the Pennsylvania Superior Court, which opined:

In his first issue, [Petitioner] contends the Commonwealth's closing argument improperly referenced [Petitioner's] post-arrest silence, because the prosecutor mentioned the statements [Petitioner] made while in the cell at the police station. [Petitioner] asserts trial counsel was ineffective for failing to object and emphasizes this Court's prior determination that the issue has arguable merit. [Petitioner] argues the February 25, 2010 evidentiary hearing established that trial counsel did not have a tactical or strategic rationale for failing to object; instead, counsel simply believed he did not have grounds to object. [Petitioner] further argues counsel's failure to object resulted in actual prejudice. Additionally, [Petitioner] recognizes that the court offered a curative instruction immediately following the prosecutor's comments, but [Petitioner] insists the curative instruction did not overcome the prejudicial effect of the comments. [Petitioner] concludes trial counsel was ineffective on this basis. We disagree.

The law presumes counsel has rendered effective assistance. *Commonwealth v. Williams, K.,*597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to make the following showing: (1) that the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Williams, K., supra.*

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit. . . ." *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Taylor*, 9*33 A.2d 1035, 1042 (Pa.Super. 2007), *appeal denied,*597 Pa. 715, 951 A.2d 1163 (2008) (quoting *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

*Id.* at 524, 645 A.2d at 194-95 (internal citations omitted).

> Prejudice is established when [a defendant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In [*Kimball, supra*], we held that a "criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Commonwealth v. Chambers*, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002) (some internal citations and quotation marks omitted). In determining prejudice, a court "must consider the totality of the evidence before the judge or jury." *Commonwealth v. Simmons*, 569 Pa. 405, 430, 804 A.2d 625, 640 (2001).

"[W]hen it is clear that the party asserting a claim of ineffectiveness has failed to meet the prejudice prong, the claim may be dismissed on that basis alone without a determination of whether the first two prongs of the ineffectiveness standard have been met." *Commonwealth v. Zook*, 585 Pa. 11, 26, 887 A.2d 1218, 1227 (2005).

> Moreover, as a general and practical matter, the fact that a claim is litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error, makes it more difficult for the defendant to prevail. For example, an apparently meritorious but defaulted claim may fail to secure collateral relief if counsel had an objectively reasonable basis for failing to pursue the claim. In addition, assuming a claim of merit, the burden and standard of proof applicable in assessing prejudice differs. This Court addressed the difference in *Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300, 1307 (1994);

>> [A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it "could have reasonably had an adverse effect on the outcome of the proceedings." *Pierce*, 515 Pa. at 162, 527 A.2d at 977 This standard is

different from the harmless error analysis that is typically applied when determining whether the trial court erred in taking or failing to take certain action. The harmless error standard, as set forth by this Court in *Commonwealth v. Story*, [Pa. 391, 409, 383 A.2d 155, 164 (1978)] (citations omitted), states that "[w]henever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless." This standard, which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the *Pierce* prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective, and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel. *Pierce, supra.*

*Commonwealth v. Gribble,* 580 Pa. 647, 676, 863 A.2d 455, 472 (2004).

"[A] defendant enjoys a Constitutional right to remain silent and that it is a violation of that right where reference is made to the accused's post-arrest silence." *Commonwealth v. Messersmith*, 860 A.2d 1078, 1093 (Pa.Super. 2004), *appeal denied*, 583 Pa. 688, 878 A.2d 863 (2005) (quoting *Commonwealth v. Nolon*, 535 Pa. 77, 86, 634 A.2d 192, 197 (1993)).

"[I]t is irrelevant whether a defendant elects to assert the constitutional right to remain silent from the outset or makes a voluntary statement and then asserts the right." The reference to post-arrest silence is not permitted. Nor may a prosecutor make references to the defendant's resumption of silence.

*Commonwealth v. Duffey*, 597 Pa. 186, 203, 855 A.2d 764, 774-75 (2004) (quoting *Commonwealth v. DiPietro*, 538 Pa. 382, 386, 648 A.2d 777, 779 (1994)).

A petitioner, however, faces a heavy burden to demonstrate that a reference to post-arrest silence resulted in actual prejudice:

[T]he mere revelation of silence does not establish innate prejudice. Moreover, this Court has made clear that improper references to post-arrest silence are subject to harmless error analysis in the direct appeal context, where an objection to the reference has been preserved. More importantly, the test for prejudice in the ineffectiveness context is more exacting than the test for harmless error, and the burden of proof is on the defendant, not the Commonwealth. Certainly, if no *per se* rule attends the harmless error analysis applicable to a preserved . . . claim upon direct review, a similar presumption cannot control the stricter prejudice inquiry in the context of a collateral attack alleging ineffective assistance of counsel. Notably, the U.S. Supreme Court very recently reemphasized that it is only in the rarest of circumstances. . . that a presumption of prejudice is appropriate in assessing a claim of ineffective assistance of counsel. *Florida v. Nixon*, 543 U.S. 175, _____, _____, 125 S.Ct. 551, 555, 562, 160 L.Ed.2d 565 (2004)

(presumption of prejudice "is reserved for cases in which counsel fails meaningfully to oppose the prosecution's case") (citing *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 :/Ed.2d 657 (1984)). *See also Bell v. Cone*, 535 U.S. 685, 696-97, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002) (for *Cronic's* presumed prejudice standard to apply, counsel's "failure must be complete").

*Commonwealth v. Spotz*, 582 Pa. 207, 226-27, 870 A.2d 822, 833-34 (2005), *cert. denied*, 546 U.S. 984, 126 S.Ct. 564, 163 L.Ed.2d 474 (2005) (some internal citations and quotation marks omitted).

The court's issuance of a prompt curative instruction can eliminate the harm caused by an improper reference to a defendant's post-arrest silence:

While any reference to an accused's decision to invoke the right to remain silent is a clear violation of the constitutional right against self-incrimination, not every such reference requires the declaration of a mistrial. The mention of an accused's post arrest silence constitutes reversible error unless a prompt and adequate curative instruction is given. . . or the reference is proven harmless.

*Commonwealth v. Boone*, 864 A,2d 630, 646 (Pa.Super. 2004) (internal citations omitted). An adequate curative instruction does not need to be especially detailed, as "succinct instructions have been found sufficient in the past." *Id.* Juries are presumed to follow the court's instructions. *Commonwealth v. Mollett*, 5 A.3d 291 (Pa.Super. 2010), *appeal denied*, _____ Pa. _____, 14 A.3d 826 (2011).

Instantly, Mr. Weihe testified that the police put [Petitioner] in a cell with Mr. Weihe during their detention at the police station. (*See* N.T. Trial, 12/16/97, at 147.) [Petitioner] did not confront Mr. Weihe; instead, [Petitioner] "told the officer or whoever it was that he didn't want to be in the cell with" Mr. Weihe. (*Id.*) The officer complied with [Petitioner's] request and moved him to a different cell. (*Id.*)

During his closing argument, the prosecutor referred to Mr. Weihe's testimony as follows:

[The police] arrested [Petitioner] and they brought him down to the police station. He and Weihe are in the same room together. What is [Petitioner's] reaction, according to Weihe? You have now been arrested and charged with [a] robbery and murder you have nothing to do with and you're a completely innocent man and the person who you think has caused you to be arrested is in the same room with you. What did [Petitioner] do? Did he confront Weihe and [say] something to him? Did he speak when you would think a person would normally speak? No. he turns around in the cell and says to the guard, "You have to put me somewhere else.["] When people accuse you of doing something that you know you didn't do, do you turn around and walk away from them? Do you say nothing to them, even if it's something minor in your life, you know, you ate the last piece of cake? No, I didn't. You defend yourself. You confront your accuser. [Petitioner] said nothing.

In the law, there is something called tacit admission. An admission is what Weihe did on himself, . . . he put it on himself and he said he wanted to tell. Sometimes not speaking when you should speak is as much of an admission when someone accuses you of doing something that you know you didn't do. You don't even defend yourself. Like when my wife came in and said, did you eat the last piece of case, and I know I did, I don't bother to deny it because my tacit admission, my silence definitely says everything.

[Petitioner] was in the same cell room with Billy Weihe. He was getting arrested and charged with murder and he had that chance to –

(*See* N.T. Trial, 12/29/97, at 149-49.) At that point, the court *sua sponte* interrupted and gave a curative instruction:

The concept of tacit admission in criminal law is not an acceptable one nor [is] any reference to tacit admission in criminal law. It is not admissible evidence. Ignore the whole context in which [the prosecutor] was going to make the statement he was about to make. It is not the law.

(*Id.* at 149-150).[16]

After closing arguments, but prior to the jury charge, the parties retired to the judge's chambers. In chambers, trial counsel moved for a mistrial based upon the prosecutor's alleged references to [Petitioner's] post-arrest silence. (*Id.* at 171-72). Although counsel did not specifically comment on the prosecutor's reference to [Petitioner's] refusal to be in a cell with Mr. Weihe, the court brought up that subject, stating it had given an adequate instruction immediately following the mention of a tacit admission. The court denied the request for a mistrial on the ground of the prosecutor's alleged references to [Petitioner's] post-arrest silence. (*Id.* at 171-72). While issuing the jury charge the next day, the court emphasized to the jury that it "must not draw any adverse inference of guilt or any inference adverse to [Petitioner] that he is hiding anything.," based upon [Petitioner's] decision to exercise his right to remain silent. (*See* N.T. Trial, 12/30/97, at 11.)

At the February 25, 2010 PCRA hearing, counsel addressed the  prosecutor's comments in closing argument regarding [Petitioner's] refusal to share a cell with Mr. Weihe:

Number one, it is my opinion that the [petitioner] has no Fifth Amendment privilege to not talk or to talk to Mr. Weihe. It is my understanding of the law and belief of the law that any pre-arrest or Fifth Amendment issues [have] to have some sort of state action. . .involved in it.

---

[16]"Tacit admission evidence is admissible at trial due to the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt." *Commonwealth v. Bartlett*, 704 A.2d 659, 662 (Pa.Super. 1997), *affirmed*, 554 Pa. 437, 721 A.2d 1058 (1998) (internal quotation marks omitted). Nevertheless, "[T]acit admission evidence is prohibited if it constitutes an exercise of 5th Amendment privileges due to the fact that [the person against whom it is used] was. . .at that time in the custody or presence of police officers." *Id.* at 662 n.4 (internal quotation marks omitted).

. . . . .

> [A]s to an objection, the judge, *sua sponte*, then ruled on-came out and said that there's no such thing as a tacit admission and you should disregard it. So that was another reason. . . . That was something that came out afterwards that kind of put it in perspective as to what [the prosecutor's] argument was, at least to the jury, because [the court] gave a pretty strong statement to the jury to disregard that, there's no such thing as that in the law, a tacit admission. That's what Judge Latrone said on his own.

. . . . .

> And, again, I didn't think it was that significant of testimony. . . . I really don't think it was that important in the case. The most important thing was Mr. Weihe's testimony, not [the prosecutor's closing statement]. That didn't carry the day in my opinion; it was not that significant.

(*See* N.T. PCRA Hearing, 2/25/10, at 6-8). As the transcript makes clear, one reason counsel did not object was that the court preempted an objection, addressed the matter *sua sponte*, and gave a strong curative instruction. The record confirms counsel's reasoning. The court's curative instruction explained that the prosecutor's comments were wholly unacceptable and directed the jury to ignore them. *See Boone, supra.* The curative instruction was prompt, succinct, and clear. *Id.* We can presume the jury followed the court's instruction. *See Mollett, supra.*

Moreover, trial counsel did move for a mistrial on the grounds of alleged references to [Petitioner's] post-arrest silence. The motion and discussion in chambers demonstrated the court knew and considered the prosecutor's reference to a tacit admission. Nevertheless, the court concluded it had issued a sufficient curative instruction and denied further relief. Under these circumstances, [Petitioner] failed to demonstrate a reasonable probability that the outcome of trial would have been different but for trial counsel's failure to object on this basis. *See Zook supra; Gribble, supra.*

Furthermore, the Commonwealth presented significant evidence of [Petitioner's] guilt. At trial, Mr. Weihe described the circumstances leading up to the robbery and murder. Mr. Weihe testified that [Petitioner] said "he needed money, and he was going to rob the laundromat." (*See* N.T. Trial, 12/16/97, at 97.) Mr. Weihe agreed to serve as a lookout, and the two men entered the laundromat. Inside, Mr. Weihe watched [Petitioner] go "right back to where the [victim] was." (*Id.* at 101). Mr. Weihe heard [Petitioner] tell the victim, "Give me the money." (*Id.*) When the victim did not comply, Mr. Weihe watched [Petitioner] strike the victim's head with a black stick or broom handle. The victim began to cry, and she pleaded with [Petitioner] to stop. At that point, Mr. Weihe exited the laundromat. Mr. Weihe recognized that [Petitioner] "was getting violent," and Mr. Weihe "didn't want to get hurt either." (*Id.* at 111).

[Petitioner] and Mr. Weihe proceeded to the home of Sara Hurd. While walking, [Petitioner] asked Mr. Weihe whether he wanted any of the robbery proceeds. Mr. Weihe declined the offer, but he noticed that [Petitioner's] pants pockets bulged with coins from the laundromat. The two men subsequently arrived at Ms. Hurd's home, where a small group of friends had gathered to use illegal drugs. [Petitioner] suggested that the group call Melanie Forman to get additional drugs and boasted about how "he went in [the laundrdomat] and he

robbed the place. He said the lady wouldn't give him the money so he hit her." (*Id.* at 122). Ultimately, Ms. Hurd left her home, went to visit Ms. Forman, and purchased additional drugs.

The next day, Ms. Forman found out about the robbery and the victim's death. Ms. Forman wanted to know if Ms. Hurd had purchased the drugs with the robbery proceeds, so she went to Ms. Hurd's home to confront her. Ms. Forman testified that she arrived at the home and encountered [Petitioner]. Ms. Forman asked [Petitioner] whether he had robbed the laundromat, and [Petitioner] admitted he had. [Petitioner] also said the victim "didn't want to cooperate, so he had to hit her." (*Id.* at 26). When Ms. Forman asked [Petitioner] whether the victim had died, he did not respond.

Joseph Maio testified that he was at Ms. Hurd's home on the night of the robbery. Mr. Maio spoke with [Petitioner] that evening, and [Petitioner] admitted participating in the robbery. [Petitioner] informed Mr. Maio, "the shit went wrong" and "something happened." (*See* N.T. Trial, 12/12/97, at 86.) [Petitioner] told Mr. Maio that [Petitioner] had struck the victim during the course of the robbery. Mr. Maio also testified that he "heard change" in [Petitioner's] pockets and saw "a little bit of cash. . . .." (*Id.* at 88).

The Commonwealth also presented Luis Rivera, who said he had spoken to [Petitioner] during the week following the murder:

> [COMMONWEALTH]: When [Petitioner] came into the living room where you were visiting Sara Hurd, what did he say to you?
>
> [MR. RIVERA]: He said, "Did you hear?" I said no.
>
> [COMMONWEALTH]: Then what?
>
> [MR. RIVERA]: Then he asked, "Did you hear about the laundromat murder? I said no. so, he said, "Well, me and Billy Weihe did a stickup and we hurt the lady and she died."
> · · · · ·

(*See* N.T. Trial, 12/17/97, at 8.)

Here, the Commonwealth presented ample evidence to support [Petitioner's] convictions. In light of this evidence, the court's *sua sponte* curative instruction, and counsel's motion for a mistrial, any failure to object to the comments at issue during the prosecutor's closing argument did not affect the outcome of the proceedings. Based upon the foregoing, [Petitioner] failed to satisfy the prejudice prong of the test for ineffective assistance of counsel, and no relief is due.[17] *See Williams, K., supra.*

---

[17]Additionally, [Petitioner] filed a petition on July 26, 2010, to remand the case for the PCRA court to enter an order consistent with its 2010 Rule 1925(a) opinion. In that opinion, the court changed its mind, concluding trial counsel had no reasonable strategic basis for failing to object to the prosecutor's alleged references to [Petitioner's] post-arrest silence, and [Petitioner] suffered actual prejudice due to counsel's failure. On August 18, 2010, this Court denied the petition without prejudice to [Petitioner's] right to renew it upon presentation to the panel assigned to decide the case. In his brief, [Petitioner] renewed his request to reverse and remand for entry of an order for a new trial, consistent with the rationale contained in the PCRA court's opinion.

*Commonwealth v. Ramirez*, No. 1684 EDA 2010, slip op. at 9-22 (Superior Court, February 6, 2012); Amended Petition, Appendix, Exhibit U, Document 14-2 at 99-112; Commonwealth's Response, Document 27-3 at 9-22.

As Mr. Ramirez failed to include his claim concerning his pre-trial silence in his Rule 1925(b) statement on direct appeal, the state courts found that claim waived. An issue is waived if the petitioner could have raised it but failed to do so at an earlier stage. *See* 42 Pa.C.S.A. §9544(b). Being waived, this claim is not properly before this Court. *See Griggs v. DiGuglielmo*, 2007 WL 2007971 *5 (E.D.Pa. July 3, 2007) ("[T]he Pennsylvania Rules of Appellate Procedure and PCRA waiver rules are independent and adequate state grounds which may bar federal habeas review."); *see also Buck v. Colleran*, 115 Fed.Appx. 526, 527-528 (3d Cir. 2004). Where, as here, the highest state court has not ruled on the merits of this claim regarding Petitioner's pre-arrest silence, and it would not do so at this time,[18] the claim is procedurally defaulted. This claim is not appropriate for federal habeas corpus review, absent a showing of cause and prejudice or a miscarriage of justice. As Mr. Ramirez presents neither cause nor prejudice or a miscarriage of justice to excuse this default, a review of his claim concerning his pre-arrest silence is not fitting for this Court.

Included in this second habeas claim is an allegation of ineffective assistance of counsel for failing to object to, and also for failing to raise on appeal, a claim of prosecutorial misconduct in regard to comments by the prosecutor about Petitioner's post-arrest silence. As the record reveals, upon his arrest, Mr. Ramirez was placed in the same cell as Mr. Weihe, and he asked to

---

Regarding the PCRA court's conclusion that counsel had no reasonable strategic basis for failing to object, we again emphasize counsel had no need to object where the court *sua sponte* stopped the prosecutor and gave a curative instruction to the jury to ignore those remarks. The curative instruction was prompt, succinct, and clear. [Petitioner] simply cannot demonstrate a reasonable probability that the outcome of trial would have been different if trial counsel had also objected. In light of our disposition of this issue, we deny the petition for remand.

[18] Absent some exceptions which are not applicable here, a PCRA petition must be filed within one year of the date a judgment becomes final. *See* 42 Pa.C.S.A. §9545(b).

be moved to another cell. The police then moved him. During the prosecutor's closing argument, he referred to this behavior by Petitioner and implied an innocent man would behave differently. The trial court interrupted him and *sua sponte* gave a curative instruction. Subsequently, defense counsel moved for a mistrial, which was denied. During the court's jury charge, it repeated that the jury was not to draw an adverse inference on the basis of his post-arrest silence.

The state courts considered this issue at great length before rejecting Mr. Ramirez's ineffective assistance of counsel claim on this basis. The Superior Court noted that the trial court's curative instruction was prompt, succinct and clear, and the jury is presumed to follow the court's instruction.[19] There was no need for defense counsel to object when the court stopped the prosecutor's closing and gave its curative instruction. The court also pointed out the many witnesses who testified against Petitioner, as well as the other evidence of his guilt.

Mr. Ramirez also takes issue with another portion of the prosecutor's closing argument. Petitioner asserts that the prosecution violated his presumption of innocence by arguing that the defense should have presented certain evidence. The offending comments read:

THE PROSECUTOR: Mr. Ramirez, [Petitioner's father], who has 18 years as a police officer and is a private investigator for the largest criminal defense firm in Philadelphia supposedly has the clothes and boots and there is no evidence of any blood on those things. This is your son and you have a personal experience and knowledge of the criminal justice system and investigation. You have physical evidence that your son is not involved in any murder, or at least evidence which would indicate that he was not involved. What do you with it? You would have to expect that Mr. Ramirez would come into this courtroom with the clothes, he says he checked them, where are they. They have no burden to prove anything to you, but if this was your child and you had that kind of experience, wouldn't you be running with those clothes down to homicide and telling them, "Here's the clothes –

MR. McMAHON: Objection.

---

[19] "[It is] the almost invariable assumption of the law that jurors follow their instructions. . . . [We] presume[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *United States v. Olano*, 507 U.S. 725, 740 (1993) (internal quotations and citations omitted). *See also Richardson v. Marsh*, 481 U.S. 200 (1987).

THE COURT: You are giving the impression that they have a burden of proof in this case. Disregard the context. They have a burden to prove nothing. You have to prove his guilt. They don't have to disprove his guilt.

MR. GILSON: I'm not saying that.

THE COURT: You're holding them to a burden of proof or drawing an adverse inference by evidence that they are otherwise under a duty to present evidence. They have no burden to present evidence, so why should they infer any adverse inference from their failure to present it.
Just get off it, let's move on.

MR. GILSON: I am not suggesting – There is a certain expectation of cooperation as one would expect from the [Petitioner's] father during the investigation, not to prove anything during the investigation, but just to cooperate with the police in terms of turning over this evidence –

MR. McMAHON: Objection.

MR. GILSON: This is not at trial.

THE COURT: But when you originally explain the context –
Just disregard the argument.

MR. GILSON: I am talking about during the investigation.

THE COURT: All right.

N.T. 12/29/97 at 163-164. These comments, too, were stopped by the court and curative instructions were given. In addition, defense counsel objected to these remarks.

In habeas review, the touchstone is the fairness of the trial, not the culpability of the prosecutor. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982). Habeas corpus relief is appropriate only if the prosecutor's acts so infected the trial as to make the resulting conviction a denial of due process. *See Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992), *cert. denied*, 113 S.Ct. 2433 (1992) ("[I]t is essential to distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due process.") (internal quotations and citations omitted). The improper conduct was corrected *sua sponte* by the court, and a curative instruction was given to the jury. The state court determined that the prosecutor's

conduct was not so egregious so as to amount to a denial of Petitioner's due process rights, and I agree. As a result, Mr. Ramirez's additional allegation of ineffective assistance of counsel cannot be supported, and federal habeas corpus relief is not warranted for this claim.

### 3. Jury Instructions

Mr. Ramirez next claims that the trial court jury instructions diminished the prosecutor's burden of proof in violation of Petitioner's right to due process of law and a fair trial, and trial and appellate counsel were ineffective in failing to raise and properly preserve this issue. Specifically, Petitioner alleges that the trial court gave a contradictory and incorrect jury instruction that diminished the prosecutor's burden of proof by allowing the jury to find Mr. Ramirez guilty without considering the defense evidence. He also asserts that the trial court's instructions diminished the prosecutor's burden of proof by directly stating and/or implying that the State had proven each charge.

Federal habeas review of jury instruction claims focuses on due process. Where a petitioner alleges no specific constitutional violation, the issue is "whether the ailing instructions by themselves so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten*, 414 U.S. 141, 147 (1973), not merely whether the instruction is "undesirable, erroneous, or even 'universally condemned.'" *Id.* at 146. *See also, Estelle v.* McGuire, 112 S.Ct. 475, 482 (1991). Furthermore, a single deficient instruction does not render a judgment of conviction invalid if the charge, considered as a whole, clearly informs the jury of the correct legal principle. *See Henderson v. Kibbe*, 431 U.S. 145, 153-155 (1977).

During Mr. Ramirez's PCRA proceedings, the Pennsylvania Superior Court addressed this issue as follows:

In his second issue, [Petitioner] complains the court gave the jury erroneous instructions relating to the Commonwealth's burden of proof, the weight of Mr. Weihe's testimony, and the

offenses of second degree murder and conspiracy. [Petitioner] asserts the court instructed the jury that it did not have to consider defense evidence if it found the Commonwealth's evidence persuasive. [Petitioner] contends this instruction impermissibly diminished the Commonwealth's burden while simultaneously abridging [Petitioner's] right to present a defense. Regarding the instruction about Mr. Weihe's testimony, [Petitioner] avers the court instructed the jury that Mr. Weihe had "participated" in the crimes as an "undisputed accomplice." [Petitioner] insists the court's choice of words implicated [Petitioner] in the criminal activity, showed the court accepted the Commonwealth's version of events, and improperly vouched for Mr. Weihe's credibility. With respect to the offenses of second degree murder and conspiracy, [Petitioner] argues the jury instruction revealed the court believed [Petitioner] was guilty. [Petitioner] further argues the court directed the jury to reach the same conclusion. [Petitioner] concludes trial counsel was ineffective for failing to object to each of these instructions. We disagree.

A jury charge is erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. *Commonwealth v. Baker*, 963 A.2d 495 (Pa.Super. 2008), *appeal denied*, 606 Pa. 644, 992 A.2d 885 (2010).

> A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

*Id.* at 507. "We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy. . . ." *Commonwealth v. Jones*, 858 A.2d 1198, 1200 (Pa.Super. 2004).

> Error cannot be predicated on isolated excerpts of the charge…it is the general effect of the charge that controls… The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law. A verdict will not be set aside if the instructions of the trial court, taken as a whole, and in context, accurately set forth the applicable law.

*Id.* at 1201 (internal citations omitted).

Instantly, the court instructed the jury on the Commonwealth's burden of proof as follows:

> In any event, [Petitioner] did, in fact, present evidence in his own defense. You will recall, there were five witnesses . . . . **Most certainly, you are to consider such evidence in determining whether or not [Petitioner's]  guilt has been proved beyond a reasonable doubt.** In the course of your fact finding function, you are at liberty to believe all, part or none of the testimony of all of the witnesses for the prosecution or the defense presented in this case.

> In your deliberations, you can find a reasonable doubt of [Petitioner's] guilt by appraising [Petitioner's] evidence alone, the Commonwealth's evidence alone or the admixture or combination of the evidence presented [on] behalf of the prosecution and the defense. On the other hand, after evaluating the Commonwealth's evidence, and the Commonwealth's

48

evidence alone, you can find that that evidence was sufficient to establish [Petitioner's] guilt beyond a reasonable doubt with respect to each and every element or each and every part of every charge for which [Petitioner] stands accused here at this trial.

. . . . .

A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to pause, hesitate or refrain from acting upon a matter of highest importance in his or her own affairs or to his or her own interests. A reasonable doubt must fairly arise out of the evidence that was presented or out of the absence or lack of evidence presented with respect to some element of each of the crimes charged. A reasonable doubt must be a real doubt. It must not be an imagined or fancied one, nor may it be a doubt manufactured or conjured up in order to avoid carrying out an unwanted or unpleasant duty.

So, to summarize, you may not find [Petitioner] guilty based upon a mere guess, surmise or suspicion. The Commonwealth has the burden of proving [Petitioner] guilty beyond a reasonable doubt. If the Commonwealth has met that burden, then [Petitioner] is no longer presumed to be innocent and you should find him guilty. On the other hand, if the Commonwealth has not met its burden, then you must find him not guilty.

(*See* N.T. Trial, 12/30/97, at 11-14) (emphasis added).

Contrary to [Petitioner's] assertion, the court did not suggest the jury should ignore defense evidence. Rather, the court said the jury could find reasonable doubt by evaluating the defense evidence alone, the Commonwealth's evidence alone, or some combination thereof. That instruction was proper. *See Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761 (2004) (holding appellant did not suffer prejudice due to counsel's failure to object to jury instruction; although court informed jury it could analyze Commonwealth's evidence alone, court also stressed that jury should consider appellant's evidence or all evidence before reaching verdict).

Regarding Mr. Weihe's testimony, the court stated:

Now, the testimony of William Weihe presents the treatment of principles relevant to evaluating the testimony of an accomplice.

What is an accomplice? Well, an accomplice is one who knowingly and voluntarily cooperates or aids another in committing a crime. It is not merely a passive bystander who happens to observe an illegal act and does not participate in it, nor is he someone who sees a crime being committed and fails to report it to the police. Instead, an accomplice is someone who knowingly, voluntarily and purposely joins with someone else in performing an illegal act. You can match that legal definition to the relevant evidence in this case concerning what was testimony as to whether or not he participated in what took place at the laundromat. I will not go into all of that. You recollect his participation.

In any event, William Weihe claims that he and [Petitioner] committed the relevant crimes to this case together. Weihe has admitted his guilt. He's entered guilty pleas to certain charges, third degree murder, conspiracy and robbery. Thus, at the present time,

there is no dispute or conflict that Weihe, as a matter of law, is a witness who has that status of being a Commonwealth witness, who is an undisputed accomplice, and I have just given you that test.

Thus, if the facts with respect to the participation of this witness and the crimes for which [Petitioner] is on trial are clear and undisputed, . . . the court, as a matter of law, instructs and charges you that that witness is an undisputed accomplice and that the following principles are to be applied by you as guidance in specifically weighing and evaluating such testimony of an undisputed accomplice.

Experience shows that after being caught in the commission of a crime, a person may falsely blame others because of some corrupt and wicked motive. On the other hand, such a person may tell the truth about how he and other persons committed the crime together.

In deciding whether or not to believe William Weihe, you should be guided by the following principles which apply specifically to his testimony.

First, the testimony of William Weihe as an accomplice should be looked upon with disfavor since it comes from a corrupt and polluted source.

Second, the testimony of William Weihe must be examined closely and accepted only with caution and care.

Third, you should consider William Weihe's testimony that [Petitioner] committed the crime is supported in whole or in part by evidence other than that testimony, for if it is supported by independent evidence, it is more dependable.

Fourth, you may find [Petitioner] guilty based on William Weihe's testimony alone, even though it is not supported by any independent evidence.

So, to summarize, even though you decide William Weihe is an accomplice, his testimony standing alone is sufficient evidence on which to find [Petitioner] guilty if, after following the foregoing principles I have explained to you, you are convinced beyond a reasonable doubt that William Weihe testified truthfully and that [Petitioner] committed the crime or crimes which he described.

(*See* N.T. Trial, 12/30/97, at 29-32.)

When viewed in context, the court explained that Mr. Weihe was an "accomplice" as defined by statute and case law. *See* 18 Pa.C.S.A. §306 (defining accomplice as person who aids, agrees, or attempts to aid another in planning or commission of offense). The court noted that Mr. Weihe had pled guilty to certain offenses stemming from the murder at issue, but the court did not imply that [Petitioner] must be guilty due to Mr. Weihe's status as an accomplice. *See Commonwealth v. Williams,T.,* 581 Pa. 57, 863 A.2d 505 (2004) (holding similar charge adequately and accurately instructed jury to view accomplice's testimony as coming from corrupt source; instruction did not imply appellant was guilty simply because witness was

considered accomplice). Under these circumstances, the court properly instructed the jury concerning Mr. Weihe's testimony.

Regarding the offenses of second degree murder and conspiracy, the court instructed the jury as follows:

In determining whether or not a conspiracy has been proved, you should consider the overt acts, conduct, surrounding circumstances and the relationship between or among the parties allegedly engaged in such alleged crime. In sum, the existence of a conspiracy can be inferred from the relationship, conduct and circumstances of the parties.

The third and last element, the performance of an overt act in pursuance of the conspiracy by any party thereto. Please note that but one overt act is sufficient by any of the parties. Further, it is not necessary that the crime which is the object of the conspiracy be completely and fully committed, but it can be attempted.

Here, there was more than an attempt under the evidence, so we are not considering an attempted robbery or homicide under the facts of this case. These are consummated crimes.

The object of this conspiracy that's relevant to the evidence, and you can probably find it, I'm not finding it for you, you can apply the evidence and you reach your own conclusions on the facts.

All that is required is that but one overt act done in pursuance of the conspiracy.
. . . . .
Murder of the second degree is oftentimes referred to as felony murder because it occurs during the attempt to commit the actual commission of or flight after the commission of a felony, and as I said, the relevant felony in this case is robbery. I heretofore defined and explained the elements of robbery to you previously, so we need not get into that.

In fact, to make out a case of felony murder, it is not even necessary that the underlying felony be fully completed. It is sufficient that the Commonwealth has proved beyond a reasonable doubt that there was an attempt to commit a robbery. So, when I refer to the underlying felony of robbery throughout these instructions, you understand they also could have included an attempted robbery. Evidently, under the facts, it would appear— well, you determine what it was. There was a robbery.
. . . . .
Second degree murder requires the presence of malice like all other grades of murder, but in the context of felony murder in this instance, you, as fact finders, can infer malice from the very fact that [Petitioner] engaged along with an accomplice in the commission or attempted commission of the underlying felony dangerous to human life, such as a robbery, which is one of the statutorily enumerated crimes.

(*See* N.T. Trial, 12/30/97, at 45-47, 72-74). Here, the court's charge revealed no personal opinion that [Petitioner] actually committed the offenses of conspiracy and second degree murder.

Likewise, the court did not order the jury to find [Petitioner] guilty of the offenses at issue. Instead, the court instructed the jury to consider the evidence and reach its own conclusion regarding [Petitioner's] guilt or innocence. In context, each of the instructions accurately set forth the applicable law. *See Jones, supra.* Therefore, [Petitioner's] claims that counsel should have objected to the instructions lack arguable merit, and no relief is due. *See Pierce, supra; Taylor, supra.*

*Commonwealth v. Ramirez,* No. 1684 EDA 2010, slip op. at 22-29 (Superior Court, February 6, 2012); Amended Petition, Appendix, Exhibit U, Document 14-2 at 112-119; Commonwealth's Response, Document 27-3 at 22-29.

The trial court properly instructed the jury regarding Mr. Weihe's accomplice status; it did not imply that Mr .Ramirez was guilty due to Mr .Weihe's status, and it did not suggest that the defense evidence could be ignored. The Superior Court found no error in the instructions, and I determine that the state court decision in this regard is neither contrary to nor an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. Nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Because the underlying claim lacks merit, Petitioner's counsel was not ineffective for declining to raise it. Mr. Ramirez is not entitled to federal relief on this issue.

4. <u>Other Bad Acts</u>

Mr. Ramirez's fourth claim is an allegation that the prosecutor elicited testimony about unrelated other bad acts in violation his right to due process of law and a fair trial. Petitioner asserts that the Commonwealth elicited inadmissible evidence concerning threatening letters purportedly received by a prosecution witness. Mr. Ramirez believes that the trial court's curative instruction improperly vouched for the credibility of that witness, thereby denying Petitioner due process of law. Petitioner also claims that the prosecutor elicited inadmissible evidence that he had previously purchased drugs, thus, denying him his right to a fair trial before

an impartial jury. In addition, he again claims that counsel was ineffective in failing to raise and preserve this issue.

"It is a well-established principle that evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Attorney General*, 623 F.2d 307, 312 (3d Cir. 1980), *cert. denied*, 449 U.S. 1042 (1980). The reviewing court must determine "only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 352-353 (1990) (internal quotation marks and citations omitted). Appropriate curative instructions should prevent federal habeas relief.

This issue concerning "other bad acts" was first raised during direct appeal as trial court error. As the Court of Common Pleas explained:

As his first assignment of error, Edward Ramirez alleges that this Court erred in admitting evidence of his drug use shortly before his commission of these crimes. This claim is unmeritorious. At trial, Joseph Maio testified to the events leading up to the robbery and murder of Joyce Dennis. Maio related that he had been with Ramirez and Weihe on the evening of February 19, 1995, which was approximately four to five hours before the commencement of these crimes. [N.T. dated 12/12/97 at pp. 68, 85]. Specifically, Maio related that while he, Ramirez, Weihe, and T.A. were waiting for the SEPTA "R" bus, which was to take them to a party at Sara Hurd's house, all four of the youths smoked "angel dust" rolled into a hollowed-out "blunt" cigar. [N.T. dated 12/12/97 t pp. 69-70, 76-78].

It is well established in this Commonwealth that the trial court has broad discretion in admitting or excluding evidence and will not be reversed absent an abuse of discretion. *Commonwealth v. Impellizzeri*, 443 Pa.Super. 296, 661 A.2d 422 (1995); *Commonwealth v. Rodgers*, 413 Pa.Super. 498, 605 A.2d 1228 ((1992); *Commonwealth v. Schwartz*, 419 Pa.Super. 251, 615 A.2d 350 (1992); *Commonwealth v. Wagner*, 383 Pa.Super. 128, 556 A.2d 462 (1989); *Commonwealth v. Underwood*, 347 Pa.Super. 256, 500 A.2d 820 (1985); *Commonwealth v. Niemetz*, 282 Pa.Super. 431, 422 A.2d 1369 (1981). In determining admissibility, the trial court should decide whether the evidence is relevant and, if so, whether its probative value is outweighed by its prejudicial impact. *Schwartz, supra; Commonwealth v. Shain*, 324 Pa.Super. 456, 471 A.2d 1246 (1984). Evidence is relevant if it tends to make more or less probable the

existence of some fact material to the case, it tends to establish facts in issue, or when it in some degree advances the inquiry and thus has probative value. *Commonwealth v. Jackson*, 336 Pa.Super. 609, 486 A.2d 431 (1984); *Wagner, supra; Schwartz, supra, Shain supra.* The probative value of a piece of evidence cannot be outweighed by its prejudicial impact. *Impellizzeri, supra.* However, evidence of a defendant's distinct crimes are not generally admissible against that defendant solely to show his bad character or his propensity for committing criminal acts. *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988). Evidence of prior criminal conduct is, on the other hand, admissible, under special circumstances. *Commonwealth v. Marshall*, 523 Pa. 556, 568 A.2d 590 (1989); *Commonwealth v. Claypool* 508 Pa. 198, 495 A.2d 176 (1985). One of these situations is where distinct crimes are part of a chain or sequence of events which form the history of the case and are part of its natural development (sometimes called the "*res gestae*" exception). *Commonwealth v. Spotz*, _____ Pa. _____, 716 A.2d 580, 1998 Pa. LEXIS 1425; *Lark, supra; Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987). When one of these exceptions applies, however, the trial court must still balance the relevancy and evidentiary need for the other crimes evidence against its prejudicial effect. *Lark, supra; Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981). In the present case, Ramirez and Weihe were charged with criminal conspiracy to rob and murder the deceased. The Commonwealth sought to meet its burden of proof, in part, by establishing that Ramirez and Weihe were together before, during, and after the deceased's murder and robbery and that this association was more than mere happenstance. The circumstances surrounding Ramirez and Weihe's association hours before the death of the deceased included their partaking of "angel dust" rolled into "blunt" cigars a mere four hours before the commencement of these crimes. Evidence of the relations, conduct or circumstances of parties is always relevant circumstantial evidence of the existence of a conspiracy. *Commonwealth v. Gwaltney*, 497 Pa. 505, 442 A.2d 236 (1982). Also relevant to the establishment of a conspiracy is the association and relationship between alleged conspirators. *Commonwealth v. Perdie*, 249 Pa.Super. 406, 378 A.2d 359 (1977); *Commonwealth v. Minnich*, 236 Pa.Super. 285, 344 A.2d 525 (1975). The association together of Weihe and Ramirez mere hours before their robbery and murder of the deceased was an essential circumstantial element of meeting the Commonwealth's burden of proof of a criminal conspiracy. A factual element of this association was their consumption together of "angel dust" in the hours leading up to the commission of these crimes. Therefore, this Court did not commit error when it allowed into evidence testimony by Joseph Maio describing drug use by the codefendants four hours before the commencement of these crimes. Sufficient evidence was established at trial to allow the reasonable inference that Ramirez's motive for these crimes was to purchase more "wet" from Melanie Forman on top of that which he had smoked earlier in the day while standing at the SEPTA "R" bus stop. Motive provides a reason for intending to do the charged act, and from this mental state it is inferred that the accused committed the act. *See, 2 Weinsteins's Federal Evidence* §404.20[3] (Matthew Bender 2d ed.). *See also,* Packel and Poulin, *Pennsylvania Evidence,* §405.1 (1987); *Ohlbaum on the Pennsylvania Rules of Evidence,* §404.19 (1998). Although proof of motive is not necessary to establish the elements of a crime to support a verdict of guilt, it is always admissible and always relevant evidence. *Ward, supra; Gwaltney, supra; Brantner, supra; Faison, supra; Costanzo, supra.* Evidence of the distinct crimes must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the distinct set of facts or circumstances. *Commonwealth v. Martin*, 479 Pa. 63, 387 A.2d 835 (1978); *Commonwealth v. Schwartz*, 419 Pa.Super. 251, 615 A.2d 350 (1992). The evidence at trial established that the original joint intent of Ramirez,

Weihe, Maio and T.A. was to take the bus to Sara Hurd's house. The Hurd household was well-known for its wild drug filled parties. Ramirez did not go directly to Hurd's house, in part, because he could not muster the bus-fare. He had no money. After the robbery and murder of Joyce Dennis at the laundromat, Ramirez made a bee-line directly for Sara Hurd's house. On the way there, Ramirez asked Weihe if he wanted any of the robbery proceeds with which to buy "angel dust". [N.T. date 12/16/97 at pg. 117]. Immediately upon his arrival at Sara Hurd's house, Ramirez began what would be an all-night binge of purchasing "wet" from Melanie Forman and smoking it with his friends. Forman testified that this night was unusual for the fact that her entire supply of "wet" was purchased by Hurd with mostly one-dollar bills. Indeed, Weihe testified that Ramirez continuously supplied Hurd that night with money to purchase "wet". These facts clearly established the acquisition of money for later drug purchases as the motive for Ramirez's robbery and murder of Joyce Dennis on the evening of February 19 into the morning of February 20, 1995. It is well-established that a need and use for drugs can serve as a motive for a killing. If the evidence is relevant, the mere fact that testimony of another crime may be prejudicial does not bar its introduction into evidence. *See Commonwealth v. Hall*, 523 Pa. 75, 519 A.2d 374 (1986) (fact that the victim had cheated the defendant in a recent drug deal was admissible and relevant evidence to establish the motive for a killing); *Commonwealth v. Gelber*, 406 Pa. 382, 594 A.2d 672 (1991) (evidence that defendant used drugs and needed money to purchase drugs admissible to prove defendant's motive to commit murder); *Commonwealth v. Potts*, 388 Pa.Super. 593, 566 A.2d 287 (1989) (theft of drugs from defendant admissible to prove his motive for a killing). For the reasons discussed, this first claim regarding trial court error must be rejected.

. . . . .

As his second claim of trial court error, this [petitioner] states in his 1925(b) Statement of Matters on Appeal that: "2. The trial court committed reversible error when it admitted other crimes evidence of [Petitioner's] prior drug sales (N.T. 2/16/96, p. 20)." The discussion of this claim must be gleaned by the reader with a most cautious eye since the claim could possibly be drafted incorrectly and an inaccurate place in the record is stated. First, there is no evidence this record relating to this [petitioner's] prior drug sales to any person. Consequently, it would appear that any well-intended claim based *on Forman's past sales of drugs to Ramirez* has been waived since it was inaccurately stated in the 1925(b) statement. A search of the portion of the record cited in the 1925(b) statement indicates that no harm or prejudice resulted from the questions and answers given by Melanie Forman, the subject witness. In the absence of a defense objection, Forman testified that she had not sold drugs directly to Ramirez on the night of this murder. [N.T. dated 12/16/97 at pp. 19-20].

On the other hand, the direct examination of Melanie Forman by District Attorney Gilson reveals the following:

QUESTION: Okay. You can't tell us what Sara told you. But let me ask you this: Do you know the [petitioner] in this case Edward Ramirez?

ANSWER: Pretty well.

QUESTION: Do you know him to go by a nickname?

ANSWER: No.

QUESTION: Where do you know him from?

ANSWER: Frankford.

QUESTION: And where did you meet him? How was it that you knew him?

ANSWER: Buying drugs.

QUESTION: Had he bought drugs from you?

ANSWER: Yes.

QUESTION: On that night that Sara Hurd was coming to your house to buy drugs, did Edward Ramirez ever come to your house to buy drugs?

ANSWER: Yes.

QUESTION: When was that?

BY MR. McMAHON: Objection. May we see your Honor at sidebar?

[N.T. dated 12/16/97 at pp. 9-10]. While defense counsel's *1925(b) Statement of Matters on Appeal* claims reversible error due to this Court's admission of evidence of Ramirez's prior drug sales, the objection that was made by attorney McMahon was not responsive to the specific question asked regarding Forman's past sales of drugs to Ramirez. The objection that was lodged was, in fact, in response to the District Attorney's question to Melanie Forman as to whether Ramirez bought drugs from her *after* the robbery and murder of Joyce Dennis. To preserve an issue for appeal, a party must make a timely, specific objection at trial. *Commonwealth v. Hubbard*, 472 Pa. 259, 295 A.2d 687 (1977); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Sampson*, 454 Pa. 215, 311 A.2d 624 (1973); *Commonwealth v. Rosenfelt*, 443 (Pa.Super. 616, 662 A.2d 1131 (1995); *Commonwealth v. Montalvo*, 434 Pa.Super. 14, 641 A.2d 1176 (1994) (*citing, Commonwealth v. Smith*, 414 Pa.Super. 208, 606 A.2d 939 (1992)). Timeliness requires that the objection be made to the question before the answer is given, where possible, or to an offer of proof at the time it is made. *See, Pa.R.E. 103(a)(1); Ohlbaum on the Pennsylvania Rules of Evidence,* §103.08 (1998). *See also, Commonwealth v. Perry*, 403 Pa.Super. 212, 588 A.2d 917 (1991). Because defense counsel's objection to the question of Melanie Forman's past drug sales to Ramirez was not pressed in a timely fashion, this claim is waived. However, in response to defense counsel's belated objection to this line of questioning, this Court, out of the presence of the jury, offered to provide a curative instruction to the jury, to which attorney McMahon replied. "I don't think it would help at this point." [N.T. dated 12/16/97 at  pg. 19]. Regrettably defense counsel's refusal of this Court's offer of a curative instruction to its belated objection has also waived this claim as a viable issue on appeal. *Commonwealth v. Norman*, 379 Pa.Super. 212, 549 A.2d 981 (1988) (counsel's refusal of trial court's offer to give a cautionary instruction, even for legitimate

tactical reasons, waived that issue on appeal). In any event, since Melanie Forman made triplicate denials regarding the absence of direct purchases by Ramirez of drugs from her that night, the area of inquiry was ultimately not prejudicial to this [petitioner] on that issue. [N.T. dated 12/16/97 at pp. 19-20]. Moreover, it would appear that the second sequence of questions into this same subject matter [N.T. dated 12/16/97 at pp. 19-20] of inquiry presents another instance of waiver resulting from defense counsel's failure to object to the subject question right after it is presented and before an answer is given by the witness' response. Lastly since the 1925(b) statement is cast in terms of this [petitioner's] sales of drugs in lieu of purchases of same, it would appear that any claim as to the latter activities has been waived under *Commonwealth v. Lord, supra* ("any issues not raised will be deemed waived").

. . . . .

The [petitioner's] third assignment of error is that this Court erred in allowing William Weihe to testify at trial concerning a threatening letter he received. The pertinent portions of the direct examination of Weihe by District Attorney Gilson is as follows:

QUESTION: Since you've been in prison, have you received any letters or notecards of a threatening nature?

ANSWER: Yes I have.

BY MR. McMAHON: Objection, your honor, may I see you at sidebar?

[N.T. dated 12/16/97 at  pg. 242]. Because of the timeliness of defense counsel's objection, neither the source nor the content was revealed to this jury regarding the alleged threatening letters. Moreover, following a sidebar conference out of the presence of the jury, this Court delivered three-page curative instructions to this jury to ignore the question and answer regarding threats received by Weihe and to not use that information against this [petitioner] in their deliberations. [N.T. dated 12/16/97 at  pp. 254-257]. In addition to this Court's extended curative instructions, as stated, this jury was never exposed to the contents of these allegedly threatening letters nor were the identities of the author or authors disclosed to this jury in open court. A trial court's use of curative instructions is an approved and encouraged practice which is normally adequate to remove the taint of prejudicial matters that are brought to a jury's attention. *Commonwealth v. Starks*, 479 Pa. 51, 387 A.2d 829 (1978). Generally, the standards used to determine the efficacy of cautionary instructions are that they be delivered promptly, that they be specifically tied to the potentially prejudicial fact or event, and that they be clearly and firmly worded to advise the jury that it must disregard the prejudicial event. *Commonwealth v. Talley*, 456 Pa. 574, 318 A.2d 922 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974); *Commonwealth v. Shoemaker*, 240 Pa. 255, 87 A. 684 (1913); *Commonwealth v. Wiggins*, 231 Pa.Super. 71, 328 A.2d 520 (1974). Finally, the jury is presumed to follow a court's cautionary instructions. *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992); *Commonwealth v. Steele*, 522 Pa. 61, 559 A.2d 904 (1989). Therefore, this claim is meritless since this Court's extended cautionary instructions encompassing three pages of notes of testimony fully met all of the aforesaid standards regarding the efficacy of such instructions. Further, no evidence of a nature prejudicial to this [petitioner] was presented for consideration by this jury following this court's sustaining of an objection to the question designed to elicit such evidence.

*Commonwealth v. Ramirez*, September Term, 1996, Nos. 0391 1/6, 2/6, 6/6, slip op. at 28-38

(C.C.P. Philadelphia County, May 13, 1999); Amended Petition, Appendix, Exhibit R,

Document 14-2 at 38-48; Commonwealth's Response, Document 27-1 at 28-48.

Upon appeal, the Superior Court of Pennsylvania first discussed the waiver of these

issues:

[Petitioner] first complains that the Trial Court erred by admitting the testimony of Joseph Maio and William Weihe concerning [Petitioner's] use of illegal drugs on the afternoon before [Petitioner] killed Mrs. Dennis. [Petitioner] contests the propriety of this testimony on the grounds that it constitutes prejudicial "other crimes" evidence which is irrelevant to the crimes at issue in this case. Before evaluating the merits of [Petitioner's] substantive claim, we must first address the Commonwealth's allegations of waiver.

The Commonwealth urges us to find this issue waived under Rules of Appellate Procedure 2119(c) and (e), because of [Petitioner's] failure to identify precisely the locations in the record at which the challenged testimony occurs. The certified record in this case is voluminous, comprising items sufficient to fill a large carton. Under ordinary circumstances we would agree with the Commonwealth that [Petitioner's] failure to provide precise citations to all of the challenged testimony constituted a waiver of this claim. *See Commonwealth v. Rodgers*, 605 A.2d 1228, 1239 (Pa.Super. 1992), *appeal denied*, 532 Pa. 655, 615 A.2d 1311 (1992) (appellate court cannot review issue in the face of voluminous record if appellant neglects to provide proper citations to precise location in that record where alleged error occurred). However, in the instant case, Judge Latrone's meticulous opinion provides the necessary information for our use. We therefore decline to find waiver on this basis as we are not substantially hampered in our evaluation of [Petitioner's] argument.

Nevertheless, we cannot consider [Petitioner's] allegations concerning the admission of Mr. Weihe's testimony because [Petitioner] did not lodge a proper objection to it during the trial. *See* N.T. Trial, 12/16/97, a t 78-90 (testimony of William Weihe concerning [Petitioner's] use of illegal drugs on the afternoon and early evening of February 19, 1995). To preserve an issue for review, a party must make a timely and specific objection at trial. *Commonwealth v. Brown*, 701 A.2d 252, 254 (Pa.Super. 1997). The Superior Court will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected. *Id. Accord Commonwealth v. Smith*, 606 A.2d 939, 942 (Pa.super. 1992), *appeal denied*, 533 Pa. 624, 620 A.2d 490 (1993). *See also Commonwealth v. Brown*, 669 A.2d 984, 988 (Pa.Super. 1995) (*en banc*), *aff'd*, 550 Pa. 580, 708 A.2d 81 (1998) (if an issue is not properly preserved at trial, it is waived for purposes of appellate review). We therefore will consider [Petitioner's] claim only as it pertains to the testimony of Joseph Maio, to which a timely and specific objection was made. *See* N.T. Trial, 12/12/97, at 71 (objection to Maio's testimony concerning [Petitioner's] use of illegal drugs on the date in question).

The thrust of [Petitioner's] argument is that the Trial court erred in permitting Joseph Maio to testify that he, [Petitioner], and William Weihe consumed illegal drugs on the afternoon before [Petitioner] killed Joyce Dennis. [Petitioner] was not charged with any drug offenses, and thus he contends that the evidence concerning his drug consumption was unduly prejudicial as well as irrelevant to the matter before the jury. We disagree.

Unquestionably, the admission or exclusion of "other crimes" evidence is within the sound discretion of the trial court. *Commonwealth v. Bracey*, 541 Pa. 322, 337, 662 A.2d 1062, 1069 (1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996). The admission of such evidence is justified so long as the need for it outweighs the potential prejudice to the defense. *Id.*

> The often-stated rule in Pennsylvania governing evidence of other crimes is that such evidence is not admissible solely to show a defendant's bad character or propensity for continuing criminal acts. However, not all references which may indicate prior criminal acts warrant reversal. Mere passing references to prior criminal activity will not require reversal unless the record illustrates definitively that prejudice resulted from the reference. In addition, it is also well-established that evidence of other crimes may be admitted where there is a legitimate evidentiary purpose for such evidence.

*Id.*, 541 Pa. at 337-338, 662 A.2d at 1069 (quotation and citations omitted). Such evidence is generally admissible if it tends to establish motive, intent, absence of mistake or accident, commission of the crime, identity of the person charged with commission of the crime, or when it concerns the chain or sequence of events which formed the history of the case. *Commonwealth v. Banks*, 677 A.2d 335, 353-344 (Pa.Super. 1996), *appeal denied*, 548 Pa. 613, 693 A.2d 585 (1997). The learned Trial Judge was aware of the correct legal standard, and has so stated expressly and in detail. *See* Trial Court Opinion at 29-30, 31-32. Judge Latrone admitted Joseph Maio's testimony for the purpose of elucidating the events that led up to the robbery and murder of Joyce Dennis and for the purpose of establishing [Petitioner's] motive to commit these crimes. *Id.* at 28.

At trial, Maio explained that he was with [Petitioner] and Weihe on the afternoon and evening before these criminal events. N.T. Trial, 12/12/97, at 68, 85. The witness stated that the three friends, accompanied by a person named "T.A.," smoked "angel dust" rolled into "blunts" while they waited for a SEPTA bus to take them to a party at the home of Sara Hurd. *Id.* at 69-70, 76-78.[20] According to Maio, the Hurd household was known for its wild, drug-filled parties. *Id.* at 80-81. However, Maio stated that [Petitioner] had no money even to pay for his bus fare, let alone for drugs. *Id.* at 78-79.[21] Nevertheless, when [Petitioner] arrived at the Hurd residence, shortly after the time of the laundromat robbery, his pockets were full of money in the form of handfuls of quarters and small denomination bills. *Id.* at 136, 141-144. [Petitioner] used his

---

[20] Phencyclidine is also known as "angel dust" and "PCP." *See* P.A. Berger, M.D., "Phencyclidine," Microsoft Encarta Online Encyclopedia 2000, http://encarta.msn.com, 1997-2000 Microsoft Corporation. A "blunt" is a hollowed-out cigar from which the tobacco has been partially removed and replaced with illicit drugs. N.T. Trial 12/12/97, at 77.

[21] This point was corroborated by William Weihe, who stated that [Petitioner] had no money to pay for the bus. N.T. Trial, 12/16/97, at 85-86. Weihe also stated that he had money, but was tired of expending it on [Petitioner's] behalf. *Id.*

money to fund some of Sarah Hurd's purchases of illicit drugs for himself and the other guests at the party. *Id.* at 90-91. *See also* N.T. Trial, 12/16/97, at 4-33 (testimony of Melanie Forman concerning her sales of drugs to Sarah Hurd during the relevant time frame).

As Judge Latrone has commented aptly, Maio's testimony clearly established that [Petitioner] lacked money and elucidated [Petitioner's] reasons for needing it. Trial Court Opinion at 33. The testimony also demonstrated that [Petitioner] suddenly had money and used it immediately after the time of the robbery and murder. We therefore agree with Judge Latrone that Maio's testimony was relevant to establish [Petitioner's] motive, as well as the chain of events leading up to the commission of these two crimes. In addition, Maio's testimony was specifically relevant to establish the existence of a criminal conspiracy between [Petitioner] and Weihe.[22] We affirm the Trial Court's ruling on this issue. *See* Trial Court Opinion at 28-33 (explaining in detail Judge Latrone's rationale for admitting this evidence).[23]

[Petitioner] next complains that the Trial Court erred in permitting Melanie Forman to testify concerning her sale of drugs to [Petitioner] on occasions other than during Sarah Hurd's party on the night of the robbery and murder at issue here. Among other things, [Petitioner] argues that his contentions are so obviously meritorious, that the Trial Court elected not to address this issue. [Petitioner] is incorrect. Judge Latrone did indeed address this contention in full. *See* Trial Court Opinion at 33-36.

We have carefully considered [Petitioner's] argument as well as Judge Latrone's response. In addition, we have scrutinized the relevant portions of the certified record. We agree with Judge Latrone that the witness' "passing reference" to her reason for being acquainted with [Petitioner], *i.e.,* his prior drug purchase from her, could not have "prejudiced" [Petitioner] within the meaning of *Bracey, supra.* We find that Judge Latrone demonstrated his awareness of the correct legal standard for handling this question, and that the pertinent case law supports his ruling. We also find that the Trial Court Opinion accurately sets forth the information of record in this case. Because we agree with Judge Latrone's rationale and conclusion, we affirm on the basis of the Trial Court Opinion with regard to this claim. *See* Trial Court Opinion at 33-36.

[Petitioner] next complains that the Trial Court committed reversible error by permitting William Weihe to testify that he received a threatening letter. Citing *Commonwealth v. Fell*, 453 Pa. 531, 309 A. 2d 417 (1973), [Petitioner] contends that the challenged evidence was irrelevant to any issue at trial, and therefore was inadmissible. While we agree that *Fell* stands for this proposition, [Petitioner] has neglected to add that our Supreme Court also held therein that the admission of inadmissible evidence does not give rise to the right to a new trial unless the evidence created actual prejudice in the defendant's case. *Id.*, 453 Pa. at 539, 309 A.2d at 420.

---

[22] Among other pertinent points, Maio's testimony in this regard corroborated Weihe's evidence concerning his association with [Petitioner] in the hours preceding the crimes at issue here, and also elucidated the nature, scope and purpose of the criminal conspiracy in which Weihe engaged with [Petitioner]. *See* N.T. Trial, 12/16/97, at 78-151 (testimony of William Weihe).

[23] We are cognizant of [Petitioner's] argument that references to his drug usage were particularly damaging to his credibility with the jury, and therefore tainted their impression of his testimony. [Petitioner's] Brief at 20. This contention is meritless and misleading. [Petitioner] did not testify at trial. *See* N.T. Trial, 12/19/97, at 31-37 (colloquy concerning [Petitioner's] election not to testify on his own behalf).

Evidentiary rulings are committed to the sound discretion of the trial judge. *Commonwealth v. Johnson*, 556 pa. 216, 242, 727 A.2d 1089, 1102 (1999), *cert. denied*, _____ U.S. _____, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000). The trial court's evidentiary rulings will not be reversed by an appellate court absent a "clear abuse" of that discretion. *Id.* The question of whether to declare a mistrial because of improperly adduced testimony also rests within the sound discretion of the trial judge. *Commonwealth v. Pearson*, 685 A.2d 551, 554 (Pa.Super. 1996), *appeal denied,* 549 Pa. 699, 700 A.2d 439 (1997). This Court will not reverse the trial court's decision to grant or deny a mistrial in the absence of an abuse of discretion. *Id.*

At [Petitioner's] trial, the following exchange occurred:

Q. [By the prosecutor]: since you've agreed to plead guilty, cooperate and testify, you've been in prison?

A. Yes.

Q. Since you've been in prison, have you received any letters or notecards of a threatening nature?

A. Yes, I have.

MR. McMAHON [defense counsel]: Objection, Your Honor. May I see you at sidebar?

THE COURT: Yeah.

N.T. Trial, 12/16/97, at 242.

At this point, the Trial Court conducted a sidebar discussion out of the jury's hearing. *Id.* at 242-254. Judge Latrone thereupon concluded that the threats emanated from a source other than [Petitioner], and that the Commonwealth could not question Weihe about the threatening mail he received in prison. The Trial Court therefore sustained the objection, but denied a mistrial, and determined that a cautionary instruction was necessary. *Id.* at 254. Judge Latrone subsequently instructed the jury as follows:

THE COURT: All right. I had told you previously in the preliminary instructions that I rule on the admissibility of evidence. And I think if somebody remembers – or you ought to remember – I said I make the rulings. You're the fact finders.

The last question and answer relating to any threats while the witness in the box has been presently in prison is hereby stricken from the record for this plain reason: such evidence of conduct by any of us in the position of the [petitioner], anybody, that he wanted through act or deed to suppress evidence, to wit, the culpatory evidence, from any witness, this specific witness in the box, would indicate a consciousness of guilt.

The general proposition is that an accused's conduct that constitutes an intent to suppress what would otherwise be incriminating evidence is evidence of consciousness of guilt.

You don't want something that's going to hurt you legally or inculpate you with wrongdoing up above the surface. You want to expunge it, throw it under the rug and not let it be used against you. Okay.

Now, but logically enough, in the annals of prison lore, somebody is, anybody that is an informant or gives testimony against another accused, they go like – or outside in society, you heard of a snitch. Snitches generally become undesirable and unfavorable people. It's nothing – the only time that you can attribute any of the threatening conduct to an accused in the case is when there has been direct or circumstantial evidence, either or both, that links the threats as constituting the conduct or the act or those associated with the [petitioner] that are causing the threats to snuff out the inculpatory or to eliminate the inculpatory evidence that's coming from the mouth of the informant or the snitch.

In this case, there is absolutely no evidence linking the threats that were admittedly made through the answer to this witness. Therefore, its mere speculation, guesses, surmise, where they came from, in the prison, out of prison, so forth; so that in both rational, analytical terms, you can't attribute to the [petitioner]. It could have come from people who just dislike in principle the witness or have some other reason unrelated to what the normal means of the accused would be in the case. So since those threats were not linked to the [petitioner], I have ordered them stricken from the record, the question and answer. You disregard them as if they weren't presented as evidence in this case. Okay? You understand?

As a general proposition, where there's  evidence that threats to intimidate a witness are presented in a case, they're not admissible in a trial unless there's additional proofs linking those threats that were made even if they were made to the accused directly or [by] some agent, association or person acting in his behalf or for his benefits. Here, there is no evidence proving that. So they are coming from a source not attributable to the [petitioner]. So you don't use it against them. You disregard them. And forget about it. Clear enough? Fine.

*Id.* at 254-257.

    A mistrial is not necessary every time inadmissible testimony is placed  before the jury. *Pearson*, 685 A.2d at 554. This is so because the trial judge may promptly and adequately give a cautionary instruction to cure what might otherwise constitute reversible error. *Id.* As Judge Latrone has noted correctly in his opinion, because of the timely objection of defense counsel, neither the source nor the content of any threats received by the witness were revealed to the jury. Trial Court Opinion at 37. Furthermore, the Trial Court's comprehensive curative instruction fully warned the jury that it could not consider either the prosecutor's question or Weihe's answer. Judge Latrone also instructed the jury that it was impermissible to speculate upon the matter of whether the witness received threats and if so, from whom the threats might have emanated. Moreover, our law is quite clear that in the absence of proof to the contrary, "the jury is presumed to have followed the trial court's instructions." *Commonwealth v. O'Hannon*, 557 Pa. 256, 262, 732 A.2d 1193, 1196 (1999). Under the circumstances of this case, we find

that it was not an abuse of discretion for Judge Latrone to deny a mistrial predicated on Weihe's answer to the prosecutor's question.

In this context, [Petitioner] further complains that because the jury was left to infer that he or his family had threatened Weihe, [Petitioner's] father had no credibility when he testified on [Petitioner's] behalf. We find no merit to this argument. We have already considered and rejected the contention that the jury was left to infer that [Petitioner] or his family were responsible for the threats to Weihe. The Trial Court's curative instruction was more than adequate on this point. Thus, the credibility of [Petitioner's] father was in no way impacted by Weihe's passing reference to threats from an undisclosed source.

[Petitioner] also contends that the Commonwealth's behavior in this regard was particularly egregious in that, during cross-examination, the prosecutor "focused on questions that implied that Mr. Ramirez [Petitioner's father] tampered with the court proceedings and attempted to influence witnesses." [Petitioner's] Brief at 24. Our scrutiny of the relevant transcript discloses that the prosecutor never questioned Mr. Ramirez about threats to William Weihe. Rather, the prosecutor properly cross-examined [Petitioner's] father about his own violation of the Trial Court's sequestration order with regard to witness Sara Hurd. *See* N.T. Trial, 12/19/97, at 14-28 (cross examination of Eduardo Ramirez, Sr.)., No defense objection was raised during the entirety of this cross-examination. *Id.* Thus, we conclude that the certified record provides absolutely no support for [Petitioner's] contentions that the prosecutor improperly emphasized Weihe's passing reference to unspecified "threats," or that he behaved in an inappropriate manner during the cross-examination of [Petitioner's] father.

*Commonwealth v. Ramirez,* No. 1030 Philadelphia 1998, slip op. at 3-14 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 66-77; Commonwealth's Response, Document 27-2 at 3-14.

In his PCRA proceedings, Petitioner again brought before the court the issues of the threatening letters and "other crimes" testimony; however, they were addressed as prosecutorial misconduct and ineffective assistance of counsel. The Superior Court opined in pertinent part:

In his third issue, [Petitioner] asserts the prosecutor questioned Mr. Weihe regarding threatening letters he had received while [Petitioner's] case was pending. [Petitioner] insists the prosecutor implied that [Petitioner] was responsible for the letters, even though the prosecutor had no evidence to connect [Petitioner] to the letters. [Petitioner] contends the prosecutor violated [Petitioner's] due process rights by deliberately eliciting inadmissible and unproven "other crimes" testimony. [Petitioner] avers the trial court compounded this error by issuing a curative instruction as if the letters actually existed, despite a lack of any evidence to support Mr. Weihe's testimony about the threats. [Petitioner] submits the court's curative instruction improperly vouched for Mr. Weihe's credibility, and counsel should have objected to the instruction.

[Petitioner] further argues that the prosecutor deliberately elicited inadmissible "other crimes" testimony form Ms. Forman. [Petitioner] maintains the prosecutor questioned Ms. Forman about her past drug transactions with [Petitioner]. [Petitioner] avers his purported drug use on occasions "other than the date of this crime, even if true, was obviously wholly irrelevant, and transparently had no probative value whatsoever." ([Petitioner's] Brief at 53). [Petitioner] complains the prosecutor provided no basis for the admission of Ms. Forman's testimony, and trial counsel failed to raise a timely objection. [Petitioner] concludes trial counsel was ineffective in handling the alleged prosecutorial misconduct. We disagree.

"Evidence of prior crimes or bad acts may not be presented at trial to establish the defendant's criminal character or proclivities." *Commonwealth . Hudson*, 955 A.2d 1031, 1034 (Pa.Super. 2008), *appeal denied,* 600 Pa. 739, 964 A.2d 1 (2009).

This rule is violated where evidence presented to the jury either expressly, or by reasonable implication, indicates that the defendant has engaged in other criminal activity. However, mere passing reference to prior criminal activity is insufficient to establish improper prejudice by itself. The inquiry into whether prejudice has accrued is necessarily a fact specific one.

If evidence of prior criminal activity is inadvertently presented to the jury, the trial court may cure the improper prejudice with an appropriate cautionary instruction to the jury. However, the instruction must be clear and specific, and must instruct the jury to disregard the improper evidence.

*Id.* (internal citations omitted).

Instantly, the prosecutor questioned Mr. Weihe about the various statements he had provided to the police during the course of the murder investigation. On cross-examination, trial counsel questioned Mr. Weihe about specific allegations within these statements, including a claim that Mr. Weihe feared [Petitioner] and his family. The prosecutor revisited this topic on redirect examination as follows:

[COMMONWEALTH]: Since you've been in prison, have you received any letters or notecards of a threatening nature?

[MR. WEIHE]: Yes, I have.

(*See* N.T. Trial, 12/16/97, at 242.) At that point, trial counsel immediately objected and requested a sidebar. During the sidebar, trial counsel moved for a mistrial, claiming the jury would attribute the alleged threats to [Petitioner]. Upon questioning from the court, the prosecutor admitted he could not link the threats to [Petitioner] Consequently, the court sustained defense counsel's objection and offered to give a cautionary instruction.

Defense counsel was not satisfied with just a cautionary instruction and continued to argue that the jury would make an "impermissible inference" from Mr. Weihe's testimony that

he had received threatening letters. (*Id.* at 250). Defense counsel again requested a mistrial claiming, "At this juncture after the answer has already been out…no curative instruction is going to help…." (*Id.* at 254). The court declined to grant a mistrial and instructed the jury as follows:

> In this case, there is absolutely no evidence linking the threats that were admittedly made through the answer [from] this witness. Therefore, it's mere speculation, guesses, surmise, where they came from, in the prison, out of prison, so forth; so that in both rational, analytical terms, you can't attribute to [Petitioner]. It could have come from people who just dislike… the witness or have some other reason unrelated to what the normal means of the accused would be in the case. So since those threats were not linked to [Petitioner], I have ordered them stricken from the record, the question and answer. You disregard them as if they weren't presented as evidence in this case. Okay? You understand?
>
> As a general proposition, where there's evidence that threats to intimidate a witness are presented in a case, they're not admissible in a trial unless there's additional proofs linking those threats that were made even if they were made to the accused directly or some agent, association or person acting [on] his behalf or for his benefits. Here, there is no evidence proving that. So they're coming from a source not attributable to [Petitioner]. So you don't use it against them. You   disregard them. And forget about it. Clear enough? Fine.

(*Id.* at 256-57). Here, the court did not vouch for Mr. Weihe's credibility. Rather, the court issued an adequate instruction, informing the jury to disregard both the prosecutor's question and Mr. Weihe's answer. *See Hudson, supra.* Again, we can presume the jury followed the court's instruction. *See Mollett, supra.* Although counsel did not object to the cautionary instruction, we conclude counsel was not ineffective for failing to object to an otherwise adequate instruction. *See Pierce, supra; Taylor, supra.*

> Regarding Ms. Forman, she testified as follows:
>
> [COMMONWEALTH]: Do you know [Petitioner] to go by a nickname?
>
> [WITNESS]: No.
>
> [COMMONWEALTH]: Where did you know him from?
>
> [WITNESS]: Frankford.
>
> [COMMONWEALTH]: And where did you meet him? How was it that you knew him?
>
> [WITNESS]: Buying drugs.
>
> [COMMONWEALTH]: Had he bought drugs from  you?

[WITNESS]: Yes.

[COMMONWEALTH]: On that night that Sara Hurd was coming to your house to buy drugs, did [Petitioner] ever come to your house to buy drugs?

[WITNESS]: Yes.

[COMMONWEALTH]: When was that?

(*See* N.T. Trial, 12/16/97, at 9-10.) At that point, trial counsel objected and moved for a mistrial. Trial counsel vigorously argued that the only purpose for Ms. Forman's testimony was "to portray [Petitioner] as a regular and frequent user of drugs," and "[t]he concept of prior drug usage from this witness is irrelevant…." (*Id.* at 11, 18). Ultimately, the court overruled the objection. On this record, we conclude counsel took appropriate steps to protect [Petitioner's] interests. Therefore, [Petitioner's] claim lacks arguable merit, and no relief is due.

*Commonwealth v. Ramirez,* No. 1684 EDA 2010, slip op. at 29-33 (Superior Court, February 6, 2012); Amended Petition, Appendix, Exhibit U, Document 14-2 at 119-123; Commonwealth's Response, Document 27-2 at 29-33.

I agree. The trial court denied Petitioner's motion for a mistrial and issued a curative instruction about the threatening letters, which the jury is presumed to have followed. Defense counsel was not ineffective for not objecting to this totally proper thorough instruction. In addition, the evidence submitted by Ms. Forman was found by the state courts to have permissible probative value and not to be unduly prejudicial. Nothing in the state courts' analysis of this entire claim was contrary to or involved an unreasonable application of clearly established Federal law or was based upon an unreasonable determination of the facts in light of the evidence presented. Mr. Ramirez's claim warrants him no relief.

5.  Ineffective Assistance of Counsel

In his next claim, Mr. Ramirez alleges that trial counsel was ineffective for failing to conduct an adequate investigation and to challenge the Commonwealth's case. Petitioner asserts that trial counsel failed to marshal proof that someone else committed the murder; he failed to

impeach Mr. Weihe with his own admission that he fabricated his account; he failed to impeach Mr. Maio with his own admissions that he fabricated his account; he failed to impeach Ms. Forman, and he failed to challenge the blood evidence and hair evidence.

These issues were considered at length by the state courts during Mr. Ramirez's PCRA proceedings. The PCRA court opined:

The [petitioner's] next set of arguments of ineffective assistance of counsel, nineteen in all, relate to his contentions that trial counsel failed to call essential witnesses, conducted a flawed pre-trial investigation, neglected to obtain critical discovery items, and did not object to the trial judge's allegedly erroneous instructions to the jury.

The [petitioner] first argues that trial counsel was ineffective for failing to investigate three witnesses who could have impeached Mr. Maio by revealing his "strong and compelling motive to lie". Though there was no real showing by the [petitioner] that the witnesses he cited would have offered the suggested testimony, there is no question that the testimony would have been cumulative and that any failure to produce it would have been harmless.

Mr. Maio was just one of many witnesses who testified that the [petitioner] had admitted to him that he had killed the decedent. Moreover, Mr. Maio was extensively cross-examined about the various statements that he had given to the police, and challenged with the fact that his first statement to the police was more than a year after the murder. The jury was given a plethora of reasons to disbelieve Mr. Maio, and they obviously chose not to do so because of the massive amounts of corroboration of his account of what the [petitioner] did and said.

Essentially the same argument is made by the [petitioner] as it relates to the supposed testimony of Mary Emmanuel. He claims that she would have impeached the damaging testimony offered by William Weihe by testifying that Mr. Weihe "told her he had lied about [petitioner's] participation in the crime". He also alleges that his trial counsel was ineffective for presenting Brook Williams and Sara Hurd as defense witnesses "without prior investigation or preparation". There is no substantive indication as to how their testimony would have been more exculpatory if it had been preceded by additional investigation or preparation.

As for Joanne Esquilin, the [petitioner] argues that she would have testified about phone conversations he had that night with her. The implication that he puts forth is that this testimony would have supported his defense theory that he left the laundromat after buying a soda and meeting her. One of the many problems with all of these arguments is that they in no way exclude culpability on the part of the [petitioner]. Even if Ms. Esquilin were to testify and she were to be believed, a factfinder could still easily conclude that the [petitioner] went back to the laundromat after meeting and talking to her to kill the decedent.

Despite any question as to the impact that these witnesses' testimony may have had on the outcome of the trial the [petitioner] cannot rely upon their proposed testimony because he

failed to follow the procedure necessary to have a PCRA court even consider it. The appellate courts have consistently held that to prove the ineffectiveness of prior counsel for not presenting a certain witness, a defendant must present an affidavit from the alleged witness, establishing that he or she was willing and available to testify at the defendant's trial.

In addition, the affidavit must include an account of the substance of the anticipated testimony. COMMONWEALTH-v-LOPEZ, 739 A.2d 485, 496 (Pa. 1999). COMMONWEALTH-v-LARK, 698 A.2d 43, 49 (Pa. 1997). In the instant case, the [petitioner] offered no such affidavits in regard to any of the witnesses that he now claims could have exonerated him, and instead only offered his "certification" of their proposed testimony.

The [petitioner] also complains that trial counsel was ineffective for failing to "properly investigate" Melanie Forman and to "confront" her with her federal plea agreement and federal "guidelines". Again Ms. Forman was thoroughly cross-examined by trial counsel, and her entire criminal record was exposed to the jury. [Petitioner] offers no reason why the introduction of the federal charges and guidelines relative to her case there would have persuaded the jury that she was not credible when she testified that she regularly brought drugs from him and also purchased drugs from him on the day of the murder. As is the case with the previous arguments, there is no showing that the introduction of the cited evidence would have had any effect on the jury's assessment of her credibility or would have persuaded them that she was being untruthful about the [petitioner's] purchase of drugs from her.

In addition, the [petitioner] alleges ineffective assistance of trial counsel for his failure to call as a witness or effectively cross-examine the homicide detectives in this case. He theorizes that this failure to "present the wealth of information the police had in their possession that pointed the finger of guilt away from [petitioner] and towards others" was reversible error. In fact, the [petitioner] has offered nothing that would represent any information of substance that would suggest that anyone but him was guilty of these crimes.

The [petitioner] cites the fact that three months after the decedent's murder, the police interviewed a woman, Ann Thompson, who had told them early in the investigation that she was in the laundromat on the evening of the murder. She was shown a photo array at that time, and she picked out a man named "Patrick Oberholtzer". She also said in the statement that was provided to trial counsel as part of the pre-trial discovery that he only looked "familiar", and that she was unable to say that he was actually the man who she had seen that night or whether she recognized his photo on the basis of seeing him on some other occasion. Thus, trial counsel could not be construed as ineffective for omitting a reference to this very dubious piece of information, or for deciding not to call homicide detectives in an attempt to demonstrate that there were other persons who they thought had committed these crimes.

As was stated in COMMONWEALTH-v-PETERKIN, 513 A.2d 373, 382 (Pa. 1986).

Failure of trial counsel to conduct a more intensive investigation or to interview potential witnesses does not constitute ineffective assistance of counsel, unless there is some showing that such investigation or interview would have been helpful in establishing the asserted defense, or would have developed more than was already known by trial

counsel. *Commonwealth v. Wade*, 501 Pa. 331, 461 A.2d 613 (1983); *Commonwealth v. Wallace*, 495 Pa. 295, 433 A.2d 856 (1981).

The [petitioner's] final evidentiary claim in support of his ineffectiveness of trial counsel argument revolves around the presence of "defensive wounds" to the hands of the decedent. He notes that fact that because of these wounds, the "initial efforts of the police to find the perpetrator concentrated on finding persons who had cuts or abrasions on their hands".

Even if one were to assume that the only investigatory angle that the police were pursuing was a person with abrasions, it is difficult to imagine the possible relevance of this proposed testimony. Though it is possible that the assailant incurred some injury during the attack, it is not even a probable conclusion in light of the fact that the decedent was beaten with a three-foot section of metal pipe while she was kneeling or lying on the ground. It is much more likely that she suffered defensive wounds but was unable to inflict any type of injury on her attacker as she attempted to ward off his fatal blows.

The [petitioner's] next claim is purely speculative in nature and reveals the speciousness of his ineffective assistance of counsel claims. He posits that trial counsel was ineffective for "not requesting DNA testing of the blood evidence found at the crime scene". He reasons that had it been tested, it "may have yielded something other than generic 'A' positive, and lead to possibly exculpatory physical evidence". The problem with this theory is that it shows a total lack of understanding of the PCRA process.

It is well established that "[a]n evidentiary hearing is not a discovery tool at the disposal of appellant for the purpose of developing testimony to support" claims for post-conviction relief. COMMONWEALTH-v-TRIMBLE, 615 A.2d 48, 51 (Pa.Super. 1992). A defendant is not permitted to assume or infer the facts that he must ultimately prove in order to procure PCRA relief. COMMONWEALTH-v-COLLINS, 687 A.2d 1112, 1115 (Pa. 1996). In COMMONWEALTH-v-PETRAS, 534 A,2d 483, 485 (Pa.Super. 1987), the Superior Court held that "an evidentiary hearing is not a discovery tool wherein counsel may conduct investigation and interrogation to search for vague or boilerplate allegations". If the [petitioner's] claims are evaluated in the context of the above reasoning, there is little doubt that these evidentiary claims have no merit and do not entitle him to collateral relief.

*Commonwealth v. Ramirez*, September Term, 1996, No. 0391 2/2, slip op. at 21-27 (C.C.P.

Philadelphia County, May 3, 2007); Amended Petition, Appendix, Exhibit D, Document 14-1 at

65-71.

The Superior Court of Pennsylvania also went to great lengths to consider these claims

and resolve them:

In his fifth issue, [Petitioner] complains trial counsel did not adequately investigate other possible suspects and failed to present certain witnesses who would have been helpful to the

defense. Specifically, [Petitioner] contends the police initially identified Kenneth Oberholtzer as a suspect, because they stopped him near the laundromat shortly after the murder, and he had visible injuries from being in a struggle. [Petitioner] asserts the police subsequently interviewed Ann Thompson, a customer at the laundromat on the night of the murder. [Petitioner] claims Ms. Thompson identified Mr. Oberholtzer's brother, Patrick, as being present at the laundromat before the murder. Further, [Petitioner] submits the Commonwealth's discovery materials revealed that one of the Oberholtzer brothers had sold drugs for Commonwealth witness Melanie Forman. [Petitioner] insists these circumstances demanded further investigation from trial counsel.

Likewise, [Petitioner] argues counsel failed to utilize witnesses to impeach the Commonwealth's witnesses. [Petitioner] submits trial counsel should have called Mary Emanuel, who would have testified that Mr. Weihe told her he had fabricated his account of the incident. [Petitioner] contends trial counsel could have called three witnesses, Billie Jo Blood, Sabrina Suarez, and Maureen Suarez, who would have testified that Mr. Maio had provided a false statement implicating [Petitioner]. [Petitioner] also maintains trial counsel could have impeached Ms. Forman by submitting evidence of her cooperation with federal authorities in other criminal matters. [Petitioner] concludes trial counsel was ineffective for failing to investigate, prepare, and present a defense at trial. We disagree.

"'[W]here matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests.'" *Commonwealth v. Smith*, _____ Pa. _____, _____, 17 A.3d 873, 888 (2011) (quoting *Commonwealth v. Colavita*, 606 Pa. 1, 21, 993 A.2d 874, 887 (2010)). "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Smith, supra* at _____, 17 A.3d at 888 (quoting *Colavita, supra* at 21, 993 A.2d at 887). "[A] claim of ineffectiveness will not succeed by comparing, in hindsight, the trial strategy trial counsel actually employed with the alternatives foregone." *Commonwealth v. Miller*, 605 Pa. 1, 27, 987 A.2d 638, 653 (2009).

"In a case where… the… issue is the credibility of the Commonwealth's witness…, failure to explore all alternatives available to assure that the [finder of fact] heard the testimony of a known witness who might be capable of casting a shadow upon the Commonwealth's witness's truthfulness is ineffective assistance of counsel." *Commonwealth v. Twiggs*, 460 Pa. 105, 111, 331 A.2d 440, 443 (1975). "If counsel's decision not to secure [defense testimony] as based on a reassessment of [the testimony's] worth and a conclusion that it was of little or no value in the posture of this case, then that decision clearly had some reasonable basis designed to effectuate [his client's] interests." *Id.* at 110, 331 A.2d at 443. "In such circumstances, counsel's conduct would not constitute ineffectiveness." *Id.*

Instantly, trial counsel testified about his strategies, over the course of a two-day PCRA hearing. PCRA counsel initially attacked trial counsel's decision not to call Ms. Thompson as a witness. In her statement to police, Ms. Thompson indicated she arrived at the laundromat between 10:30 p.m. and 10:45 p.m. on the night of the murder. Ms. Thompson started her wash and noticed a suspicious individual. Ms. Thompson described the individual as a white male,

medium height and build, with brown hair. This individual went to the back of the laundromat, near the soda and candy machines, and remained there for a few minutes. Ms. Thompson observed the individual enter and exit the laundromat four or five times without carrying any items in or out of the laundromat.

The individual's behavior made Ms. Thompson nervous, and it prompted her to finish her laundry in a hurry. Ms. Thompson, the last customer in the laundromat, also asked the victim what she does with the door after the last customer leaves. The victim informed Ms. Thompson that the victim locks the door, and she only opens it for people she knows. At approximately 12:30 a.m. or 12:45 a.m., Ms. Thompson left the laundromat and watched s the victim locked the door. Subsequently, police showed a photo array to Ms. Thompson. Ms. Thompson indicated the photo of Patrick Oberholtzer looked familiar, but she could not definitely state whether he was the individual at the laundromat on the night of the murder. (*See* Amended PCRA Petition, filed 1/28/03, at Exhibit K; [Petitioner's] Brief at Exhibit K.)

Trial counsel did not believe testimony from Ms. Thompson would have helped the defense:

> [N]umber one, in my mind, [Ms. Thompson was not there] at the time of the… murder. The murder was later.[24] This was 10:45, 11:00 [that she claimed to have seen the suspicious individual]. That's number one. Number two, the witness gives a description of a person that could fit the description of [Petitioner].
>
> She did not pick [Petitioner] out of the photo lineup, but she didn't say it was not him. And she… picks out an Oberholtzer [and] doesn't say that was the person that was there that night. She said she just recognizes him from somewhere. That's he's familiar but saying that it was that person.
>
> The risk that you run in calling somebody like that is, when she sees the person in person, not in photographs, and not in any way, shape, or form in an artificial way, but in reality sees him in court, she could identify him as being that individual, very possible, especially with the description.

(*See* N.T. PCRA Hearing, 1/3/05, at 71-72.) Trial counsel emphasized his concern that, if called to testify, Ms. Thompson could identify [Petitioner] as present in the laundromat on the night of the murder. Counsel did not want to risk his entire case "on a grandstand play to try to bring in Ann Thompson." (*Id.* at 73.)

Trial counsel also explained his reluctance to pursue the possibility that Mr. Olberholtzer or some other suspect had committed the murder. Significantly, trial counsel recognized that Mr. Weihe's testimony inhibited counsel's ability to blame the crime on another individual:

> [PCRA COUNSEL]: Strategically, you wanted to point the finger away from [Petitioner], right?

---

[24] Dr. McDonald testified the homicide occurred between 11:30 p.m. and 2:30 a.m. (*See* N.T. Trial, 12/17/97, at 56.)

[TRIAL COUNSEL]: Well, obviously, but not in the context of how this case developed with Mr. Weihe pleading guilty. You're forgetting one very critical point here, and that is, that Mr. Weihe has admitted his own involvement in placing [himself] at the scene and doing it with someone else.

. . . . .

But my opinion on trying the case, when a co-defendant has admitted his involvement, and placed [himself] at the scene, to now, go ahead and say to the jury, oh, it was some drifter, drug addict, knuckle-head… who happened to be in that area at the time would have been a foolish defense.

(*Id.* at 86-87). Here, trial counsel chose a particular course that had a specific reasonable basis designed to effectuate [Petitioner's] interests. Thus, counsel's assistance was constitutionally effective. *See Smith, supra*.

Regarding Ms. Emanuel's proposed testimony to discredit Mr. Weihe, trial counsel explained that he had already elicited evidence of Mr. Weihe's false statements:

[COMMONWEALTH]: In your case in chief, do you recall calling Detective Steven Vivarena to testify that Mr. Weihe admitted to detectives that he lied in his first statement to Homicide about [Petitioner's] involvement in this murder and falsely implicating Mary Emanuel?

[TRIAL COUNSEL]: Yes, I did.

[COMMONWEALTH]: Were you able to bring all of that testimony out, either on cross-examination of Mr. Weihe, or by calling Detective Vivarena in your case in chief?

[TRIAL COUNSEL]: Yes. The jury clearly heard that evidence that he, in fact, lied and falsely implicated somebody else.

[COMMONWEALTH]: Based upon your reviewing the statements from Ms. Emanuel, your speaking to her and investigating her, would you as a trial attorney see any reason to call her to testify to that same fact scenario that Mr. Weihe admitted that he lied to the police and falsely implicated her on?

[TRIAL COUNSEL]: There was no need to [do] it, number one. We already had that testimony in front of the jury. And number two, as I said, Mary Emanuel created a bunch of other problems I didn't need in my opinion.

. . . . .

[S]he was not the most credible witness in my opinion number one. And number two, her recollection of the events… would have been cross-examined on and would have been… subject to cross-examination, ant it conflicted a bit with… her father[, who also testified at trial].

And I didn't see, again, risk benefit, you know. I wasn't going to get anything really out of her other than what the jury already knew and that was a great risk….

(*See* N.T. PCRA Hearing, 1/4/05, at 53-54.) Because trial counsel assessed Ms. Emanuel's testimony and concluded it was of no value, counsel's decision had a reasonable basis designed to effectuate [Petitioner's] interests. *See Twiggs, supra.*

Further, trial counsel testified about his decision not to call additional witnesses to impeach Mr. Maio. Although trial counsel interviewed Billie Jo Blood, he did not think the jury would find Ms. Blood credible:

And I spoke to her on the telephone, spoke to her in my office. And it was my determination, based on her association with [Petitioner], close association with [Petitioner], that there was a bias.

The manner of testifying, her interest or drug abuse, all these things were—made her not a credible person that I felt comfortable with vouching in front of the jury. I did not think she would make a good impression.

Again, I think for [Petitioner's] good close friend to come in and say the main witness against him said he lied, I though was not very believable….

She was not—that might be good if it was an excellent witness, some fantastically credible, believable, you know, the parish priest or something, but that's not what Billie Jo Blood was. And I thought that again that would not be credible.

And I think when you're trying a case from the defense standpoint in a murder case, once you put on somebody that you think is a real—ahead of time, that you think is not believable or credible even yourself, you have to believe that twelve people are going to think that. And once they start thinking that you're putting up false testimony you could be sinking your whole ship.

(*See* N.T. PCRA Hearing, 1/4/05, at 32-33). Trial counsel also testified he did not know of the existence of Sabrina and Maureen Suarez. (*Id.* at 33).

In addition, the PCRA court observed:

Though there was no real showing by [Petitioner] that the witnesses he cited would have offered the suggested testimony, there is no question that the testimony would have been cumulative and that any failure to produce it would have been harmless.

Mr. Maio was just one of many witnesses who testified that [Petitioner] had admitted to him that [Petitioner] had killed the decedent. Moreover, Mr. Maio was extensively cross-examined about the various statements that he had given to the police, and challenged with the fact that his first statement to the police was more than a year after the murder. The jury was given a plethora of reasons to disbelieve Mr. Maio, and they obviously chose not to do so because of the massive amounts of corroboration of his account of what [Petitioner] did and said.

(*See* PCRA Court Opinion, May 3, 2007, at 21-22.) The record supports the PCRA court's conclusion; therefore, trial counsel was not ineffective on this basis. *See Commonwealth v. Showers*, 782 A.2d 1010 (Pa.Super. 2001), *appeal denied*, 572 Pa. 723, 814 A.2d 677 (2002) (stating counsel is not ineffective for failing to pursue cumulative evidence).

Regarding the impeachment of Ms. Forman, PCRA counsel questioned trial counsel about his knowledge of Ms. Forman's criminal record. PCRA counsel noted that trial counsel had questioned Ms. Forman about open drug charges in two state cases. PCRA counsel emphasized that the county prosecutor had actually transferred the cases to federal court, and trial counsel did not attempt to explain these circumstances to the jury. PCRA counsel repeatedly attacked trial counsel for leading the jury to believe that the county prosecutor had somehow dropped the charges. Trial counsel responded:

> But I believe that I created an even better image personally. And I argued it, if you read my closing argument, that, in fact [Ms. Forman] gives a statement and coincidentally, these cases were… dropped right after it.
>
> And it was not clear, I don't think with the jury, exactly what happened. And I don't think they really understand adoption all that well.
>
> And if you read my argument, my closing argument, I made the argument that she gives a statement. And then amazingly two state drug cases, and that was a state case that we're dealing with, get dropped. And I made that argument. And I said, is that just coincidence?
> . . . . .
> Nobody had any documentation otherwise. And I thought it came out better that way, personally. [The prosecutor] said it.
>
> I said that they were dropped. I argued that they were dropped because of her giving the statement. That's what I argued, and it came out better. Because [the prosecutor] didn't come in with the U.S. Attorney's plea agreement or anything to show what actually happened.

(*See* N.T. PCRA Hearing, 1/3/05, at 117-18)

PCRA counsel also questioned trial counsel about his failure to introduce a "sentencing memorandum" produced in conjunction with Ms. Forman's federal drug charges. Trial counsel testified he did not try to  get the memorandum, because he did not know it existed. Even if he had known about it, trial counsel testified the memorandum was unnecessary:

> Number one, the jury was fully aware that [Ms. Forman] was… a drug dealer. It was no secret. There's no mystery… that she was a drug dealer, therefore, we certainly had the argument as to her credibility regarding that very factor.
>
> Second of all, I was able to argue her credibility in regards to two drug cases being discharged right after giving her statement.

It created in my mind an argument that… there may have been some *quid pro quo*, and that was argued to the jury by me in my closing.

Third of all, we got out the fact that she was, in fact, convicted of a federal gun case which the jury was fully aware of. So everything about Melanie Forman certainly they were aware of…

. . . . .

Now, the sentencing [memorandum], which I've seen subsequent, doesn't change anything because her… cooperation had nothing to do with our case and would have been inadmissible, because it has nothing to do with cooperation in this case. It had to do with her cooperation against another fellow and her boyfriend. So it would have been clearly irrelevant and inadmissible.

(*Id.* at 124-25). Again, trial counsel's particular course had a reasonable basis designed to effectuate [Petitioner's] interests; and his assistance was constitutionally effective. *See Smith, supra*. Likewise, the PCRA court concluded, "[T]here is no showing that the introduction of the cited evidence would have had any effect on the jury's assessment of [Ms. Forman's] credibility or would have persuaded them that she was being untruthful about [Petitioner's] purchase of drugs from her." (*See* PCRA Court Opinion, May 3, 2007, at 24.)

To the extent [Petitioner] raises additional allegations of trial counsel's ineffectiveness for his alleged failure to adequately prepare for trial, [Petitioner's] bald assertions amount to nothing more than underdeveloped attacks against trial counsel's strategic decisions, and no additional analysis is required. We also emphasize: "Although a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. A defendant is entitled to a fair trial but not a perfect one." *Commonwealth v. Wright*, 599 Pa. 270, 298, 961 A.2d 119, 135 (2008) (quoting *Commonwealth v. Martinolich*, 456 Pa. 136, 162, 318 A.2d 680, 695 (1974), *cert. denied*, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974)). We conclude [Petitioner] is not entitled to relief on his allegations of ineffectiveness in conjunction with trial counsel's strategy and preparation. *See Smith, supra*. Therefore, we affirm the order denying PCRA relief.

*Commonwealth v. Ramirez*, No. 1684 EDA 2010, slip op. at 38-49 (Superior Court, February 6, 2012); Amended Petition, Appendix, Exhibit U, Document 14-2 at 128-139; Commonwealth's Response, Document 27-3 at 38-49. Clearly, a review of the record reveals that the state courts neither contradicted nor unreasonably applied federal law in denying this claim, and Mr. Ramirez is not entitled to federal habeas relief.

6. <u>Detective Vivarina's Opinion</u>

Mr. Ramirez further alleges that due process was violated when the prosecution solicited Detective Vivarina's expression of his personal opinion that he believed that Mr. Weihe was telling the truth.

During Petitioner's direct appeal, the Court of Common Pleas of Philadelphia County related the circumstances of this event as follows:

The [petitioner's] fourth claim of error is that this Court erred in allowing Homicide Detective Stephen Vivarina to express his personal opinion as to the truthfulness of William Weihe's police statement, Exhibit C-31, which was taken on July 3, 1996. This assignment of error is meritless. During this trial, Detective Vivarina was testifying on December 18, 1997 as a defense witness pertinent to his investigation of the robbery and murder of Joyce Dennis. Pursuant to that investigation, a total of three police statements were taken from the codefendant William Weihe. In the first two of Weihe's statements taken shortly after these crimes, Exhibits C-29 and C-30, he exculpated himself and inculpated Ramirez. During cross-examination by the Commonwealth, Detective Vivarina testified to the circumstances surrounding Weihe's third statement which was taken on July 3, 1996, Exhibit C-31, as follows:

> QUESTION: After that interview was completed, do you remember having Weihe's mother and other members of his family brought to the Homicide Division?
>
> ANSWER: Yes, sir.
>
> QUESTION: What was the purpose of that?
>
> ANSWER: They were in Homicide and during the end of the interview, they showed up. I informed Mr. Weihe that his parents were there and that they were concerned about him. I informed his parents that he was being arrested for the murder of Joyce Dennis and he asked if he could talk to his parents. I said sure. I was somewhat concerned. I had a feeling that if I brought the parents in, I would get the truth and –
>
> QUESTION: Did you want a confrontation between Mr. Weihe and his parents?
>
> ANSWER: Yes, sir. I brought the parents into the room. I asked Billy Weihe to explain to his parents what happened. He sort of broke down and got a little emotional and told his parents the whole truth of how he was involved in the murder of Joyce Dennis, exactly the way the statement read, and he explained in detail what happened. They broke down, the parents broke down. They hugged and they kissed. **I was thoroughly convinced that he had told the truth.** [Emphais supplied]

[N.T. dated 12/18/97 at pp. 47-49]. Following a timely objection by defense counsel, this Court immediately delivered cautionary instructions to this jury that they must not be in any way affected by Detective Vivarina's opinion as to whether William Weihe was telling the truth.

[N.T. dated 12/18/97 at pg. 49]. Following a discussion in chambers, this Court delivered further cautionary instructions to this jury to strike Detective Vivarina's opinion from their minds and to determine for themselves the credibility of all witnesses who had testified in the case. [N.T. dated 12/18/97 at pp. 57-58]. A trial court's use of curative instructions is an approved and encouraged practice which is normally adequate to remove the taint of prejudicial matters that are brought to a jury's attention. *Starks, supra.* Indeed, the two separate and distinct sets of curative instructions given to this jury by this Court were delivered in a timely manner, were directed at the possibly prejudicial comments at issue, and they were clearly and firmly worded to advise the jury that it must disregard the possibly prejudicial event. *Talley, supra; Martinolich, supra; Shoemaker, supra; Wiggins, supra.* Therefore, this [petitioner's] specific claim is meritless and must be rejected for the reasons stated.

*Commonwealth v. Ramirez*, September Term, 1996, Nos. 0391 1/6, 2/6, 6/6, slip op. at 38-40,

Document 14-2 at 48-50; Commonwealth's Response, Document 27-1 at 38-40.

Upon appeal, the Superior Court opined:

[Petitioner's] fourth argument is that the Trial Court erred by permitting Detective Vivarina to express a personal opinion concerning the credibility of witness William Weihe. We agree with [Petitioner] that an expert may not provide testimony intended to bolster the credibility of other witnesses. *Commonwealth v. Pitts*, 740 A.2d 726, 733 (Pa.Super. 1999). This is so because witness credibility is solely within the province of the jury. *Id.* We also agree that the prosecutor may not vouch for the credibility of a government witness. *Commonwealth v. Reed*, 446 A.2d 311, 314 (Pa.Super. 1982). However, neither of these events happened in the present case.

The Trial Court has explained correctly the full circumstances surrounding the introduction of the challenged testimony. *See* Trial Court Opinion, at 38-40. Detective Stephen Vivarina testified concerning the difficulties created by the fact that William Weihe gave the police three separate statements, two of which exculpated himself but inculpated [Petitioner]. However, the investigating officers did not believe Weihe's initial two statements were entirely accurate, and pursued the matter. At the third interview, Weihe admitted that he assisted [Petitioner] and participated in the robbery and murder at the laundrdomat. All three of Weihe's written statements were admitted at trial. *See* Exhibits C-29 (Statement of William Weihe, dated 3/1/94), C-30 (Statement of William Weihe, dated 4/11/95), and C-31 (Statement of William Weihe, dated 7/3/96).

The prosecutor questioned Detective Vivarina as follows about the discrepancies in his statements.:

Q. [By the prosecutor]: You brought Weihe down on April 11th, 1995;

A. Yes. I had more information and I wanted to talk to him again.

Q. But you did not interview him; correct?

A. Out of an abundance of caution, we had two other detectives interview Mr. Weihe.

Q. You took the first statement from him and established sort of rapport with him at that time; correct?

A. Yes, sir.

Q. When you brought him down on April 11th, 1995, you were there and Detective Snell was there, your partner, correct?

A. Yes, sir.

Q. But you turned over that interview to some other detectives. Why did you do that?

A. As I said, as an abundance of caution, we asked two other detectives, Detectives Gross and Worrell to interview Mr. Weihe to get their feeling as to whether he was actually lying or not.

On the first statement we did, as I said earlier, I had the gut feeling that he was lying and we wanted two other detectives to talk to him and maybe get the same feel or whatever. They took the interview and talked to Mr. Weihe and took the interview. [sic]

Q. Now, after April 11th, 1995 and that statement, Weihe was interviewed for the last time in July of 1996; correct?

A. Yes, sir.

Q. And it was at that interview in which he implicated himself; correct?

A. Yes, sir.

Q. After that interview was completed, do you remember having Weihe's mother and other members of his family brought to the homicide division?

A. Yes, sir.

Q. What was the purpose of that?

A. They were in homicide and during the end of the interview, they showed up. I informed Mr. Weihe that his parents were there and that they were concerned about him. I informed his parents that he was being arrested for the murder of Joyce Dennis and he asked if he could talk to his parents. I said sure. I was somewhat concerned. I had a feeling that if I brought the parents in, I would get the truth and –

Q. Did you want a confrontation between Mr. Weihe and his parents?

A. Yes, sir. I brought the parents into the room. I asked Billy Weihe to explain to his parents what happened. He sort of broke down and got a little emotional and told his parents the whole truth of how he was involved in the murder of Joyce Dennis, exactly the way the statement read, and he explained in detail what happened. They broke down, the parents broke down. They hugged and they kissed. I was thoroughly convinced that he had told the truth.

[By defense counsel]: Objection and move to strike. May we see you at side bar or in the back?

N.T. Trial, 12/18/97, at 46-49. Judge Latrone granted the request for a sidebar, and immediately delivered a *sua sponte* curative instruction directing the jury to ignore Detective Vivarina's personal opinion. *Id.*, at 49. The Trial Court further cautioned the jury:

You determine what's the truth in this case. Don't be in any way affected by his opinion as to whether he was telling the truth or not.

*Id.*

At the sidebar, defense counsel moved for a mistrial on the grounds that the lead investigator in the case expressed an opinion that the statement William Weihe provided in July of 1996 was truthful. *Id.* at 49. Judge Latrone denied the mistrial, but gave the following additional curative instruction:

Ladies and Gentlemen, just obliterate from your minds what he believes or does not believe. You strike it out of your minds. You determine whether you believe all, part or none of that testimony from this witness at trial. That's the way it works. You determine believability and credibility and nobody's opinion. What they think, what they believe and what they feel about it and whether or not they believe him ain't important in any degree at all. Ignore it.

*Id.*, 57-58. During the final jury instructions, Judge Latrone repeatedly emphasized to the jury that the determination of credibility was their responsibility, and that it was their duty to use their own recollection and their own assessment of the witnesses' demeanor and testimony when reaching their determinations. N.T. Trial, 12/30/97, at 7-9, 11-12, 14-18, 20, 21-24, 26-29, 31-32, 80-81, 88-89.

As we have already stated, a mistrial is not necessary every time inadmissible testimony is placed before the jury. *Pearson supra.* If the trial judge provides a full and adequate cautionary instruction, there is no need to declare a mistrial. *Id.* Judge Latrone has stated correctly that defense counsel's timely objection prevented the police witness from providing any testimony concerning William Weihe's veracity beyond the bald statement that he believed Weihe finally told the truth in July of 1996. Trial Court Opinion at 39-40. Furthermore, we note that all of Weihe's statements inculpated [Petitioner], and none of them in any way exonerated [Petitioner]. *See* Exhibits C-29, C-30, and C-31, *supra.* When the Detective stated that he believed the third

statement, he was indicating that he believed Weihe was finally telling the truth about his *own* participation in the crime, not about *[Petitioner's]* involvement.

> We agree with the following assessment by Judge Latrone:
>
> A trial court's use of curative instructions is an approved and encouraged practice which is normally adequate to remove the taint of prejudicial matters that are brought to a jury's attention. Indeed, the two separate and distinct sets of curative instructions given to this jury by this court were delivered in a timely manner, were directed at the possibly prejudicial comments at issue, and they were clearly and firmly worded to advise the jury that it must disregard the possibly prejudicial event. Therefore, this [petitioner's] specific claim is meritless and must be rejected for the reasons stated.

Trial Court Opinion at 40 (citations omitted). We find that Judge Latrone's timely curative instructions, as well as his final instructions, were more than adequate to cure any possible prejudice stemming from Detective Vivarina's brief reference to the fact that he believed Weihe's inculpatory statement. The jury is presumed to follow the trial court's instructions. *O'Hannon, supra*. Thus, we can grant no relief on this claim.

*Commonwealth v. Ramirez*, No. 1030 Philadelphia 1998, slip op. at 14-19 (Superior Court, June 5, 2000); Amended Petition, Appendix, Exhibit T, Document 14-2 at 77-82; Commonwealth's Response, Document 27-2 at 14-19.

The record shows no indication that Detective Vivarina's statement had been intentionally solicited. The trial judge issued a prompt and thorough cautionary instruction, and there is nothing in the record to indicate that the jury did not heed that instruction. The state courts' resolution of this issue is entirely reasonable, and it does not violate federal law. Petitioner is not entitled to habeas relief for this claim.

       7.  <u>Cumulative Effect</u>

Finally, Mr. Ramirez claims that the cumulative prejudicial effect of the errors described in this Petition denied him due process and the effective assistance of counsel. Having found that Petitioner's above claims have been reasonably resolved by the state courts, and that they did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court, nor that they

resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented, this claim of cumulative error fails. Mr. Ramirez is not entitled to federal habeas corpus relief.

## **RECOMMENDATION**

For the reasons stated above, it is recommended that the Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. §2254 be DENIED AND DISMISSED WITHOUT AN EVIDENTIARY HEARING. It is further recommended that a finding be made that there is no probable cause to issue a certificate of appealability.

Petitioner is advised that he may file objections to this Report and Recommendation. See Local Rule of Civil Procedure 72.1. Failure to file timely objections may constitute a waiver of any appellate rights in this habeas action.

BY THE COURT:


_S/M. FAITH ANGELL_____
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE


By Email:
Hon. Petrese B. Tucker, Chief Judge
Susan M. Lin, Esq.                              susan_lin@fd.org
Jennifer O. Andress, Esq.                       jennifer.andress@gmail.com
Thomas W. Dolgenos, Esq.                        thomas.dolgenos@phila.gov